**brown**rudnick

MICHAEL J BOWE
MBowe@brownrudnick com

E PATRICK GILMAN
PGilman@brownrudnick com

Redactions approved.
Docket and file in 21-MC-425.
  So ordered.
5/17/2021

_____
J. PAUL OETKEN
United States District Judge

May 12, 2021

~~TO BE FILED UNDER SEAL~~

**BY EMAIL**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

RE: *In re Search Warrant dated April 28, 2021*, 21 Mag. 4591r (21 MC 00425)

Dear Judge Oetken:

Victoria Toensing, by and through counsel, respectfully requests that the Court order the Government to return materials seized from Ms. Toensing and, by extension, her clients pursuant to the above-captioned warrant and earlier covert warrants (the "Covert Warrants").[1] While Ms. Toensing agrees with the Government's April 29, 2021 letter ("Letter") that the circumstances require, at a minimum, a Special Master to oversee the review of information seized pursuant to these warrants, Ms. Toensing must be permitted to effectively assert her client's privilege protections and otherwise comply with her ethical obligations to inform them that the Government is in possession of potentially privileged and confidential materials.

To do so, Ms. Toensing should be afforded the same opportunity to review and assert the privilege that she and her clients would have had if this information were pursued through a subpoena as it normally would have been under similar circumstances. Whatever exigent circumstances the Government asserted to instead justify covert and overt search warrants in this instance were satisfied when the information was secured and preserved. The information should now be returned to Ms. Toensing and her counsel for a privilege and responsiveness review under the supervision of a Special Master. Moreover, the Government should disclose what seized information it has already reviewed and whether and what information it has provided to the case team. This is the fairest and only way for Ms. Toensing and her clients to adequately protect the

---

[1] The Covert Warrants related to Ms. Toensing's electronic data seized from her Google and Apple iCloud accounts: *In re Search Warrant dated Dec. 13, 2019*, 19 Mag. 11704 (Google) and *In re Search Warrant dated Nov. 4, 2019*, 19 Mag. 10364 (Apple iCloud). Based on what Ms. Toensing understands to be a haphazard initial review process of materials seized pursuant to the Covert Warrants, any process designed to protect the fundamental rights at stake in this matter must necessarily encompass information seized pursuant to the Covert Warrants in addition to the April 28, 2021 warrant.

fundamental Constitutional protections implicated by the seizure of electronic files from this *bona fide* criminal defense lawyer, including files concerning unrelated matters currently being investigated and prosecuted by the Department of Justice.[2] Counsel for Ms. Toensing conferred with the Government prior to filing this response and remains in communication with the Government.

### A. Background

Ms. Toensing is a *bona fide* criminal defense attorney with real clients, including clients who are the subject of active DOJ law enforcement matters.[3] The Government's seizure, previous wholesale review, and currently proposed review of her electronic criminal defense files directly implicates and jeopardizes *her clients'* privileged information and *their* Sixth Amendment rights to protect that privileged information. These actions also implicate Ms. Toensing's own interest in preserving the attorney-client privilege, ensuring she can effectively represent her clients, and fulfilling her ethical duties to her clients.

Although minimized in the Government's letter, prior to executing the above-captioned overt search warrant on Ms. Toensing on April 28, 2021, the Government covertly seized virtually identical data from Ms. Toensing's Apple iCloud and Google accounts pursuant to two Covert Warrants served upon third party service providers—Apple and Google—in 2019. *In re Search Warrant dated Dec. 13, 2019*, 19 Mag. 11704 (Google); *In re Search Warrant dated Nov. 4, 2019*, 19 Mag. 10364 (Apple iCloud). On their face, those search warrants were unclear as to their precise scope, Apple and Google were ill-equipt to determine what information was responsive or not, and their only interest and incentives would have been to be overly inclusive. Given the unrestricted breadth of the search warrants, it is virtually certain that the materials the Government received included substantial privileged and confidential information concerning clients and criminal matters that have nothing to do with this investigation, privileged and confidential information concerning unrelated other matters that are actively before the DOJ, and privileged

---

[2] The Department of Justice's "Justice Manual" (formerly known as the United States Attorneys' Manual) advises prosecutors that, "[i]n order to avoid impinging on valid attorney-client relationships, prosecutors are expected to take the least intrusive approach . . . when evidence is sought from an attorney actively engaged in the practice of law." Justice Manual § 9–13.420(A). According to the Justice Manual, that means "[c]onsideration should be given to obtaining information from other sources or through the use of a subpoena." *Id.* Likewise, the Justice Manual takes great care to emphasize "the potential effects upon an attorney-client relationship that may result from the issuance of a subpoena to an attorney for information relating to the attorney's representation of a client" and therefore encourages an attorney-subject's participation in the review process. *Id.* § 9–13.410(A), 9–13.420(F).

[3] While the Government attempts to analogize this matter to that involving Michael Cohen, Ms. Toensing and Mr. Cohen could not be farther apart. In the case involving Mr. Cohen, the Government made much of the fact that Mr. Cohan "admits that he has only three legal clients." *In re the Matter of Search Warrants Executed on April 9, 2018*, No. 18 MJ 3161 (S.D.N.Y. Apr. 16, 2018) (Dkt. 104 at 6:8–12). In fact, the Government even joked that Mr. Cohen has "more attorneys of his own than he has clients" and took "the position repeatedly that Mr. Cohen is not a real lawyer, that [he] doesn't provide real legal services," rather the Government characterized him as "more of a businessman." *Id.* at 7:6–7; 59:19–24. On the other hand, Ms. Toensing is a respected criminal defense attorney who, over the course of the past three decades, has represented and currently represents many high-profile, international political figures. Ms. Toensing's interest in limiting the exposure of privileged information and that of her very real clients could not be more different than Mr. Cohen's purported interest.

and confidential information concerning the investigation that is the subject of the warrants. Nevertheless, the Government used a filter team to begin reviewing all the materials received without restriction (a review that is ongoing) and provided information from that review to the case team without the input or context from Ms. Toensing necessary to fully understand whether such materials were responsive or privileged or an opportunity for her or her clients to be heard. To date, the Government has declined to disclose what documents it acquired, reviewed, found privileged, or turned over to the investigative team.

By way of illustration, the December 2019 Google search warrant, among other things, would have secured privileged and confidential information concerning Ms. Toensing's client, ▮▮▮▮, who the DOJ is currently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Yet, that search warrant specifically limited the information that the Government could review to information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *In re Search Warrant dated Dec. 13, 2019*, 19 Mag. 11704 (emphasis added). However, the earlier November 2019 iCloud warrant contained no such limitation even though it too contained privileged and confidential information concerning the same pending DOJ matter. Moreover, neither warrant excluded such information from Google or iCloud production obligations, nor would either third party be equipt to do so if it did.



Thus, both warrants would have resulted in the production of information, including privileged information, concerning Ms, Toensing's representation of ▮▮▮ in an unrelated criminal matter pending before the DOJ as well as privileged information concerning other matters, including the investigation at issue here. There was no restriction on the Government's ability to review such information received from the iCloud backup of Ms. Toensing's phone, and although the Google search warrant purported to limit what the Government could review, it is impossible to reliably determine which information falls in and out of this restriction without actually reviewing the material and the filter team was not equipt to reliably do so, or evaluate privilege, without factual context and input from Ms. Toensing. This is a determination that can only reliably be made in the first instance by Ms. Toensing and her counsel and, if the Government disagrees, by a Special Master.

Indeed, the Government implicitly acknowledges this reality in its current application for a Special Master to supervise the review of materials subsequently seized from Ms. Teonsing's iPhone. Although the Government now acknowledges that reviewing these materials implicates "unusually sensitive privilege issues" (Letter at 4) justifying a Special Master, these materials are virtually identical to those previously seized and reviewed wholesale from the iPhone's backup on iCloud without any input from Ms. Toensing or Special Master supervision. The "unusually sensitive privilege issues" implicated by the seizure of this information were no less so simply because in the first instance the Government seized and reviewed them secretly. To the contrary, the secret nature of the seizure and review amplifies the "unusually sensitive" nature of this process.

Accordingly, to adequately address these "unusually sensitive privilege issues," protect the Sixth Amendment right of Ms. Toensing's clients, and promote the efficient administration of

May 12, 2021
Page 4

justice, Ms. Toensing advances an alternative to the Government's proposed Special Master review procedure. With respect to the above-captioned warrant, Ms. Toensing respectfully requests that the Court (i) order the Government to return her cell phone data; (ii) allow Ms. Toensing to process the data as she would in response to a subpoena and produce a privilege log before the Government or a Special Master reviews the outstanding data; and (iii) appoint a Special Master to oversee the process. With respect to the data obtained via the 2019 Covert Warrants, Ms. Toensing respectfully requests that the Court order the Government to: (i) return the data it obtained; (ii) disclose the procedures its filter team used during its review of that data—including all search terms and limitations; (iii) disclose what information it then shared with the case team; and (iv) disclose what information is left to be shared from that review. Allowing Ms. Toensing to retain custody of her seized data and to process the data with oversight from a Special Master—rather than appointing a Special Master to conduct the review in the first instance—will most efficiently and fairly ensure the accuracy of the review process and reliably protect her client's Constitutional rights in accordance with the legal principles discussed below.

**Legal Framework**

  1. *The Sanctity of the Attorney-Client Privilege*

"The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) ("We readily acknowledge the importance of the attorney-client privilege, which 'is one of the oldest recognized privileges for confidential communications.'" (citation omitted)). The Supreme Court has long recognized that the privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when *free from the consequences or the apprehension of disclosure*." *Upjohn*, 449 U.S. at 389 (quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (emphasis added)). By respecting the privilege, the justice system "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice" that are unattainable in the absence of the privilege. *Id.*; *see also Clearwater Ins. Co. v. Granite State Ins. Co.*, No. 15-CV-165 (RJS), 2015 WL 13687223, at *2 (S.D.N.Y. Mar. 2, 2015) ("[T]he litigants here and the public at large have a *strong interest in preserving the sanctity of the attorney-client privilege*." (emphasis added)).

  2. *The Effect of Privilege in the Review Process*

With that backdrop in mind, courts consider the sanctity of the attorney-client privilege when deciding how to best serve the Government's interest in reviewing material seized from an attorney pursuant to a warrant. In this District, *United States v. Stewart* speaks most directly to the inherent tension under these circumstances. There, the Court recognized that "special circumstances" of a particular case—in that case, "the search of the office of a *criminal defense attorney* who represents defendants unrelated to any of the allegations in this case *and the seizure of at least computerized information* belonging to lawyers who are also unrelated to this case, and

who represent clients unrelated to this case"—dictate which safeguards the Court should put in place during a privilege review. *United States v. Stewart*, No. 02 CR. 395 JGK, 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) (emphasis added) (appointing a Special Master to oversee the review of documents obtained from the execution of a search warrant at a criminal defense attorney's office, directing the Government to return two original hard drives seized from the attorney's office, acknowledging that "the Special Master may direct the defendant to produce a privilege log within a reasonable time period," and finally directing the Special Master "to hand over to the prosecution any materials that the parties agree are responsive and not privileged"). Of note, the Court agreed that the subject's ability to "produce a privilege log within two to three weeks of obtaining copies of the materials" would greatly expedite proceedings. *Id.* at *8 (ordering the Government to pay the costs of a Special Master (*id.* at *10)).

Most presciently, the Court in *Stewart* explained that "privileged attorney-client communications and work product . . . raise special Sixth Amendment concerns in this case because the law offices that were searched were those of criminal defense attorneys." *Id.* at *5. Of course, "the Sixth Amendment guarantees criminal defendants the right to counsel and supports an expectation of privacy regarding a defendant's legitimate communications with the defendant's attorney." *Id.* The Court further relied on the Justice Manual (then called the United States Attorneys' Manual), which states that during the course of such a search: "every effort should be made to avoid viewing privileged material." *Id.* at *6 (quoting Justice Manual § 9–13.420(E)). To that end, "it is important that the procedure adopted in this case not only be fair but also appear to be fair." *Id.* at *8; *see also In re the Matter of Search Warrants Executed on April 9, 2018,* No. 18 MJ 3161 (S.D.N.Y. Apr. 16, 2018) (Dkt. 104, Apr. 16, 2018 Tr. at 88) (involving defense counsel in the review process promotes the "perception of fairness, not fairness itself" due to the public nature of the premises searches). The Court therefore expressed a preference to avoid review by third parties when the confidentiality of an attorney's sensitive data is at stake.[4] *Stewart*, 2002 WL 1300059, at *6.

Even so, this District has noted the shortcomings associated with in camera review of documents for privilege, which is akin to review exclusively conducted by a Special Master. "[T]he Supreme Court has noted that the alternative [of] in camera review [] is not without its own problematic implications" *United States v. Kaplan*, No. 02 CR. 883 (DAB), 2003 WL 22880914, at *10–11 (S.D.N.Y. Dec. 5, 2003) ("A blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." (citing *United States v. Zolin*, 491 U.S. 554, 571 (1989)). "There is also reason to be concerned about the possible due process implications of routine use of in camera proceedings." *Id.* (quoting *Zolin*, 491 U.S. at 571). Summed up elsewhere, the author of privileged information is "undoubtedly

---

[4] The Court noted that "at least three courts that have allowed for review by a Government privilege team have opined, in retrospect, that the use of other methods of review would have been better." *Stewart,* 2002 WL 1300059, at *6 (citing *United States v. Skeddle*, 989 F. Supp. 890, 898 n.6 (N.D. Ohio 1997), 989 F. Supp. at 898 n. 6 ("By hindsight, a safer course would have been to have given notice to the defendants . . . and the lawyers whose offices were searched to show cause within a specified period why the materials should not be released to the Government.")).

correct in arguing that [third parties] will not be able to recognize privileged, possibly privileged, and non-privileged materials with complete accuracy." *Hicks v. Bush*, 452 F. Supp. 2d 88, 102–03 (D.D.C. 2006) (considering pre-screening of documents for privilege by counsel, but deciding against it because "pre-screening by counsel for the detainees could [not] be accomplished in a reasonable amount of time").

### 3. When Privilege Requires the Return of Seized Property

In a similar context, the D.C. Circuit railed against "the compelled disclosure of privileged material to the Executive during execution of the search warrant for" then-Congressman William Jefferson's congressional office in violation the Speech or Debate Clause's legislative privilege. *United States v. Rayburn House Off. Bldg., Room 2113, Washington, D.C. 20515*, 497 F.3d 654, 655–56 (D.C. Cir. 2007) [hereinafter *Rayburn House*] (considering "whether the procedures under which the search was conducted were sufficiently protective of [ ] privilege" (citing U.S. Const. art. I, § 6, cl. 1)). There, the court expressed concern because "[t]he search of Congressman Jefferson's office must have resulted in the disclosure of [privileged] materials" and even "the possibility of compelled disclosure may therefore chill the exchange of views with respect to [privileged] activity." *Id.* at 661. Therefore, the court held "that the Congressman is entitled to the return of documents that the court determines to be privileged" because "[t]his chill runs counter to the [privilege's] purpose." *Id.* The court further grounded its conclusion in the principle that "if the United States' *legitimate interests* can be satisfied even if the property is returned, continued retention of the property would become unreasonable." *Id.* at 663 (rejecting a review procedure involving a filter team because "search that allows agents of the Executive to review privileged materials without the Member's consent violates the" law giving rise to the privilege in the first place (emphasis in original)).

In so holding, the D.C. Circuit relied on a Fifth Circuit opinion concluding that, in the context of the seizure of documents from a law office pursuant to a warrant, "the privilege holder was allowed an opportunity to identify documents protected under the attorney-client privilege at the point the search was completed." *Id.* at 662 (citing *United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 407 (5th Cir. 2003) [hereinafter *Search of Law Office*]). In that case, the Fifth Circuit provided a non-exhaustive list of factors for courts to consider when determining whether the Government must return items seized from a subject-attorney under Federal Rule of Criminal Procedure 41. *Search of Law Office*, 341 F.3d at 409–10 (citing Fed. R. Crim. Pro. 41 ("A person aggrieved . . . by the deprivation of property may move for the property's return," and "[i]f it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings")). Among them, courts may consider "whether the plaintiff has an individual interest in and need for the material whose return [s]he seeks" and whether she "would be irreparably injured by denial of the return of the property." *Id.* at 410. Of course, courts seek to avoid unnecessarily imposing "the harmful effects [that] the loss of the property wreaks on the movant." *Id.* at 415.

**B. The Government Must Return Ms. Toensing's Data to Respect Her Clients' Rights**

The factors under consideration in *Stewart* are particularly apropos of Ms. Toensing's circumstances. *See* 2002 WL 1300059, at *10. In fact, both situations involve the sensitive nature of privileged, computerized information on a criminal defense attorney's device that almost certainly will include confidential and privileged information concerning unrelated criminal matters before the DOJ as well as privileged information related to the investigation that is the subject of the warrant. *See id.* Indeed, the Government's search warrants themselves and their Letter at issue here ███████████████████████████ concerning a specific unrelated criminal matter before the DOJ involving a client who Ms. Toensing represented in that very matter and privileged information about this investigation.

Moreover, Ms. Toensing's decades-long criminal defense practice frequently involves representations of high profile political and other figures whose confidential information about wholly unrelated matters the Government has no right to seize, keep, or review because it has nothing to do with this investigation and there is no probable cause to justify the Government's possession. *See id.* at *7 (expressing particular concern that seized documents "are likely to contain privileged materials relating not only to unrelated criminal defendants but also *to the clients of attorneys other than the defendant*, for whom there has been no showing of probable cause of criminal conduct" (emphasis added)). In fact, the Government has not advanced a single legitimate interest served by its "continued retention of the property," which therefore makes that retention "unreasonable." *Rayburn House*, 497 F.3d at 663.

Here, the basis upon which the Government initially justified the Covert Warrants, and presumably the seizure of Ms. Toensing's iPhone 7—namely that there is a risk that Ms. Toensing would destroy or tamper with evidence, tamper with potential witnesses, or otherwise "seriously jeopardize" an ongoing investigation is, at best, dubious but in any event now non-existent. *See In re Search Warrant dated Dec. 13, 2019*, 19 Mag. 11704 at 2. If permitted to stand against Ms. Toensing, then a precedent will be set to make the secret seizure and possession of criminal defense lawyer files and those of others like journalists common instead of extraordinary. And now that the seizure and review has occurred and the purported exigent circumstances undeniably become stale, steps must be implemented to protect the applicable privileges and Constitutional protections. As *Rayburn* House noted, it is not speculative to state that the failure to provide robust protections in this circumstance will have a chilling effect on the effectiveness of attorney-client communications, especially in significant high-profile matters such as those involved here. In short, the secret seizure and wholesale review of these criminal defense materials and their continued possession without justification is gross Government overreach and a violation of the Constitution. The obvious remedy should be to return these materials and proceed with a process equally protecting the applicable privileges and Constitutional rights while also satisfying the Government's legitimate law enforcement interests.

Of course, it is much easier to expand the Government's access to information in the event the Court later determines that the privilege review procedure was overly protective than to do the opposite. *See Stewart*, 2002 WL 1300059, at *6. The risk of harm by removing Ms. Toensing from the review process therefore weighs heavily in favor of allowing her to conduct the initial

review of the data with an agreed to and appointed Special Master in place to resolve any disputes. *See Rayburn House*, 497 F.3d at 663 (likewise rejecting a process that did not allow the data owner to first review materials for privilege). Allowing Ms. Toensing, through counsel, to first review seized data for privilege is undoubtably the best way to ensure the Government does not view privileged material. So, in the interests of fairness, no procedure is more fair, or appears more fair, than allowing Ms. Toensing to take the first pass at the documents for responsiveness and privilege and produce a privilege log with oversight from a Special Master. *See Stewart* at *8 (requiring a procedure to both be fair and maintain the appearance of fairness); *see also In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 183 (4th Cir. 2019), *as amended* (Oct. 31, 2019) (Third parties "rummaging through law firm materials that are protected by attorney-client privilege and the work-product doctrine is at odds with the appearance of justice."). To be clear, Ms. Toensing and her counsel have ample resources to conduct an efficient, transparent review with the aid of a Special Master that will ensure the fair administration of justice.

Likewise, the same risk calculus supports a decision requiring the Government to return the contents of Ms. Toensing's seized device to her, along with data the Government previously seized pursuant to the 2019 Covert Warrants. Of course, Ms. Toensing suffered and continues to suffer irreparable harm from the fact that her clients' privileged data is out of her control and in the control of a third-party who is directly adverse to at least one of her clients in pending criminal proceedings. *See Search of Law Office*, 341 F.3d at 415; *see also Stewart*, 2002 WL 1300059, at *5 (emphasizing clients' Sixth Amendment protection against such a practice). For each day that data remains in the control of the Government, Ms. Toensing's reputation suffers given that prominent clients rely on her ability to provide immediate and discrete counsel in criminal cases—the product of which is now in the hands of the Government. *See id.*

To the extent the Government opposes return of her data due to whimsical concerns about flight or the potential destruction of information by a 79 year-old criminal defense attorney firmly rooted in the Washington, D.C. legal community, such concern is unfounded and without adequate justification. In fact, the Government has yet to provide any *legitimate* interest justifying its continued retention of Ms. Toensing's files or its decision not to disclose to Ms. Toensing the status of the files it seized and previously reviewed pursuant to the Covert Warrants. *Rayburn House*, 497 F.3d at 663. Instead, Ms. Toensing bears the much greater risk of compromised privilege while her  and data are in the Government's hand because her reputation and that of her clients are in jeopardy when the Government retains custody of such sensitive, privileged information.[5] Of course, her clients whose privileged information is in the possession and also has been reviewed, in part, by the Government are also irreparable harmed by the inability to freely communicate with counsel without the chilling fear that the Government may secretly or otherwise seize and review that privileged information.

---

[5] Ms. Toensing understands that the Government's filter team already reviewed the materials seized from Ms. Toensing's iCloud and Google accounts pursuant to the Covert Warrants issued in 2019. Notwithstanding the fact that the Government has already received that information, privileged or otherwise, Ms. Toensing requests that data back as well because it should have been treated the same way that she asks the Court to treat the production of data pursuant to the current search warrant to be treated—as under a subpoena.

May 12, 2021
Page 9

To that point, and exacerbating her reputational harm, Ms. Toensing has an ethical duty to investigate and inform her clients of the unauthorized disclosure of their information, and she cannot do that without knowing precisely what information the Government seized, has reviewed, and has passed on to the case team. *See* ABA Formal Opinion 483 (Oct. 17, 2018) (lawyers owe a duty to their clients to investigate and disclose the intrusion on clients' potentially privileged materials under ABA Model Rule 1.4); D.C. Bar Rule of Professional Conduct 1.4 (adopting the relevant provisions of ABA Model Rule 1.4); *see also Hiscox Ins. Co. Inc. v. Warden Grier, LLP*, 474 F. Supp. 3d 1004, 1007 (W.D. Mo. 2020) (finding that a lawyer "owed certain duties to [its client] in the attorney-client relationship and [the lawyer] breached these duties when it failed to promptly notify [the client] of the 2016 Data Breach"). By withholding information and privileged data from Ms. Toensing, the Government—particularly the United States Attorney's Office for the Southern District of New York—is jeopardizing Ms. Toensing's ethical duties to her clients.

**C. Conclusion**

Whatever its motivation, this exercise by the Government flies in the face of the Sixth Amendment and the most sacred attorney-client privilege. At its core, this constitutionally intrusive exercise attempts to normalize a process that under all relevant jurisprudence, should not be, and indeed is not, normal. Accordingly, Ms. Toensing respectfully asks the Court to adopt the following review procedures in this matter:

- Order the Government to return Ms. Toensing's iPhone 7, Google, and iCloud data;
- Allow Ms. Toensing to process the data as she would in response to a subpoena and produce a privilege log before the Government or a Special Master reviews the outstanding data;
- Appoint a Special Master from the list of candidates proposed by the parties or another suitable candidate identified by the Court to oversee the process and resolve any disputes that may arise;
- Order the Government to disclose the protocols and procedures its filter team used during its review of the data obtained via the 2019 Covert Warrants including all search terms and limitations;
- Order the Government to disclose what data its filter team shared with its case team during that process; and,
- Order the Government to disclose what data is left to be shared from that process.

May 12, 2021
Page 10

Under our proposal, Ms. Toensing will retain custody of her device and data, review the data first to determine whether information is responsive to the Government's request as outlined in the above-captioned warrant, and, if responsive and not privileged, turn the data over to the Special Master. And, if privileged, Ms. Toensing will turn over a privilege log to the Special Master and the parties can amicably discuss with a Special Master already in place any disputes arising during the review process.

Respectfully submitted,

**BROWN RUDNICK LLP**

Michael J. Bowe


Cc: Audrey Strauss, Esq. (United States Attorney for the Southern District of New York)
    Rebekah Donaleski, Esq. (Assistant United States Attorney)
    Nicolas Roos, Esq. (Assistant United States Attorney)
    Aline Flodr (Assistant United States Attorney)