AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>(1) the Person of Rudolph Giuliani; (2) ███████<br>(2) ███████████  New York, New York;<br>(3) ███████████  New York, New York | )<br>)<br>)<br>)<br>)<br>) | Case No.  **21 MAG 4335** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

(1) the Person of Rudolph Giuliani; (2) ███████████  New York, New York; (3) ███████
███, New York, New York
located in the ___Southern___ District of ___New York___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A, B, and C

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 22 U.S.C. §§ 612 and 618 | Acting as an unregistered foreign agent |
| 18 U.S.C. § 2 | Attempting to and willfully causing a violation of the foregoing statutes |
| 18 U.S.C. § 371 | Conspiracy to violate the foregoing statutes |

The application is based on these facts:

See Attached Affidavit and its Attachments A, B, and C

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more* ████████████████████████████ der
18 U.S.C. § 3103a, the basis of which is set forth on the ███████████████

████████████████████████████

_____
*Applicant's signature*

███████████ , FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___FaceTime_____  *(specify reliable electronic means)*.

Date:  ___April 21, 2021___

City and state:  ___New York, New York___

_____
J. PAUL OETKEN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 21 MAG 4335

**TO BE FILED UNDER SEAL**

In the Matter of the Application of the United
States of America for a Search and Seizure
Warrant for (1) the person of Rudolph Giuliani;
(2) the Premises Known and Described as ▮
▮▮▮▮, New York, New
York, and Any Closed Containers/Items
Contained Therein; and (3) Specified Spaces
and Items in the Premises Known and
Described as the Offices of ▮▮▮▮
LLC, ▮▮▮▮▮ New York,
New York, and Any Closed Containers/Items
Contained Therein;
USAO Ref. No. ▮▮▮▮

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

▮▮▮▮▮▮, being duly sworn, deposes and says:

## I.   Introduction

### A.   Affiant

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI").  In the
course of my experience and training in this position, I have participated in criminal investigations
into federal offenses involving public corruption and violations of the foreign agent registration
laws.  I also have training and experience executing search warrants, including those involving
electronic evidence such as cellphones and computers.

2.      This affidavit is based upon my personal knowledge; my review of documents and
other evidence; my conversations with other law enforcement personnel; and my training,
experience and advice received concerning the use of computers in criminal activity and the
forensic analysis of electronically stored information ("ESI"). Because this affidavit is being
submitted for the limited purpose of establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation. Where the contents of documents and

1

2019.11.19

the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.  The Person, Subject Premises, and Subject Devices to be Searched**

3.      I make this Affidavit, pursuant to Federal Rule of Criminal Procedure 41, in support of an application for a warrant to search (a) the person of Rudolph Giuliani, including any personal effects, for, and to seize, any cellphone or electronic device, as described in Attachment A; (b) the premises particularly described as the residential apartment identified as ████████ located at ████ ████████ New York, New York (the "Giuliani Residence"), for and to seize the Subject Devices described in Attachment B; and (c) the premises particularly described as the work area and electronic devices that belong to or that are or were used by Giuliani, ████████████████ ██████ in the office space occupied by ████████████ LLC, ████████ on the ████████ floor of the building located at ████████████ New York, New York (the "Offices of ████████ for and to seize the Subject Devices described in Attachment C.  The Giuliani Residence and the Offices of ████████████ are collectively referred to herein as the "Subject Premises."

4.      The Subject Devices are all cellphones, tablets, computers, and memory storage devices (i) in Giuliani's possession, custody, or control, or (ii) used by or otherwise associated with Giuliani, ████████████████ and located in the Subject Premises at the time of the execution of this warrant.  Based on my review of records provided by cellphone service providers and Apple, as well as my involvement in this investigation, I know that the Subject Devices include, but are not limited to, the following cellphones and computers:

a.   an Apple iPhone X with IMEI number ████████████ (which, according to records obtained from AT&T, appears to have been used between approximately January 8, 2018,

2019.11.19

and at least August 13, 2019), and an Apple iPhone X with IMEI number ███████ (which, according to records obtained from AT&T, appears to have been used between January 20, 2021, and at least February 11, 2021), both of which were registered to the telephone number ███ ███ with a user address of the Giuliani Residence ("Giuliani Number-1");

     b.   an Apple iPhone X with IMEI number ███████ (which, according to records obtained from AT&T, appears to have been used between approximately April 5, 2018, and August 27, 2019), an Apple iPhone XS Max with IMEI number ███████ (which, according to records obtained from AT&T, appears to have been used between approximately August 27, 2019, and October 3, 2019), an Apple iPhone 11 Pro Max with IMEI number ███████ (which, according to records obtained from AT&T, appears to have been used between approximately October 3, 2019, and at least February 19, 2021), and an ASCS cellphone with IMEI number ███████ (which, according to records obtained from AT&T, appears to have been used on or about December 13, 2018), all of which, based on my review of AT&T subpoena returns, were registered during different periods of time to the telephone number ███ ███ with a billing address of the Offices of ███████ ("Giuliani Number-2");

     c.   an Apple iPad Pro 10.5 with serial number ███████ which according to records from Apple was purchased on or about May 24, 2018, and registered to "Rudolph Giuliani," and an iPad Pro 11 with serial number ███████ which was registered on or about August 27, 2019, to "Rudolph Giuliani"; and

     d.   an Apple MacBook Pro 13.3 in "space gray" with serial number ███████ which according to records from Apple was purchased on or about February 16, 2019, and registered to "Rudolph Giuliani."

2019.11.19

5.      The requested warrant would authorize the search of any closed containers or items contained therein, along with the forensic examination of any Subject Device seized from Giuliani or the Subject Premises for the purpose of identifying electronically stored data or other evidence, fruits, or instrumentalities of the Subject Offenses, as particularly described in Attachments A, B, and C.

**C.   The Subject Offenses**

6.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises and Subject Devices contain evidence, fruits, and instrumentalities of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 2 (attempting and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (together, the "Subject Offenses").

**D.   Prior Search Warrant Applications Referenced Below**

7.      In the course of the investigation discussed below, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained search warrants that have yielded evidence that is described below.   As is relevant for the instant application, the following search warrants were previously obtained:

a.      On or about January 18, 2019, the USAO and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, ███, ███, and others.   On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the January 18 Warrant returns for evidence of additional offenses.

b.      On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search

4

warrant (the "May 16 Warrant") for records in iCloud accounts belonging to Parnas and ███████ among others.  On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the May 16 Warrant returns for evidence of additional offenses.

c.   On or about August 14, 2019, the USAO and FBI sought and obtained from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, a search warrant (the "August 14 Warrant") for email accounts belonging to Parnas, ███████ and others.

d.   On or about November 4, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "November 4 Warrant") for records in iCloud accounts belonging to Giuliani and ████████████.

e.   On or about December 13, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "December 13 Warrant") for records in an email account belonging to ████████.

f.   Together, the records obtained pursuant to the January 18 Warrant, May 16 Warrant, August 14 Warrant, November 4 Warrant, and December 13 Warrant are referred to as the "Prior Search Warrant Returns."

g.   On or about April 13, 2021, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "GPS Warrant") for prospective and historical location information for Giuliani Number-1 and Giuliani Number-2.

2019.11.19

## II.  Probable Cause

### A.  Probable Cause Regarding Subjects' Commission of the Subject Offenses

<u>Overview</u>

8.      The FBI and USAO are investigating whether Rudolph Giuliani, ███████████

Lev Parnas and others undertook actions to cause the removal of the United States Ambassador to

the Ukraine, ██████████, including actions detailed below at the request and/or under the

direction of a foreign government, entity, or person, in violation of the Foreign Agents Registration

Act ("FARA").[1]  Specifically, as discussed below, there is probable cause to believe that starting

in at least January 2019, Giuliani, ███████ and Parnas engaged in a multi-pronged lobbying effort

aimed at causing Ambassador ██████████s removal, all while hiding the fact that they were

doing so at the request and direction of ██████████, a Ukrainian official from whom Giuliani,

██████ and Parnas sought personal compensation and gain.  As discussed below, after meeting

with ███████ on two occasions in January and February 2019, Giuliani lobbied then-President

Donald J. Trump on at least three occasions and lobbied then-Secretary of State ██████████

on at least two occasions for the Ambassador's removal.  When those efforts appeared to have

failed, Giuliani, ████████ and Parnas appear to have devised and participated in a coordinated

---

[1] FARA criminalizes acting as an agent of a foreign principal without registering with the
Attorney General for certain specified activities.  Activities covered by FARA include acting as a
"publicity agent" or engaging in the United States in "political activities."  *See* 22 U.S.C. §§ 611-
12.  "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency
or official of the Government of the United States or any section of the public within the United
States with reference to formulating, adopting, or changing the domestic or foreign policies of the
United States or with reference to the political or public interests, policies, or relations of a
government of a foreign country or a foreign political party."  *Id.*  As relevant here, FARA requires
any person acting "at the order, request, or under the direction or control" of (i) a foreign principal,
or (ii) a person whose activities are "indirectly supervised, directed, controlled, financed or
subsidized in whole or in major part by a foreign principal," to register with the Attorney General
and to make periodic public disclosure of their relationship with the foreign principal, as well as
activities, receipts, and disbursements in support of those activities.  *Id.*

2019.11.19

media campaign aimed at using and publicizing disinformation from ███████    It appears that

Giuliani, together with ████████ and Parnas, were incentivized to undertake these efforts on behalf

of ████████ in at least two different ways.  First, in the same discussions in which ████████ raised

the firing of Ambassador ████████ he mentioned the possibility of retaining Giuliani to aid in

a legal matter or lawsuit in the United States to recover purportedly stolen Ukrainian assets.  As

discussed below, Giuliani was interested in being engaged to do that work, and proposed a retainer

with a $200,000 upfront payment.  Thus, it appears that Giuliani took steps to cause the firing of

the Ambassador to prove to ████████ what he could achieve in order to, among other things, secure

the legal representation.  Second, as discussed below, it appears that Giuliani was also motivated

to act at ████████ direction and on ████████ request so that ████████ would provide

derogatory information about, among other things, now-President ████████ and his son ████████

████, which would potentially be politically valuable to Giuliani.  The efforts were successful:

the Ambassador was removed from her post in late April 2019.  Moreover, despite all these efforts

to lobby for the removal of the Ambassador on behalf of ████████ Giuliani, Parnas, and ████████

never filed a FARA registration.

9.    As set forth below, based on my review of the Prior Search Warrant Returns, as

well as subpoena returns and public sources, there is probable cause to believe that Giuliani will

be in possession of, and the Subject Premises will contain, fruits, evidence and instrumentalities

of the Subject Offenses, including the Subject Devices.

2019.11.19

Giuliani's Involvement with Parnas in 2018

10.     Parnas is a Florida-based Ukrainian-American businessman.[2]  Giuliani first met

Parnas in or around July 2018, and based on my review of materials obtained pursuant to the May

16 Warrant, it appears that over the next several months they started communicating and spending

time together on a regular basis.   Among other things, based on my review of records obtained

pursuant to the January 18 Warrant, it appears that in or around August 2018, Parnas raised with

Giuliani the prospect of being hired by Parnas's nascent insurance business, Fraud Guarantee.  On

or about August 16, 2018, Giuliani emailed Parnas's business partner, ███████,[3] a one-page

draft agreement between Fraud Guarantee and Giuliani's consulting and management firm,

████████ which contemplated that Fraud Guarantee would pay ██████████ $500,000

upon signing the agreement, and $100,000 per month thereafter.   Based on my review of the

materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I know that Giuliani

repeatedly requested that Parnas complete the engagement and pay ██████████ the $500,000,

---

[2] Parnas has been charged alongside co-defendants ███████, ██████████, and Andrey
Kukushkin in a seven-count indictment which charges Parnas with (i) conspiring to make straw
donations, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30122, 30109(d)(1)(A) & (D); (ii) making
false statements to the Federal Election Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2;
(iii) falsification of records, in violation of 18 U.S.C. § 1519 and 2; (iv) conspiring to violate the
foreign donor ban, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30121, 30122, and 30109(d)(1)(A)
& (D); (v) soliciting a contribution from a foreign national, in violation of 52 U.S.C. § 30121,
30109(d)(1)(A), and 18 U.S.C. § 2; (vi) aiding and abetting the making of a contribution from a
foreign national, in violation of 52 U.S.C. § 30121, 30109(d)(1)(A), and 18 U.S.C. § 2; and (vii)
conspiring to commit wire fraud in connection with his business "Fraud Guarantee," in violation
of 18 U.S.C. § 1349.  Parnas has pleaded not guilty and is scheduled to proceed to trial in October
2021. *See United States v. Parnas, Fruman, Correia, and Kukushkin*, S1 19 Cr. 725 (JPO).

[3] ███████ was charged alongside Parnas in indictment S1 19 Cr. 725 (JPO), and has since
pleaded guilty and been convicted of (i) making false statements to the Federal Election
Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2; and (ii) conspiring to commit wire fraud
in connection with "Fraud Guarantee," in violation of 18 U.S.C. § 1349.  In February 2021, ███████
was sentenced to a term of one year and one day's imprisonment, and is currently serving his
sentence.

2019.11.19

and in or about September and October 2018, Parnas induced a third party to make two payments totaling $500,000.  While Giuliani stayed in regular contact with Parnas after receiving the payments, it appears that he did little to no work for Fraud Guarantee.

11.     It appears based on my review of the Prior Search Warrant Returns that in or around November or December 2018, Parnas started providing Giuliani with information about Ukraine. For instance, based on my review of those materials, on or about December 7, 2018, Parnas forwarded Giuliani a copy of a letter dated May 9, 2018, which it appears Parnas had caused Congressman ██████████ to write and send to Secretary ██████ and which called for the firing of Ambassador ██████████  On or about December 14, 2018, Parnas told Giuliani that he was traveling to Ukraine the following day, and texted Giuliani a link to a Ukrainian news article alleging that two Ukrainian government officials broke Ukrainian law in revealing ██████████ "black ledgers," which were relevant to the Special Counsel's Office ("SCO") investigation.[4]

12.     Based on my review of the Prior Search Warrant Returns, I have learned that while in Ukraine, Parnas met with multiple current and former Ukrainian government officials, including ██████████, the former Prosecutor General, which is the position equivalent in Ukraine of the United States Attorney General.  Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that ██████ created notes during or shortly after the Ukraine trip that reflected that Ambassador ██████████ was a topic of conversation, and that ██████ and ██████ (the then-Prosecutor General) would each provide information regarding alleged corruption by now-President ██████ and Ambassador ██████████  Based on my review of those same materials, it appears that ██████ went to meet with Giuliani shortly after returning to the

_____

[4] Based on my involvement in this investigation to date, it is not clear whether Giuliani requested the materials from Parnas because he was interested in Ukraine as a result of the SCO investigation or for other reasons, or if Parnas provided them to Giuliani unprompted.

2019.11.19

United States to discuss, among other things, the topics contained in those notes.  Additionally, based on my review of the Prior Search Warrant Returns, I have learned that upon returning to the United States, Parnas solicited Giuliani's assistance in arranging a visa for ██████ to come to the United States and, among other things, meet with Giuliani.  Based on my review of the Prior Search Warrant Returns, as well as records provided by the State Department and my participation in interviews with officials at the State Department, Giuliani did, in fact, make requests to officials at the State Department that they grant a visa to ██████ but Giuliani was ultimately unsuccessful in securing a visa.

13.     Notwithstanding the negative information that was provided by Parnas to Giuliani in 2018 about Ambassador ██████ and Giuliani's inability to obtain a visa for ██████ which from my review of the Prior Search Warrant Returns and participation in the investigation it appears that Parnas and ██████ if not Giuliani, blamed at least in part on Ambassador ██████—Giuliani did not seek the Ambassador's removal until after meeting with ██████ in late January and early February 2019, as discussed below.

<u>Giuliani's January 2019 Meetings with ██████ and ██████</u>

14.     On or about January 25 and 26, 2019, Giuliani, ██████ (who works for ██████ Parnas, and ██████ met with ██████ ███████████████████ (both of whom worked with ██████ at the Offices of ██████ I have reviewed a three and a half page memorandum prepared by ████ regarding the two-day, multi-hour meeting.  The memorandum was obtained from the State Department, and was provided to the State Department by Giuliani, as discussed below.  From my review of that memorandum, as well as public statements subsequently made by Parnas and ██████ I have learned, among other things, the following:

2019.11.19

15.     According to the memorandum, during the January 25 and 26 meetings, ██████ stated, in sum and substance, that his predecessor, ██████ had opened an investigation into ██████ in which ██████, a board member, was implicated.   According to the memorandum, ██████ also provided information regarding the ██████ "black book."   The memorandum also indicated that ██████ raised two issues of potential importance to himself. First, it appears from the memorandum that ██████ and Giuliani discussed Ambassador ██████ whom ██████ asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine, who ██████ claimed asked him to close three cases.  According to the memorandum, ██████ stated that, in his then-capacity as Prosecutor General of Ukraine, he had re-initiated an investigation into ██████.  Second, it appears from the memorandum that Lutsenko raised allegations that the global investment firm ██████ held approximately $7 billion dollars in money that had been embezzled from Ukraine since 2010 to benefit pro-Russian Ukrainians.  A separate memorandum that appears to also have been prepared by ██████ indicates that Giuliani also spoke by phone with ██████ who was in Ukraine at that time, on January 23, 2019 regarding some of the same allegations regarding ██████

a.   Based on my review of statements subsequently made by ██████ that were quoted in an article published by the ██████, ██████ claimed that in 2018, his office sent a letter to the legal attaché at Embassy Kiev, requesting the Americans' assistance in recovering assets from ██████, but that his office did not receive the requested assistance in pursuing these funds.  Accordingly, it appears that ██████ was seeking assistance in recovering assets from or bringing legal action against ██████, and after he was unsuccessful through formal channels, he raised the issue with Giuliani.

2019.11.19

b.    Based on my review of the transcript of a televised January 16, 2020 interview of Parnas by ▇▇▇▇▇▇, I have learned that Parnas stated, among other things, that ▇▇▇ wanted ▇▇▇▇ removed for "his own career reasons" and that "both ▇▇▇▇ and ▇▇▇▇ had an interest in getting rid of" ▇▇▇▇▇  While it is not clear from Parnas's statements the timing of when these messages were conveyed by ▇▇▇▇ Parnas was also asked whether "▇▇▇ [was] saying in effect, listen, if you want me to make these ▇▇▇ allegations, you're going to have to get rid of this ambassador," to which Parnas replied, "absolutely."[5]

16.    Based on my review of materials obtained via the Prior Search Warrant Returns, including text messages between Parnas and Giuliani, who was using Giuliani Number-2, I have learned that Giuliani and Parnas exchanged several messages about ▇▇▇▇ following those meetings in New York.  Specifically, on or about February 4, 2019, Giuliani texted Parnas from Giuliani Number-2 to have a safe flight to D.C., and said "need to lock up law suit for AG [o]f Ukraine," which appears to be a reference to ▇▇▇ retaining Giuliani to file a lawsuit to recover the ▇▇▇▇▇▇ assets.  On or about February 10, 2019, Giuliani texted Parnas from Giuliani Number-2, "Any word on guy [▇▇▇ coming here" and in connection with their

---

[5] Based on my conversations with the prosecutors assigned to this investigation, I have learned that on about October 28, 2019, Parnas's counsel proffered to the USAO and FBI that all of Parnas's efforts to remove Yovanovitch were done at the direction of President Trump and/or Giuliani, who was himself acting at the direction of President Trump.  For the reasons discussed herein, the USAO and FBI do not regard this claim as credible, and believe the evidence provides probable cause to believe that Giuliani and Parnas were acting at the request and/or under the direction of one or more foreign principals, including ▇▇▇▇

I am also aware that on or about March 4, 2020 Parnas himself provided information to the USAO and FBI, in a proffer session.  That information is not being set forth herein as a basis for probable cause.  Nonetheless, I am aware that Parnas described ulterior motives for his efforts to seek Ambassador ▇▇▇▇ removal, in addition to the fact that ▇▇▇▇ had requested her removal, including among other things his desire to ingratiate himself with Giuliani and President Trump.

2019.11.19

upcoming trip to Poland and Ukraine, "Any progress on plane tomorrow[.]"  Parnas responded by text to Giuliani Number-2 that "[t]hey," in sum and substance, were calling him shortly and Parnas would find out the details.  Shortly thereafter, Parnas texted Giuliani Number-2, in sum and substance, that ▇▇▇▇▇ would meet Giuliani and Parnas on or about February 12, 2019 in Warsaw, Poland.  Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that Giuliani and Parnas did then travel to Poland.

> Anticipated Retention of Giuliani, ▇▇▇▇ and ▇▇▇▇ by ▇▇▇▇ and Continued Lobbying for Ambassador ▇▇▇▇▇ Removal

17.    Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that in or around February 2019, Parnas, Giuliani, and ▇▇▇▇ exchanged messages and a draft retainer agreement reflecting ▇▇▇▇▇▇ and ▇▇▇▇ anticipated representation of ▇▇▇▇ in connection with what appears to be the ▇▇▇▇▇▇ allegations.  Based on my review of the Prior Search Warrant Returns, as discussed below, it appears that Giuliani, Parnas, and ▇▇▇▇ undertook efforts to cause the removal of Ambassador ▇▇▇▇ from her post at or around the same time they were drafting a retainer agreement to represent ▇▇▇▇  Additionally, as discussed below, it appears from the same materials that those efforts to cause the Ambassador's removal were undertaken at ▇▇▇▇ request or direction, at least in part, in order to secure the retainer agreement to represent ▇▇▇▇ in the ▇▇▇▇▇▇ matter.  Moreover, as discussed below, based on my review of the Prior Search Warrant Returns, it appears that ▇▇▇▇ also incentivized Giuliani, ▇▇▇▇ and Parnas to cause the Ambassador to be fired by agreeing to provide negative information about now-President ▇▇▇▇▇ and ▇▇▇▇▇, in addition to information Giuliani could use to attack the SCO investigation, all of which appears, from text messages and emails, to have been of significant

2019.11.19

interest and value to them.  Specifically, with respect to the foregoing, I have learned the following, based on my review of materials obtained via the Prior Search Warrant Returns:

a. ███████ became involved in Giuliani and Parnas's efforts to remove Ambassador ███████ on or around February 9, 2019.  Based on my review of materials obtained from the Prior Search Warrant Returns, I have learned that Giuliani invited ███████ to participate in the matter, with what appears to be the expectation that in exchange for ███████ Giuliani, and Parnas's efforts to remove Ambassador ███████ from her post, ███████ would reward ███████ and Giuliani with a several-hundred thousand dollar retainer agreement which expressly contemplated future paid work by ███████ and Giuliani.[6]  Based on my review of materials obtained via the Prior Search Warrant Returns, including text messages between ███████ and Giuliani, who was using Giuliani Number-1 and Giuliani Number-2, I have learned that ███████ and Giuliani had a preexisting relationship and discussed matters related to press appearances and the SCO investigation (they both represented individuals in connection with that inquiry), and that Giuliani introduced ███████ to Parnas in or around February 2019.

b. On or about February 9, 2019, ███████ texted Parnas "Anything happening?  My emails to you have come back."  As discussed above, based on my review of travel records, I have learned that Parnas and Giuliani traveled to Warsaw, Poland and met with

_____

[6] Based on my review of a financial analysis prepared based on bank records and public reports, it appears that around this time, Giuliani had a financial interest in receiving a retainer agreement from ███████  Specifically, in May 2018, Giuliani left his former law firm and its substantial compensation package.  Based on my review of a financial analysis of bank records that have been collected to date (which may not include all of Giuliani's checking and credit card accounts), on or around January 25, 2018, Giuliani had approximately $1.2 million cash on hand, and approximately $40,000 in credit card debt.  By contrast, on or around January 25, 2019, right before he met with ███████ Giuliani had approximately $400,000 cash on hand in those same accounts and approximately $110,000 in credit card debt.  By on or around February 16, 2019, his account balances had dropped to approximately $288,000 and his credit card debt remained over $110,000.

14



████, on February 11, 2019.[7]  On or about February 11, 2019, ████ texted Giuliani Number-1 and Giuliani Number-2 and Parnas: "Is there absolute commitment for HER to be gone this week?"  On or about the same day, Giuliani texted back from Giuliani Number-1 and Giuliani Number-2, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you.  ████ is now aware of it.  Talked to him on Friday [February 8, 2019]."

        c.        ████ Giuliani, and Parnas exchanged numerous messages following the meeting with ████ regarding Giuliani's drafting of a retainer agreement for ████ and Parnas's need for information on the status of Ambassador ████ while he was in Ukraine and meeting with ████  Specifically, on or about February 14, 2019, ████ texted Giuliani at Giuliani Number-2: "How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA."  ████ then texted Parnas a copy of what she described in a text as her "nudge to Rudy."  Parnas then texted ████ to "nudge [Giuliani] about the Mrs. A.," which appears to be a reference to Ambassador ████ ████ and Parnas exchanged several messages stating, in sum and substance, that they had followed up with Giuliani about the retainer agreement and complaining about the delay.

        d.     It appears that Parnas continued to press ████ and Giuliani for movement on the retainer agreement and the Ambassador's removal while he was in Ukraine

---

[7] Based on my review of public reporting, I have learned that according to an article published on September 29, 2019 in *Reuters*, Giuliani admitted that he met ████ in Warsaw in February 2019 after first meeting him in New York in January, but that the meeting with ████ in Warsaw was "really social . . . I think it was either dinner or cigars after dinner.  Not opportune for substantive discussion."  However, this does not appear to be accurate, as described herein, Giuliani circulated a draft retainer agreement between ████ and ████ (a firm owned by ████ and her husband, ████) only five days after meeting with ████ and communicated with Parnas and ████ about lobbying ████ and Trump to remove ████ on the same day, and in the days following, his meeting with ████

2019.11.19

meeting with ███████  On or about February 15, 2019, ███████ texted Parnas that she had "[t]alked to Rudy" but "[d]id not bring up Retainer as I figured you are on ground in need of it." On or about February 16, 2019, Parnas texted back that he was waiting to hear from Giuliani, and stated to ███████ by text that he "really need[ed] to know [the] status of madam A. [w]hile I'm here."  Based on my review of travel records for Parnas, it appears that "here" was a reference to Ukraine.  ███████ responded, "That's for Rudy to get tonight."  Later that day, Giuliani texted ███████ from Giuliani Number-2: "I'm heading for Florida.  Lev meeting with our friend and going over retainer will get it to him today."  Based on my involvement in this investigation and review of text messages, I believe that "our friend" was a reference to ███████ ███████ sent Giuliani's message to Parnas and asked if "Rudy c[a]me through," and Parnas confirmed to ███████ that he had received a draft.

      e.     On or about February 16, 2019, Giuliani used ████████████████████, which appears to be his iCloud account which is registered to an iPad, to send Parnas and ███████ a draft retainer agreement between "███████████, as the General Prosecutor of Ukraine," and ████████████ ███████ and ███████  The retainer amount was $200,000 for services by Giuliani, ███████ and ███████ in recovering "sums of money in various financial institutions outside Ukraine."  Based on my involvement in this investigation, I believe that the description in the agreement of recovering "sums of money in various financial institutions outside Ukraine" was a reference to recovering allegedly stolen assets from ████████████, which ███████ had raised with Giuliani at their first meeting.  The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement."  Parnas told Giuliani that same day that he had just met with "the other gentleman," in an apparent reference to ███████ and that it "went great call me when you can I'll update you."

2019.11.19

f.      On or about February 17, 2019, Parnas texted ▮▮▮▮ to confirm that Giuliani had sent the retainer agreement. ▮▮▮▮ asked Parnas by text if Giuliani "me[]t with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to Giuliani meeting with then-President Trump to lobby for Ambassador ▮▮▮▮ removal. ▮▮▮▮ also texted Giuliani at Giuliani Number-2, "What happened with the big Guy re Amb." And Giuliani replied "It is in process." Later that day, ▮▮▮▮ asked Parnas "Was he successful re Amb?" to which Parnas replied "this week," which appears to be a reference to their expectation that as a result of Giuliani's lobbying, then-President Trump would remove Ambassador ▮▮▮▮ that week. The next day, on February 18, 2019, Parnas told Giuliani to make out the retainer agreement to the Ministry of Justice of Ukraine, attention to Minister ▮▮▮▮. Giuliani asked "How much?" and Parnas promised to call him shortly, and then followed up regarding the retainer agreement again.

g.      Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that Parnas met with ▮▮▮▮ regarding the retainer agreement on or around February 21, 2019, and then appears to have met again with ▮▮▮▮ several days later to obtain paperwork. On or about February 20, 2019, Parnas texted Giuliani at Giuliani Number-2 to send wire instructions and a "signed copy by you ▮▮▮▮ and ▮ so they can execute and wire funds." Based on my involvement in this investigation, I believe that "▮▮ is a reference to ▮▮▮▮, ▮▮▮▮ husband and law partner who, as discussed herein, later made media appearances promoting the removal of the Ambassador. Later that day, Parnas confirmed that he "received signed retainer." On the day of the meeting between Parnas and ▮▮▮▮ on or about February 21, 2019, Giuliani texted Parnas from Giuliani Number-2, "How is it going????" to which Parnas replied, "Meeting with ▮▮▮▮ now

17

2019.11.19

everything good."   Three days later, Giuliani again asked how things were going, and Parnas responded that he was "meeting with ███████████ in 2 hours he has some paperwork to give us I'll call you after the meeting."   On or about the same day, ███████ texted Giuliani at Giuliani Number-2, "What happened with discussion," to which Giuliani replied from Giuliani Number-2, "Told today getting done Saturday I said no need a confirmation and will get it tomorrow."   Based on my involvement in this investigation and my review of text messages, it appears that Giuliani was referring to the execution of ████████ retainer agreement and the wiring of funds.  However, based on my review of bank records, it does not appear that ███████ wired funds to Giuliani at that time, or any subsequent time.

   h.  On or about February 24, 2019, ██████████ texted Giuliani at Giuliani Number-2, "Was the deed done?"  On or about February 25, 2019, ████████ texted Parnas to ask, "Is she still there?"  Parnas texted back, "Yes."  On or about February 25, 2019, █████████ also texted Giuliani at Giuliani Number-2, "Is she still there?"   Based on my involvement in this investigation and my review of text messages from the Prior Search Warrant Returns, it appears that ████████ was asking whether Ambassador ████████████ had been removed from her post.

<u>Public Media Campaign to Remove Ambassador ██████████</u>

   18.  Based on my review of the Prior Search Warrant Returns and public sources, I have learned that following Parnas's meeting with ██████████ in February 2019, and in light of the fact that Giuliani's lobbying efforts up until that point appeared to have been unsuccessful, Parnas, ████████ Giuliani, and ██████████ worked with a journalist, ████████████ at ████████, to mount an aggressive and coordinated public media campaign aimed at discrediting and causing the

2019.11.19

removal of Ambassador ███████.[8]  It appears from my review of the materials that their media campaign began within days of ███████ complaining, in early March 2019, to Parnas about actions that ███████ had taken in Ukraine.  Specifically, based on my participation in the investigation, my participation in an interview with Ambassador ███████ my review of public statements made by ███████ Giuliani, and ███████ and my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a.      Based on my review of articles published on or around March 6, 2019, I have learned that on or about March 5, 2019, Ambassador ███████ gave a speech in which she called for the removal of an ally of ███████ ███████, from his government position in Ukraine because he had been accused by the National Anti-corruption Bureau of Ukraine ("NABU"), a separate prosecutor's office, of leaking information about corruption investigations to the targets of those investigations.  ███████ also criticized the Ukrainian court system, which she described as riddled with compromised judges.

b.      Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that ███████ immediately complained about ███████ statements to Parnas.  Specifically, on or about March 5, 2016, the day of ███████ speech, ███████ texted Parnas "Ambassador openly called to fire [███████"[9]  Parnas asked ███████ to call him, and

---

[8] Informational materials that an agent disseminates or causes to be disseminated in interstate commerce on behalf of a foreign principal must contain labeling as required by Section 614(b) of FARA.  *See* 22 U.S.C. § 614; 28 C.F.R. § 5.400 and 5.402.  The articles published in ███████ and the subsequent tweets disseminating that information did not contain such labeling.

[9] Parnas's text messages with ███████ were in Russian, and my description of those messages herein are based on preliminary translations of those messages by FBI Russian-language linguists.

2019.11.19

████████ texted back, in sum and substance, that the Ambassador had also criticized Ukrainian Supreme Court judges.

   c.  Based on my review of materials obtained pursuant to the ████ Warrant, I have learned that in response to ████████ complaint, on March 8, 2019, Parnas sent ████████ a text message containing a photograph of the May 2018 letter written by Congressman ████████ and she replied by sending the contact information for ████████ ████████ also texted Giuliani at Giuliani Number-2 to "Contact ████████ re interview this am."

   d.  On or about March 8, 2019, ████████ texted Parnas and referred to a statement ████████ made in which she called for ████████ removal. Parnas texted back, "we are all in the loop," and wrote, in sum and substance, that they were setting up an interview between ████ and a journalist – a reference to ████ ████ then sent Parnas the contact info for ████████ and ████ wrote: "████████████ is waiting[,] I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and ████ also discussed setting up an interview between ████ and then-President ████████ of Ukraine, but ████ told Parnas that ████ could not answer questions about "the Ambassador, ████" in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, ████ was running for re-election, which he would ultimately lose.

   e.  On or about March 9, Parnas texted Giuliani at Giuliani Number-2 information about the press campaign, and stated, in sum and substance, that he had just spoken with ████ and ████ Parnas also asked Giuliani, by text sent to Giuliani Number-2, to call Parnas so he could "update you very good stuff."

   f.  However, it appears that ████ grew impatient with Parnas's failure to secure Ambassador ████████ removal. On or about March 11, 2019, ████ texted Parnas

2019.11.19

about when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General.  On or about March 13, 2019, ████ texted Parnas, "I am fucking sick of everything.  I did not get the visit.  My Number One did not get shit.  I am ready to shaft your competitor.  But you want even more.  We do everything.  You do later.  This is dishonest."  Based on my participation in the investigation, this appears to be a reference to ████ and others' willingness to share information about ████ and the ████ and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador ████ or a meeting with then-Attorney General ████  On or about March 14, 2019, Parnas texted back, "I just spoke with our [people].  I think there is good news. When you get a chance, call me regarding your visit here."  Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or ████

g.      At the same time, based on my review of the Prior Search Warrant Returns, it appears that Parnas, ████ and ████ worked together to publicize ████ allegations through ████  On or about March 12, 2019, Parnas received from ████ a written narrative and answers to questions posed by ████ about ████ and the ████ Parnas forwarded ████ answers to ████  Parnas also texted with ████ and conveyed additional information back to ████

h.      On or about March 19, 2019, ████ texted ████ that she had spoken with "Rudy and Lev" and stated "I have the plan.  So call when you can."  Based on my review of the Prior Search Warrant Returns and public reporting, it appears that Parnas set up an interview between ████ and ████  On or about March 20, 2019, a portion of ████ video interview with ████ and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in ████ .  In his interview,

2019.11.19

█████ claimed he would open an investigation into whether the director of NABU, ██████

█████ attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee

████████." In a second video interview published on March 20, 2019, by ██████ in ███

██, ██████ told ██████ that Ambassador █████████ had given him "a list of people whom

we should not prosecute" during their first in-person meeting. ██████ reported that ██████ was

not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman

██████ wrote a "private letter asking Secretary of State ████████ to recall the current U.S.

ambassador, alleging that she made disparaging statements about President Trump." ██████ also

posted a copy of the letter. The article quoted ██████ as describing ███████ allegations as

untrue and an "absurd attempt" to discredit NABU.[10]

       i.    Based on my review of materials obtained from the May 16 Warrant and

public reporting, I have learned that Parnas continued working to publicize ██████ allegations

against ████████ and texted links to ██████ articles to many of his contacts. On or about

March 20, 2019, Parnas sent ██████████, the development director of America First PAC (to

whom Parnas had previously donated in the name of a corporation), links to both of ████████

articles in *The Hill*, along with links to tweets by ██████████ and ████████. Parnas

instructed ██████ "have █ retweet it," in reference to ████████████. ██████ did so, and

confirmed to Parnas, "sent." ████████ subsequently retweeted an article summarizing ████████

reporting in the ████████, entitled "Calls Grow to Remove Obama's U.S. Ambassador to

---

[10] Based on my participation in an interview with ████████████████, I have learned
that each of ████████ claims were either false or fabrications.
████████████████████████████████████████████████████████████
████████████████████████████████████████ Indeed, ████████ himself retracted or otherwise
walked back many of these claims in subsequent interviews and statements.

Ukraine."  Moreover, while it is not known how he came across the article, on March 20, 2019, then-President Trump also retweeted one of the links that Parnas had sent to ███████ an article entitled "As Russia Collusion fades, Ukrainian plot to help Clinton emerges." ███████ sent a copy of President Trump's tweet to Parnas.

      j.     Parnas frequently updated ███████ on the success of their press blitz in Russian-language text messages.  In particular, Parnas promptly sent a screenshot of then-President Trump's tweet to ███████  In an apparent effort to garner more information for ███████ Parnas asked ███████ to send him "the names of the people that she said," which appears to be a reference to ███████ and the "do not prosecute list" ███████ claimed she had given him. ███████ sent Parnas three names and described them all as "loud NABU activist[s]." Based on public reporting and my participation in this investigation, including my interview with ███████████, it appears that ███████ may have clashed with ███████ regarding what he perceived to be a rival prosecutor's office in Ukraine, NABU, in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for ███████ to falsely claim that ███████ had asked him not to prosecute "loud NABU activist[s]."  Parnas congratulated ███████ and told him that "Today you become a world-class political figure.  Glory to the Ukraine !!!" ███████ then texted Parnas if it was "true, that the Ambassador chick and [the head of NABU] were called to Washington," to which Parnas replied, "I will call later.  We'll talk."  Parnas then reported to ███████ by text message, in sum and substance, that then-President Trump had re-tweeted a story about ███████ ███████ responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]."  Based on my participation in the investigation, it appears

that ▆▆▆▆ reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

k.     The day after ▆▆▆▆ published the ▆▆▆▆ interview, on or about March 21, 2019, Parnas wrote ▆▆▆▆ and ▆▆▆▆ that the top news story in Ukraine was the reporting regarding Ambassador ▆▆▆▆ which according to Parnas prompted the Ambassador to put out a statement saying that ▆▆▆▆ was a "prime example of corruption."  Based on my review of text messages, ▆▆▆▆ was upset about that statement, and the news coverage he was receiving in Ukraine.  He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine.  "Moreover," ▆▆▆▆ continued, "they are saying in the State Department that my reports work in favor of corrupt officials.  Great fucking help to Ukraine."  Parnas responded that he would call ▆▆▆▆ and had "good news."

l.     ▆▆▆▆ continued to complain to Parnas about the lack of results with respect to ▆▆▆▆ removal.  On or about March 22, 2019, ▆▆▆▆ wrote that "It is simply that if you do not make a decision regarding the madam, you cast doubt on all of my statements, including regarding ▆."  Based on my review of a televised January 16, 2020 interview with ▆▆▆▆ ▆▆▆▆ Parnas confirmed that the "madam" was ▆▆▆▆ and "▆" was "▆▆▆▆ and that Parnas understood ▆▆▆▆ to be saying, in sum and substance, that if Parnas wanted ▆▆▆▆ to make ▆▆▆▆ allegations (and for those allegations to be taken seriously), he needed to have ▆▆▆▆ removed.  Meanwhile, ▆▆▆▆ continued to lobby then-President Trump for Ambassador ▆▆▆▆ removal, and on or about March 22, 2019, Giuliani texted ▆▆▆▆ from Giuliani Number-2, apparently in reference to then-President Trump and the letter from Congressman ▆▆▆▆ calling for ▆▆▆▆ removal, that "he has letter says she's gone no more screwing around[.]"

m.      Based on my review of public reporting, ███████ articles soon received substantially increased press attention.  On or about March 22, 2019, on ████████████ on ███████, ████████ aired a segment highlighting that former-Congressman ██████ sent Secretary of State ██████ "an urgent letter" in May 2018, asking that Ambassador ███████████ be removed from her position, and published a copy of that letter.  ████████ was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman ███████ She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her."  Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that then-President Trump had decided, at least at that point, to fire ██████████ appears to be the "good news" that Parnas reported back to ████████ two days prior.

n.      Later that day, in an apparent reference to ██████ ████████ interview, Parnas texted ████████ "I love you and your husband you are the best," and "Tell ██ he was awesome my hero."  ████████ responded, "We can be really great if we have a retainer signed."  Based on my participation in the investigation as well as my review of the Search Warrant Returns, I believe that ████████ was telling Parnas, in sum and substance, that her and her husband's efforts to seek the Ambassador's removal were an indicator of how "great" they could be for ████████ and how much more they could do for him, if he signed the retainer agreement and paid them.  Parnas agreed, and ████████ asked if the "Wicket [sic] Witch" was gone, which appears to be a reference to ████████ Giuliani separately texted ████████ from Giuliani Number-2 to say that "██ is my hero and you too."  Based on my review of public statements made by Giuliani and

2019.11.19

██████ I have learned that around this time, ██████ and Giuliani frequently posted messages related to Ukraine, ████████ ██ and the 2016 election on Twitter, apparently in an effort to further magnify the press attention ██████ allegations against ████████ would receive.

      o.    Based on my participation in an interview with ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

      p.    Although Parnas, Giuliani, and ██████ appeared to have been pleased with the press response in the U.S., as noted above, the press response in Ukraine was unfavorable to ██████ On or about March 26, 2019, ██████ texted Parnas pictures of documents that allegedly contained information about ██████ and noted, "I hope this is enough." He then complained to Parnas, in sum and substance, that despite the information he was gathering about ██████ the Ambassador had not been fired. In particular, he stated: the "██████████ is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the conversation. My case on

26

2019.11.19

███████ [the head of ██████ is moving along nicely. There is evidence about transfers to ██████]. And only you cannot get rid of that fool of a woman ☹." Parnas wrote back, "She is not a simple fool of a woman. Believe me. Well, she will have nowhere to go."

q.      On or about March 29, 2019, Parnas wrote to ██████ "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." ██████ then told Parnas that he had additional documents related to ██████ payments to ██████, and when Parnas asked ██████ to send them to him, ██████ replied that he would "forward through the new Ambassador ☺."

r.      Over the next several days, Parnas continued to feed information to ██████ who asked Parnas by text to "eyeball" articles for "accuracy," and continued to publish articles in ██████. On or about March 27, 2019, Parnas told Giuliani that "██████ just canceled [on ██████ which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on or about March 30, 2019, Giuliani confirmed that he would be appearing on ██████ that morning, to which Parnas responded, "Great." Parnas sent some of ██████ articles to Giuliani, among many other contacts. ██████ also texted with ██████ about ██████ show canceling on him. ██████ texted ██████ "I think everything will be fine once we get ██████ reported next [w]eek" and said that "██████ told [Giuliani] that ambassador under criminal investigation." ██████ texted back, "Geez. So what could possibly be the rationale to keep her? Makes no sense."

s.      When ██████ still had not been removed, ██████ continued his complaints about ██████ to Parnas. On or about March 29, 2019, ██████ told Parnas that

27

the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding ███████   Next one is going to be about me."  Parnas replied, "I will call you soon with the news."  On or about April 2, 2019, ██████ texted Parnas, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week."  On or about April 9, 2019, ███████ provided the names of "Advisors and public speakers of the presidential candidate" ████████████, who was running against ████████  and their alleged connections to ██████████ (to whom ███████ referred by her nickname, '██████  and wrote that the candidate for Prosecutor-General—who would replace ██████ in the event ████████ was elected—was a "Favorite activist of ██████

<u>Giuliani's Continued Lobbying of the State Department for Ambassador ███████████<br>Removal</u>

19.     Around this time, based on my review of materials obtained from the State Department as well as public statements made by Giuliani, I have learned that Giuliani facilitated the delivery of a package of materials to Secretary ██████ in furtherance of his effort to seek Ambassador ███████████ removal.  According to a U.S. Department of State ███████████████ ████████████████  in late March or early April 2019, ██████ received a package that had to do with "Ukraine issues."  The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, ███████ and Giuliani with ██████ and ████████ from January 2019 regarding ████████ and ██████████  The documents were separated into folders that bore the insignia of the Trump Hotel.  The package also contained ████████ March 20, 2019 articles (discussed above) featuring his interview with

2019.11.19

██████ along with documents that appeared to be ██████ notes and emails regarding the articles.

20.     On or about October 2, 2019, Giuliani confirmed to ████ that the package originated with him, and that he gave the documents to the White House, which then passed them to Secretary ██████ Giuliani claimed that ██████ told him that ██████ would refer the matters detailed in the documents for further investigation.

<u>Continued Efforts to Formalize Relationship with ██████ and Seek Ambassador</u>
<u>██████ Removal</u>

21.     Parnas, ██████ and Giuliani made continued efforts to formalize the relationship with ██████ in April 2019.  Specifically, based on my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a.     On or about April 13, 2019, Giuliani sent Parnas a message from ██████████████, which contained a new retainer agreement, this one between ██████ and ██████ and ██████ and his deputy, ████.[11]  The agreement indicated that ██████ was retaining ████████████████ to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."  The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain of its activities on behalf of foreign political parties or

---

[11] Based on my review of publicly available material, I have learned that ████ worked under ██████ at that time as the deputy head of International Legal Cooperation.  According to an article published on October 5, 2019 in the ████████████, ██████████ asked ██████ to remove ████ at a meeting in 2016 due to ████████ corruption.

2019.11.19

entities." Per the agreement, ████ would pay a $125,000 retainer and $25,000 per month, plus

costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that

████ subsequently signed a copy of each of the three retainer agreements. ████ did not

ultimately pay Giuliani or ████ any money. Shortly after receiving the retainer, ████

wrote to ████ to nudge him on questions for additional Ukrainian interviews because "Lev

wanted me to work with you," and reported, presumably about the retainer, that "Lev says ████

should be client."

   b.   Between in or around April 11 and 23, 2019, Parnas worked with ████

to arrange additional interviews with Ukrainian government officials, and provided the questions

that ████ would ask one official. ████ ran multiple articles during that period. However,

████ walked back some of his claims and told ████ on or about April 17, 2019 that

Ambassador ████ had never provided him with a "do not prosecute" list, and it was instead

he who had requested that list. In addition, on or about April 21, 2019, ████ won the Ukrainian

presidential runoff against ████.

   c.   On or about April 23, 2019, Parnas texted Giuliani at Giuliani Number-2 to

"text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas

wrote, "I pray it happens this time I'll call you tomorrow." But on or about May 4, 2019, Giuliani

texted Parnas from Giuliani Number-2, "Boy I'm so powerful I can intimidate the entire Ukrainian

government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times

and she's still there." That same day, ████ told Parnas that "People here are talking that there

will be a very high level coming from you to the [Ukrainian] inauguration,"[12] to which Parnas

---

[12] Based on my review of public reporting, I have learned that the 2019 Ukrainian election was held on March 31 and April 21 in a two-round system. ████ won the election

2019.11.19

replied "You do understand Who is dealing with this."  Two days later, on or about May 6, 2019, the State Department confirmed that Ambassador ▮▮▮▮▮ would leave her post on May 20, 2019.  That same day, Parnas reported to Giuliani and ▮▮▮▮ that "▮▮▮▮ [] said Ukraine media is saying that the ambassador is being recalled by us."

        d.    On or about May 9, 2019, Parnas forwarded to ▮▮▮▮ three articles entitled "Giuliani previews potential 2020 attack dog role with ▮▮▮-Ukraine story," "How Rudy Giuliani's unfounded claims of an anti-Trump conspiracy in Ukraine may have ousted an ambassador," and "Giuliani plans Ukraine Trip to Push for Inquiries That Could Help Trump." However, ▮▮▮▮ appears to have not been pleased with the press coverage regarding her relationship with ▮▮▮▮  On or about May 9, 2019, ▮▮▮▮ texted Giuliani at Giuliani Number-2 if he told the ▮▮▮▮ that she had been representing ▮▮▮▮ because "I do not have a client."  Giuliani responded "Sorry I thought that's why you were coming?" ▮▮▮▮ wrote, "Pls call. ▮▮▮ now after me for not registering under FARA.  I told you earlier today I had no Retainer with anyone.  Now I am being accused of violating FARA.  This needs to be corrected ASAP."[13]  Giuliani replied by text from Giuliani Number-2, "Really."  ▮▮▮▮ wrote Parnas

---

in the second round with 73% of the vote, defeating the incumbent President ▮▮▮▮▮▮ ▮▮▮▮▮ inauguration was May 20, 2019.

    [13] Based on my review of public statements made by a spokesman for ▮▮▮▮ to the ▮▮▮▮▮▮ on or about November 27, 2019, I have learned that ▮▮▮▮ and ▮▮▮▮ had "agreed to represent people they described as 'Ukrainian whistleblowers'" and that those discussions included a possible representation of ▮▮▮▮  However, "all of the retainer letters under consideration included 'the necessary notice of FARA registration,'" which according to the article, "suggest[ed] the couple had planned to register as foreign lobbyists if the agreements had been executed."  (*See* https://www.washingtonpost.com/politics/giuliani-was-in-talks-to-be-paid-by-ukraines-top-prosecutor-as-they-together-sought-damaging-information-on-democrats/2019/11/27/636c3e86-112d-11ea-b0fc-62cc38411ebb_story.html).     While this statement and the above-referenced text messages reflect a self-professed intention to register for FARA based on ▮▮▮▮ representation of ▮▮▮▮ in the ▮▮▮▮ matter once there was a signed contract, even assuming those statements are credited, FARA explicitly does not require a written contract.  *See* 22 U.S.C. § 612(a)(4).  Moreover, the evidence described above

"Pls tell me name of client.  What happened?  I do not represent ███████  Or anyone else at this moment . . . Who is the person I am supposed to represent?  Rudy told ████ I had been representing ███████  I need to get retainer done so this is cleared up."  Parnas texted back, "I'm not aware of that but don't worry we will clear everything up [once] you['re] here and will get retainer signed."  ███████ asked again for the "complete name so I can have office draft retainer."[14]

    e.  On or about May 13, 2019, Giuliani texted Parnas from Giuliani Number-2 a public statement Giuliani intended to make calling for the ██████ to be investigated.  Parnas responded "Awesome."  Around that time, Parnas sent ███████ a copy of a statement issued by Giuliani.  On or about June 21, 2019, ███████ wrote Parnas, "I think it is time for us to talk with the Mayor.  I have 2-2.5 months and I have a plan.  I am serious.  We have to talk."

---

indicates that ███████ Giuliani, and Parnas never had any intention of registering for FARA based on their representation of ███████ in connection with their efforts to seek Ambassador ███████ removal at ███████ direction and request; only that they may have intended to register in connection with the more innocuous-sounding "recovery of stolen assets."

[14] Based on my review of public statements made by Giuliani, I have learned, among other things, that Giuliani (i) told the ███████ in an interview on November 27, 2019, that, with respect to the proposed contract with ███████ "I thought it would be too complicated.  I never received a penny." (*See* https://www.nytimes.com/2019/11/27/nyregion/giuliani-ukraine-business-trump.html); and (ii) stated on Twitter on November 27, 2019, that "I did NOT pursue a business opportunity in Ukraine, as [███████] misrepresented.  I could have helped them recover $7B in stolen money, but I didn't.  Was paid ZERO." (https://twitter.com/RudyGiuliani/status/1199823401663258624).  As noted above, ███████ made similar statements, distancing herself from representation of ███████ after the relationship became public in May 2019 reporting in the ███████.  However, based on my review of the information described herein, Giuliani's and ███████ statements, made after intense media focus on their relationship with ███████ and role in Ambassador ███████ removal, appear to be inconsistent with the materials described herein and indeed intended to distance them from the conduct under investigation.  For instance, as described herein, Giuliani appeared close to going forward with the representation of ███████ in late February 2019, having sent a retainer agreement and wiring instructions to send to ███████ and it appears the only reason it did not go forward is because ███████ did not wire the money.

2019.11.19

Knowledge of FARA and Absence of FARA Registration

22.     Based on my review of a publicly-available FARA registration database maintained by the Department of Justice, I have learned that Parnas, Giuliani, and ███████████ have never filed a FARA registration.  Additionally, based on my review of those same records, I know that ████████ previously registered under FARA and therefore it appears was aware of the requirement.  Specifically, the firm of ██████████████ previously registered on behalf of the ██████████████, but never made a filing related to Ukraine or ████████  Based on my review of the Prior Search Warrant Returns, I have learned from ██████████ statements in text messages, discussed above, as well as the language of her draft retainer, that she is aware of FARA's registration requirements.

23.     As detailed below, notwithstanding the fact that Giuliani and Parnas had not previously registered, it appears that both Parnas and Giuliani were aware of the FARA registration requirement.  Specifically, based on my review of publicly available FARA filings, press reports, and materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

        a.     On or about July 11, 2018, ██████████████ ran an article on Giuliani's work on behalf of foreign clients while he was working for President Trump, and in response to a request for comment, Giuliani stated: "I've never lobbied [President Trump] on anything . . . I don't represent foreign governments in front of the U.S. government.  I've never registered to lobby."  In September 2018, seven United States Senators wrote to the Justice Department to request a review into whether Giuliani had complied with FARA.  In response to the letter, Giuliani told ██████████████ that he was working for a U.S. firm and was not trying to influence

2019.11.19

U.S. policy.  He added that he "did nothing to invoke FARA either now or ever" and "never represented foreign interests with [the] U.S. government."

      b.    Parnas explicitly discussed FARA or was privy to materials about it on multiple occasions.  First, in or around January 2017 Parnas sent a contact an article that specifically referenced a FARA registration on behalf of the Ukrainian government.  Second, on or about March 5, 2019, one of Parnas's contacts sent him a FARA registration filed by a third party, and Parnas confirmed "Got it."  Notably, that FARA registration was completed regarding lobbying work done on behalf of two embassies (the ██████████████████) and on behalf of a foreign individual in order to arrange meetings with Congressional representatives and staffers, and set up a ██████ congressional caucus.  Third, in or around April 2019, Parnas texted with ██████████, a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding ██████ and ██████  On or about April 24, 2019, as part of a conversation unrelated to the lobbying activities detailed above, Parnas asked ████ to send him the "fara registration," and ████ responded with a FARA registration completed by a public relations firm on behalf of ██████

\* \* \*

24.    Based on the above, there is probable cause to believe that the efforts by Giuliani, ██████ and Parnas to seek the removal of Ambassador ██████ were done at the direction and/or request of ██████ as a part and in furtherance of the Subject Offenses.[15]

---

[15] Based on my review of public statements made by Giuliani, I have learned that Giuliani has made statements intended to suggest that he sought Ambassador ██████ removal for reasons independent of his desire to gain business from ██████  Giuliani told the ██████ ████ in a December 16, 2019, interview that he "gave them [President Trump and Secretary ████ the facts.  I mean, did I think [Ambassador ██████ should be recalled? I thought she should have been fired.  If I was attorney general, I would have kicked her out.  I mean – Secretary of State," and that he had "pointed out to the president a couple of times … what I had learned about the visa denials.  I may or may not have passed along the general gossip that the

2019.11.19

**B.   Probable Cause Justifying Search of Giuliani and the Subject Premises**

25.     There is probable cause to believe that Giuliani is in the possession of the Subject

Devices that were used as instrumentalities and contain evidence of the Subject Offenses, as further

described below.   There is also probable cause to believe that the Subject Premises, closed

containers therein, and the Subject Devices contain evidence and instrumentalities of the Subject

Offenses, as described below.

<u>Giuliani's Use of the Subject Devices</u>

26.     As described below, there is probable cause to believe that the Subject Devices

were used by Giuliani as instrumentalities of the Subject Offenses and contain evidence of the

Subject Offenses.

27.     First, as described above, Giuliani used certain of the Subject Devices to send and

receive text messages and place phone calls to Parnas and ███████ among others, relating to

Ambassador ███████ attempts to remove her from her post, entering into a retainer agreement

---

embassy was considered to be a kind of out-of-control politically partisan embassy, but that was
like, general gossip, I didn't report that as fact."
(https://www.nytimes.com/2019/12/16/us/politics/giuliani-███████-ukraine.html).   In an
interview with the ███████ published on December 16, 2019, Giuliani stated, "I believed that
I needed ███████ out of the way. She was going to make the investigations difficult for
everybody."   (https://www.newyorker.com/magazine/2019/12/23/the-ukrainian-prosecutor-
behind-trumps-impeachment?verso=true). In a December 16, 2019, television interview he stated,
"I didn't need [Ambassador ███████ out of the way.  I forced her out because she's corrupt."
(https://www.youtube.com/watch?v=qFCeznGIXKs).  Giuliani stated on Twitter on December 17,
2019 that "███████ needed to be removed for many reasons most critical was denying visas
to Ukrainians who wanted to come to US and explain Dem corruption in Ukraine. She was
OBSTRUCTING JUSTICE and that's not the only thing she was doing. She at minimum enabled
Ukrainian collusion."  As detailed herein, these statements appear to be inconsistent with the
evidence, including the fact that Giuliani did not take actions to seek the Ambassador's firing until
*after* ███████ had offered a retainer in connection with a potential legal matter, which strongly
suggest that acting at ███████ request and direction appears to have been a strong motivating
factor for Giuliani.  Moreover, and tellingly, none of these statements makes reference to that
retainer or the offer of negative information about the ███████ that ███████ offered Giuliani
shortly before Giuliani's lobbying efforts began.

35

2019.11.19

with ▮ or other Ukrainian government officials, collecting information about ▮ and the ▮ and the requirements of FARA. For instance, Giuliani used Giuliani Number-1 and Giuliani Number-2, both of which were associated with the Subject Devices discussed above, to make and receive communications relating to the commission of the Subject Offenses:[16]

    a.  Specifically, as discussed above, Giuliani sent and received text messages using Giuliani Number-1 relating to the firing of Ambassador ▮ For instance, on or about February 11, 2019, as discussed above, he received a text on Giuliani Number-1 from ▮ asking, "Is there absolute commitment for HER to be gone this week?" He also used Giuliani Number-2 to text back that "▮ is now aware of it." Giuliani also sent and received text messages using Giuliani Number-2 relating to being retained by ▮ For instance, on February 4, 2019, as discussed above, he used Giuliani Number-2 to text Parnas, "need to lock up law suit for AG [o]f Ukraine," and on February 14, 2019, he used Giuliani Number-2 to receive a text message from ▮ asking, "How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA." Based on the subscriber information and associated device information relating to Giuliani Number-1 and Giuliani Number-2, described above, there is probable cause to believe that those numbers are associated with Subject Devices that thus contain evidence of and relating to the Subject Offenses.

---

[16] As discussed above, on November 4, 2019, the FBI and USAO sought and obtained a search warrant for, among other things, Giuliani's iCloud account. However, the iCloud did not contain many of the text messages outlined above with Parnas and ▮ during the December 2018 to April 2019 time frame. Based on my training and experience, as well as my review of records provided by Apple, I believe the iCloud account did not contain text communications from early 2019 because Giuliani did not backup that content, or removed it from the backup, and not because it does not exist. Indeed, for the reasons set forth below, including Giuliani's public statement that he has retained potentially relevant communications on his cellphones, there is probable cause to believe that, unlike the iCloud account, evidence of the Subject Offenses continue to be maintained on the Subject Devices.

2019.11.19

b.   Additionally, on or about September 24, 2019, discussing allegations that he attempted to collect negative information about ▇▇▇ in Ukraine, Giuliani stated, holding up one of the Subject Devices (as pictured below),[17] "I never talked to a Ukrainian official until the State Department called me and asked me to do it, and then I reported every conversation back to them and . . . it's all here, right here, the first call from the State Department, the debriefing . . . ."



28.    Second, in addition to records of text messages and calls, the Subject Devices are likely to contain other evidence of the Subject Offenses, including emails, documents, notes, audio and video recordings, and GPS data.  Specifically:

a.   There is probable cause to believe that the Subject Devices will contain email evidence of the Subject Offenses.  As discussed above, Giuliani used email or messaging associated with his iCloud account to send draft retainer agreements on or about February 16, 2019, and April 13, 2019.  Based on my review of the Prior Search Warrant Returns, I have learned that Giuliani used his iPhones and iPad to send and receive emails.  For instance, on August 16, 2018, Giuliani emailed a draft agreement between ▇▇▇▇▇▇ and Fraud Guarantee (which

---

[17] Video available at: https://youtu.be/5JwNUo92DQ4.

is discussed above) to himself "from [his] iPad" and then forwarded that to ███ "from [his] iPhone." On February 5, 2019, ████████, a senior manager and/or secretary at ███████ ███ emailed Giuliani about flight options to Poland, which is where, as discussed above, Giuliani met with ██████ and Giuliani replied "from [his] iPhone" to ask about ticket prices. On March 20 and 27, 2019, Giuliani "[s]ent from [his] iPhone" links to articles in ██████ that had been written by ███████ about Ukraine.  More generally, based on my training and experience, as well as my review of product information provided by Apple, I know that cellphones and tablets, including iPhones and iPads, can be used to send, receive, and store emails.  I also know from my training and experience that email accounts and their contents, including emails maintained on cellphones, that have been used in furtherance of the Subject Offenses often contain records of that activity, including email correspondence, address books with contact information for co-conspirators, and documents saved as email attachments.

b.  In addition to emails, there is probable cause to believe that documents will be found on the Subject Devices.  Indeed, I know from my training and experience that document attachments to communications can be saved intentionally or as a result of a cellphone's or tablet's operating system or web browser to the cellphone itself.  Tablets and computers can also be used to create documents in word processing programs, like Microsoft Word.  Additionally, from my training and experience, I know that users of cellphones, tablets, and computers who are engaged in the commission of the Subject Offenses often store important documents relevant to that activity on their devices, and also maintain notes of meetings and telephone calls on their devices.  Such documents can include, but are not limited to, Microsoft Word and PDF documents, drafts, scans, bank statements received from financial institutions, and government filings.  As discussed above, the commission of the Subject Offenses involved the use of documents including signed and draft

retainer agreements, notes of meetings with ███████ and others, and documents provided by ███████ and therefore some or all of those types of documents are likely to be found on the Subject Devices.

      c.   There is also probable cause to believe that the Subject Devices contain multimedia, such as videos, audio records, and photographs, that are evidence of the Subject Offenses.  For example, from my review of the Prior Search Warrant Returns, I know that Giuliani used his iCloud account to send to an assistant what appear to be copies of the recording of his interview with ███████  More generally, I know that cellphones can contain photographs and videos of meetings and documents, audio recordings of telephone calls and meetings, and screenshots of text messages.  Based on my involvement in this investigation and my review of public sources, I know that Giuliani and individuals working with him made audio and video recordings of meetings and interviews (including, for instance, a meeting with ███████  Indeed, in an interview on ███████ in or around October 2019, discussing the impeachment inquiry, Giuliani stated that he has relevant "videotapes and tape recordings."[18]  On or about December 15, 2019, Giuliani posted a video of himself interviewing ███████ to Twitter, and according to public reporting, Giuliani traveled from the United States to Europe to meet with ███████ and other current and former Ukrainian officials.[19]  Because I know that co-conspirators often exchange such documentary evidence with each other to further a criminal scheme and/or keep records of their activity, the Subject Devices are likely to contain such evidence.

---

[18] Available at: https://www.youtube.com/watch?v=nMrSbv4pbzA.

[19]    Available    at:    https://twitter.com/RudyGiuliani/status/1206291142498750465; https://www.nytimes.com/2019/12/04/us/politics/giuliani-europe-impeachment.html.

2019.11.19

d.  In addition to text messages, call logs, emails, documents, and multimedia (including photographs, videos, audio recordings, and voicemails), the Subject Devices are also likely to contain other records that are evidence of the commission of the Subject Offenses. Specifically, based on my training and experience and review of the Prior Search Warrant Returns, including Giuliani's iCloud account and his communications with Parnas, there is reason to believe that the Subject Devices will contain contact information of co-conspirators and/or witnesses (such as contact cards), internet search and browser history which may reveal Giuliani's state of mind at the time of the commission of the Subject Offenses, and GPS data and calendar entries, which may reveal Giuliani's presence at meetings with co-conspirators or other relevant witnesses.

29.     Third, I understand from my training and experience, and my review of publicly-available information, that even for cellular telephone data and files that were created or last modified in 2018 or 2019, there is reason to believe that they can still be recovered from one or more of the Subject Devices.  Specifically:

a.  From my training and experience, I have learned that electronic files, or remnants of those files, downloaded to a cellular telephone can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space–that is, in space on the cellular telephone that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space–for long periods of time before they are overwritten.  In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery"

file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a cellular telephone depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and cellular telephone habits.

b.   Additionally, I have learned from my training and experience, and review of publicly-available information, that a person can transfer data from an old phone to a new phone, including, for example, mail, contacts, calendars, photos and videos, books and pdfs, call logs, and text messages.  For individuals who regularly change or upgrade their phone, as appears to be the case for Giuliani, I have learned that it is common to transfer electronic records, such as emails, contacts, calendars, photos and videos, books and pdfs, call logs, and text messages from the old phone to a new phone.  I have further learned that individuals can transfer data in a few ways, including in a cellphone provider or Apple store, through a personal computer containing a backup, or through an iCloud backup.

c.   Moreover, as discussed above, Giuliani has appeared on television and stated that he has retained evidence relating to Ukraine, and accordingly there is reason to believe that Giuliani has actively sought to preserve electronic evidence on the Subject Devices that may be relevant to the Subject Offenses.

<u>The Subject Devices in the Possession, Custody, or Control of Giuliani</u>

30.    The applied-for warrant would authorize the search of and seizure from Giuliani of Subject Devices for the purpose of identifying electronically stored data or other evidence, fruits, or instrumentalities of the Subject Offenses, as particularly described in Attachment A.  As

41

2019.11.19

described below, there is probable cause to believe that one or more of the Subject Devices are likely to be found on Giuliani's person or in his possession, custody, or control.

a.   First, based on my review of publicly available information, I believe that Giuliani carries one or more cellphones with him at nearly all times.  For instance, according to a December 23, 2019, article in ███████████ about an interview with Giuliani, he carries "three phones of varying sizes" with him.[20]  The article stated that at the end of the interview, Giuliani's bodyguard asked if he had "all three phones" and Giuliani said, "Yeah, I got all three phones."[21] Additionally, as quoted and pictured above, it appears that Giuliani regularly has on his person one or more electronic devices, including cellphones and tablets.

b.   Second, based on my review of pictures and video taken of Giuliani over the last several years, it appears that Giuliani regularly conducts his day-to-day activities with at least one cellphone or other electronic device with him, and accordingly there is probable cause to believe that he maintains one or more devices on his person.  Additionally, based on my review of an interview of Giuliani on ██████ on or about September 26, 2019, it appears, as pictured below, that Giuliani also travels outside his residence or office with an iPad.[22]

---

[20]   Available   at:   https://nymag.com/intelligencer/2019/12/a-conversation-with-rudy-giuliani-over-bloody-marys.html.

[21]  The article also notes that Giuliani commented that he needed to "get down to two [phones]," which he was going to "try that [night]," and that he accidentally left one of the phones with the reporter, which his bodyguard later recovered.  Nonetheless, based on the other quoted portions of the article and the information set forth herein, there is probable cause to believe that Giuliani continues to carry at least one cellphone on his person.

[22]  Available at: https://twitter.com/i/status/1177416704634359809.

2019.11.19



c.   Third, based on my training and experience, I have learned that individuals regularly keep electronic devices such as cellphones in their homes or on their persons.  Indeed, based on my review of the Prior Search Warrant Returns, it appears based on the time text messages and emails are sent (i.e., early or late in the day) that Giuliani regularly operates the Subject Devices to send messages from wherever he is residing at the time those messages are sent.  In addition, based on my review of location data obtained pursuant to the GPS Warrant, I have learned that Giuliani Number-2, which appears to be Giuliani's primary telephone, has been located within the vicinity of the Giuliani Residence during a substantial period of time since the initiation of the GPS Warrant.  Accordingly, there is probable cause to believe that the Giuliani will have one or more of the Subject Devices on his person, in his personal possessions (like a briefcase or backpack), or in his immediate vicinity at his residence or office (both of which are discussed below).

Evidence in the Giuliani Residence

31.     The applied-for warrant would authorize the search of the Giuliani Residence and any closed containers or items contained therein, along with the forensic examination of any Subject Device seized from the Giuliani Residence, for the purpose of seizing any Subject Devices

43

found in the Giuliani Residence and identifying electronically stored data or other evidence, fruits, or instrumentalities of the Subject Offenses, as particularly described in Attachment B.   As described below, there is probable cause to believe that Giuliani resides principally at the Giuliani Residence and that it will contain Subject Devices containing evidence relating to the commission of the Subject Offenses.

32.     First, there is probable cause to believe that Giuliani lives at the Giuliani Residence. Based on my review of subpoena returns from Amazon, AT&T, and Apple, I know that since at least in or about June 2019, Giuliani's address has been the Giuliani Residence.  In addition, from my review of press reports and commercial databases, I know that Giuliani has been living at the Giuliani Residence since at least the middle of 2019.[23]

33.     Second, there is also probable cause to believe that the Giuliani Residence is likely to contain one or more of the Subject Devices, which, as discussed above, contain fruits, instrumentalities and evidence of the Subject Offenses.  Specifically, from my the Prior Search Warrant Returns and publicly-available sources, I am aware of the following reasons that one or more of the Subject Devices is likely to be found in the Giuliani Residence:

a.   Based on my review of information provided by AT&T and Apple, I have learned that Giuliani has registered multiple electronic devices to the address for the Giuliani Residence, including the Subject Devices registered to Giuliani Number-1.  Because I know from my training and experience that people routinely keep their electronic devices where they are registered, there

---

[23] Based on my participation in the investigation and review of public reporting, I have learned that Giuliani previously resided in the Giuliani Residence with his wife.  During periods of their divorce proceedings, Giuliani moved out of the Giuliani Residence and lived at a different residence in Manhattan, between in or about 2018 and the middle of 2019.  In approximately June 2019, Giuliani moved back into the Giuliani Residence.  It appears that Giuliani resides there alone, but occasionally hosts guests.

2019.11.19

is probable cause to believe that Giuliani's electronic devices, including certain Subject Devices that were registered to Giuliani's phone numbers that were used in furtherance of the scheme described herein (including those enumerated in this paragraph, which were linked to the Giuliani Numbers), will be found in the Giuliani Residence.  In addition, based on my review of location data obtained pursuant to the ████████ I know that Giuliani Number-2 has been located at the Giuliani Residence for a substantial period of time since the initiation of the ████████.

      b.    Based on my review of recent episodes of Giuliani's podcast (which is viewable by video online), including his statements during those podcasts and the characteristics of the room in which he is seated, it appears that Giuliani is filming the podcasts in his apartment in ████████. Indeed, based on my review of news reporting, it appears that Giuliani is filming the podcast in his ████████ apartment, that is, the Giuliani Residence.[24]  Based on my review of the video of those podcasts, it appears that Giuliani is keeping electronic devices with him in his apartment. For instance, during a podcast that was posted online on or about February 10, 2021, Giuliani can be seen with an iPad.  During a podcast that was posted online on or about July 1, 2020, Giuliani can be seen with a cellphone on his lap.  During a podcast posted online on or about July 15, 2020, Giuliani can be seen with an iPad.  During podcasts posted online or about July 24, 2020, and July 29, 2020, Giuliani can be seen with a tablet, which appears to be an iPad.  During a podcast on or about January 31, 2020, as pictured below, Giuliani held up an iPhone and stated that he was reading information off the screen from "the Ministry of the Home Affairs of Ukraine Information Department" about ████████.[25]

---

[24]   Available at:  https://www.washingtonpost.com/politics/giuliani-a-familiar-voice-in-trumps-ear-promotes-experimental-coronavirus-treatments/2020/04/05/d4b3b56a-7438-11ea-85cb-8670579b863d_story.html.

[25] Available at: https://youtu.be/eKDYhb3kaMk.

2019.11.19



It appears that the devices seen on the podcasts are Apple devices that fit the description of some of the devices defined as Subject Devices. Accordingly, there is probable cause to believe that at least some of the Subject Devices are within the Giuliani Residence.

      c.   Additionally, it appears based on the time text messages and emails relevant to the Subject Offenses have been sent (*i.e.*, early or late in the day) that Giuliani regularly operates the Subject Devices to send and receive messages and phone calls – and has done so relevant to the Subject Offenses – at times a person would typically be at home. Additionally, based on Giuliani's public statements discussed above, it appears that he has retained electronic evidence and, based on my training and experience, I know that owners of cellphones and tablets routinely keep devices in their homes years after their last use because of the difficulties associated with safely disposing of electronic devices. Accordingly, there is probable cause to believe that the Giuliani Residence will contain the Subject Devices that Giuliani was using during the commission of the Subject Offenses, but has since replaced with newer devices.

2019.11.19

<u>Evidence in the Offices of</u> █████████

34.     The applied-for warrant would authorize the search of the workspaces in Offices of ████████ of three ████████ employees: Giuliani, ████████ (an employee who took notes in the ██████ meeting), and ████████ (the senior manager/secretary who sent scans of documents and emails relevant to the Subject Offenses to Giuliani) for any electronic devices used by Giuliani, ████ and ████  With respect to ████ and ████ in particular, given the nature of their above-described use of the Subject Devices in connection with the Subject Offenses, the applied-for warrant would authorize the search of electronic devices stored at the Offices of ████████ and used by ████ and ████ for the purposes of their work, rather than their personal devices. This warrant would also authorize the forensic examination of seized electronic devices – including any device used by Giuliani, ████ or ████ at the Offices of ████████ all of which are part of the Subject Devices – for the purpose of identifying electronically stored data or other evidence, fruits, or instrumentalities of the Subject Offenses, as particularly described in Attachment C.  There is probable cause to believe that the specified electronic devices in the Offices of ████████ will contain evidence relating to the commission of the Subject Offenses.  As discussed above, ████████ is a management and security consulting business that was founded by Giuliani in or around 2002, which appears to have multiple employees, several of whom were involved in the activity described above.  In particular, it appears that Giuliani and ████ used the Offices of ████████ to conduct interviews and meetings relevant to the commission of the Subject Offenses, and that there are electronic devices located in the work areas of Giuliani, ████ and ████ at the Offices of ████████ which contain evidence of the commission of the Subject Offenses.  Specifically,

as discussed above, and from my review of the Prior Search Warrant Returns, I have learned the following:

a.   First, as discussed above, Giuliani used the Offices of ███████ to conduct interviews with ████ and ███████ and meet with ██████ on or about January 25 and 26, 2019, as part of the commission of the Subject Offenses.  Based on my review of a video of the ████ interview – a still image of which is below – I have learned that during the interview, Giuliani and ████ took hand-written notes about what ████ was saying over the phone, while Parnas held the phone.



b.   As discussed above, it appears that ████ or another person transcribed those hand-written notes into a multi-page typed document.  Additionally, while it does not appear the ████ meetings and interview were recorded by video, there are, as discussed above, typed notes of the meeting.  Both sets of notes have printed on the top the address for the Offices of ███████.  Accordingly, there is reason to believe that the computer(s) containing the typed summaries of those notes that I have since reviewed will be found in the work areas or on the electronic devices of Giuliani, ████ or ████ (the senior manager at ███████ who

2019.11.19

appears to do paperwork for Giuliani) at the Offices of ██████████   Additionally, based on my review of public sources, including statements by Giuliani, it appears that Giuliani conducted interviews with other Ukrainian government officials in 2019.  Not only does it appear that typed summaries and notes of the ██████ and █████ interviews, and potentially others like them, were created in the ████████ workspace, but based on my training and experience, it is common for individuals to keep work product they create at their office in their office.  This is particularly likely based on my review of the Prior Search Warrant Returns, which include a May 10, 2019 email to Giuliani from █████ transmitting scanned hand-written notes about, among other things, Ukraine.  Therefore, there is probable cause to believe that electronic devices in those premises used by Giuliani, ██████ █████ are likely to contain typed notes of meetings, telephone calls, and interviews related to the commission of the Subject Offenses.

c.   Second, as discussed above, Giuliani exchanged draft and partially signed retainer agreements in which ██████ or other Ukrainian government officials were the counterparties. Based on my review of the Prior Search Warrant Returns, it appears that drafts, signed originals, and scans of these retainer agreements, as well as notes or emails about them, are likely to be found on electronic devices used by Giuliani, █████ and ██████ in the Offices of ██████████ Specifically, as discussed above, on or about February 16, 2019, Giuliani sent Parnas a draft retainer agreement according to which ████████ would retain ██████████████ ████████ and ████████ "to advise on Ukraine claims for the recovery of sums of money in various financial institutions outside of Ukraine."  The retainer was sent by Giuliani as a Microsoft Word document titled "Blank 14," and based on the format of the document, its file name, and the style of the short-form agreement, when compared with other agreements I have reviewed that I believe were drafted by Giuliani, I believe this document was also drafted by Giuliani or an assistant working on his

2019.11.19

behalf.  Moreover, based on my training, experience, and the features of this particular document, I believe it was likely drafted on a computer or tablet, and therefore given the fact that it was generated on behalf of ███████████ there is probable cause to believe the tablet or computer used to draft the retainer will be found in the Office of ███████████ Additionally, on or about February 20, 2019, ██████ sent Parnas, copying Giuliani, an email containing a scan of the retainer agreement dated February 19, 2019, which included Giuliani's signature.  ███████ signature line and the letterhead on which the retainer was printed had the address of the Offices of ███████████ Accordingly, it is likely that a computer containing the scan will be found in the Offices of ███████████

d.   Third, in addition to the foregoing, there is probable cause to believe that computers or tablets used by Giuliani, ██████ and ██████ all of which constitute a part of the Subject Devices, will be found in the Offices of ███████████ Based on the subject matter of certain text messages and emails, and the time at which they were sent, it appears likely that Giuliani, ██████ and ██████ were likely at work and therefore in the Offices of ███████████ Finally, the iPhone assigned Giuliani Number-2 is registered to ███████████ at the Offices of ██████████ ████████

e.   Based on records subpoenaed from the realty company that manages ████████ ██████, I have learned that ████████, located on the ████ floor, is currently leased by "█████ ███████████," which is another business owned by Giuliani which appears to share an address with ███████████

f.   Law enforcement intends to execute the search in the early morning hours at a time in which Giuliani, ██████ and ██████ are not expected to be present at the Offices of ██████ ████████ With respect to ██████ and ██████ in particular, *supra* Paragraph 34, given the early

50

2019.11.19

morning hour their personal devices are not expected to be present at the Offices of ████

████

     g.   Accordingly, there is probable cause to believe that the Offices of ████████

will contain computers and electronic devices used by Giuliani, ████ and ████ in furtherance

of the Subject Offenses, as well as Subject Devices that Giuliani, ████ and ██████ were using

during the commission of the Subject Offenses.

* * *

    35.    Based on the foregoing, I respectfully submit there is probable cause to believe that

Giuliani and others engaged in criminal activity in violation of the Subject Offenses, and that

evidence of this criminal activity is likely to be found in Subject Devices on Giuliani's person and

in the Subject Premises.  Specifically, based on the foregoing, there is probable cause to believe

that the following evidence, described below and in Attachments A, B, and C, will be found within

the Subject Premises and in Subject Devices in the Subject Premises or on Giuliani's person:

     a.   Evidence relating to, including but not limited to communications with or

regarding, Parnas, ████ ████ ████ ██████ ██████ ████████ ██████ ████

████ ██████ or ██████

     b.   Evidence relating to ██████ and the position of U.S. Ambassador to Ukraine,

including but not limited to any communications with any U.S. Government official or employee

regarding ██████ or the position of U.S. Ambassador to Ukraine.

     c.   All retainer agreements, including any drafts or partially executed agreements, with

any Ukrainian government entity, official, or national, including but not limited to ██████

     d.   Evidence relating to any work or potential work concerning ████████████ or

the recovery of assets stolen from Ukraine.

     e.   Evidence relating to a trip by Giuliani to Poland in February 2019.

51

    f.   Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

36.    <u>Time Limitation.</u>  To the extent materials are dated, this warrant is limited to materials created, modified, sent, or received between August 1, 2018, and December 31, 2019. Materials going back to approximately August 2018 are relevant to understand Giuliani's relationship with Parnas and information he was provided in the fall of 2018 relating to, among other things, Ambassador ███████ and Ukraine.  Materials created, modified, sent, or received after approximately May 2019, when the Ambassador was removed from her post, through the end of December 2019, during which time Giuliani traveled to Europe to meet with ███████ are relevant because based on my review of the Prior Search Warrant Returns, it appears that Giuliani continued to make public statements about Ukraine and the Ambassador.

## III.  Procedures for Searching

### A.  Use of a Filter Team

37.    Because Giuliani is an attorney, and continues to have legal clients, the initial search will be conducted by FBI agents who are not members of the prosecution team. Additionally, the review of evidence seized from the Subject Premises and Subject Devices will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in the investigation, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  The procedures will include use of a designated "filter team," separate and apart from the investigative team, in order to review potentially privileged communications and determine which communications to release to the investigation and prosecution team.

2019.11.19

**B.  Unlocking Cellphone and Tablet Devices with Biometric Features**

38.    I request authority to allow law enforcement agents to obtain from the person of Giuliani (but not any other individuals present at the Subject Premises at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device(s).  The grounds for this request are as follows:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

2019.11.19

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d.   If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

2019.11.19

f.   As discussed above, there is reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to

2019.11.19

know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

i.   Due to the foregoing, I respectfully request that the Court authorize that, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## C.   Execution of Warrant for ESI

39.   Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

a.   First, the volume of data on computer devices, cellphones, and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

2019.11.19

b.    Second, because computer and cellphone data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices and cellphones are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

c.    Third, there are so many types of computer hardware and software, and so many types of cellphone software and applications in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

d.    Fourth, many factors can complicate and prolong recovery of data from a computer device or cellphone, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer or cellphone, which often take considerable time and resources for forensic personnel to detect and resolve.

40.    As discussed herein, ███████████ is a functioning company that conducts legitimate business.  The seizure of ██████████ computers or other storage media may limit the ██████████ ability to conduct its legitimate business.  In order to execute the warrant in the most reasonable fashion, law enforcement personnel will attempt to investigate on the scene of what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied.  Law enforcement personnel will speak with ████████████ personnel on the scene as may be appropriate to locate the work areas and devices that are or have been used by Giuliani, █████ and █████  Where appropriate, law enforcement personnel will copy data, rather than physically seize computers, to reduce the extent of any disruption of the ██████████ business operations.  If employees of ████████████ so request, the agents

57

will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continued functioning of ▮▮▮▮▮▮▮ legitimate business.  If, after inspecting the seized computers off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it promptly.

**D.  Review of ESI**

41.     Following seizure of any electronic device, including but not limited to the Subject Devices, and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

42.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

•      surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

•      conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

•      "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files;

•      performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation; [26] and

---

[26] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information

2019.11.19

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

43.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

**E.   Return of ESI**

44.    If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

---

properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

2019.11.19

## IV.  Conclusion and Ancillary Provisions

45.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachments A, B, and C to this affidavit and to the Search and Seizure Warrant.

46.     In light of the confidential nature of the continuing investigation, and the fact that premature disclosure of this affidavit could alert subjects of the investigation as to the nature and scope of the investigation, thereby prompting them to destroy evidence, shape their testimony, or tamper with witnesses, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Special Agent
Federal Bureau of Investigation

Sworn to before me on April 21, 2021

J. PAUL OETKEN
United States District Judge

60

2019.11.19

**ATTACHMENT A**

## I.  Person to be Searched and Items to be Seized

The person to be searched is Rudolph Giuliani, pictured below, provided at the time of the execution of the search warrant he is located in the Southern District of New York.



This warrant authorizes the search, seizure, and forensic examination of any and all cellphones, tablets, and electronic devices within the possession, custody, and control of Rudolph Giuliani (the "Subject Devices"), including but not limited to the following devices: an Apple iPhone X with IMEI number ████████████ and an Apple iPhone X with IMEI number ████████████; an Apple iPhone XS Max with IMEI number ████████████ an Apple iPhone 11 Pro Max with IMEI number ████████████ an ASCS cellphone with IMEI number ████████████; an Apple iPad Pro 10.5 with serial number ████████████ an iPad Pro 11 with serial number ████████████ an Apple MacBook Pro 13.3 in "space gray" with serial number ████████████

## II.  Review of ESI on the Subject Devices

### A.  Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from Rudolph Giuliani the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in

2019.11.19

front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## B.   Evidence of the Subject Offenses

Following seizure of the Subject Devices, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for evidence and instrumentalities of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 2 (attempting to and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (the "Subject Offenses"), for the time period August 1, 2018, up to and including December 31, 2019, described as follows:

1.      Evidence relating to, including but not limited to communications with or regarding, Lev Parnas, █████████████████████████████████████████████████ ███████████████████████████████████

2.      Evidence relating to ███████████████ and the position of U.S. Ambassador to Ukraine, including but not limited to any communications with any U.S. Government official or employee regarding ███████████ or the position of U.S. Ambassador to Ukraine.

3.      All retainer agreements, including any drafts or partially executed agreements, with any Ukrainian government entity, official, or national, including but not limited to ████████

4.      Evidence relating to any work or potential work concerning ██████████████ or the recovery of assets stolen from Ukraine.

5.      Evidence relating to a trip by Rudolph Giuliani to Poland in February 2019.

6.      Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

## C.   Methods of Review of ESI

In conducting the review of ESI on the Subject Devices, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

2019.11.19

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section III.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

2019.11.19

**ATTACHMENT B**

## I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein: the residential apartment ███████ located at ███ ███████████, New York, New York.

## II. Items to Be Seized

This warrant authorizes the search, seizure, and forensic examination of any and all cellphones, tablets, and electronic devices within the Subject Premises (the "Subject Devices"), including but not limited to the following devices: an Apple iPhone X with IMEI number ████████████ and an Apple iPhone X with IMEI number ██████████ an Apple iPhone XS Max with IMEI number ███████████ an Apple iPhone 11 Pro Max with IMEI number ██████████ an ASCS cellphone with IMEI number ██████████ an Apple iPad Pro 10.5 with serial number ██████████ an iPad Pro 11 with serial number █████████ an Apple MacBook Pro 13.3 in "space gray" with serial number ██████████.

## III. Review of ESI on the Subject Devices

### A. Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from Rudolph Giuliani the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

### B. Evidence of the Subject Offenses

Following seizure of the Subject Devices, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for evidence and instrumentalities of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 2 (attempting to and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (the "Subject Offenses"), for the time period August 1, 2018, up to and including December 31, 2019, described as follows:

1.      Evidence relating to, including but not limited to communications with or regarding, Lev Parnas, ████████████████████████████████████████████████

██████████████████████████████████

2.      Evidence relating to ███████████ and the position of U.S. Ambassador to Ukraine, including but not limited to any communications with any U.S. Government official or employee regarding ██████ or the position of U.S. Ambassador to Ukraine.

3.      All retainer agreements, including any drafts or partially executed agreements, with any Ukrainian government entity, official, or national, including but not limited to ██████

4.      Evidence relating to any work or potential work concerning ████████ or the recovery of assets stolen from Ukraine.

5.      Evidence relating to a trip by Rudolph Giuliani to Poland in February 2019.

6.      Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

## C.   Review of ESI

Following seizure of any cellphones, tablets, computers, and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein that was sent, received, posted, created, or otherwise accessed, established, modified, or deleted between the time period August 1, 2018 and December 31, 2019 for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

•      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

•      opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

•      scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

•      performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

2019.11.19

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section III.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## ATTACHMENT C

### I.   Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein: the office space occupied by ███████ LLC, ███████, on the ███████ floor of the building located at ███████, New York, New York.

### II.   Items to Be Seized

This warrant authorizes the search, seizure, and forensic examination of:



a. Any and all cellphones, tablets, and electronic devices that belong to or that are or were used by Rudolph Giuliani including but not limited to the following devices: an Apple iPhone X with IMEI number ███████ and an Apple iPhone X with IMEI number ███████ an Apple iPhone XS Max with IMEI number ███████ an Apple iPhone 11 Pro Max with IMEI number ███████ an ASCS cellphone with IMEI number ███████ an Apple iPad Pro 10.5 with serial number ███████ an iPad Pro 11 with serial number ███████ an Apple MacBook Pro 13.3 in "space gray" with serial number ███████

b. Any work-related electronic devices that are or were used by ███████ and/or ███████, but not their personal electronic devices.

The foregoing devices are collectively defined as the "Subject Devices."

### III.   Review of ESI on the Subject Devices

#### A.   Unlocking Devices with Biometric Features

During the execution of the warrant, law enforcement personnel are authorized to obtain from Rudolph Giuliani the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

#### B.   Evidence of the Subject Offenses

Following seizure of the Subject Devices, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for evidence and instrumentalities of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign

agent), 18 U.S.C. § 2 (attempting to and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (the "Subject Offenses"), for the time period August 1, 2018, up to and including December 31, 2019, described as follows:

1.      Evidence relating to, including but not limited to communications with or regarding, Lev Parnas, 

2.      Evidence relating to ▮▮▮▮▮▮▮▮▮ and the position of U.S. Ambassador to Ukraine, including but not limited to any communications with any U.S. Government official or employee regarding ▮▮▮▮▮▮ or the position of U.S. Ambassador to Ukraine.

3.      All retainer agreements, including any drafts or partially executed agreements, with any Ukrainian government entity, official, or national, including but not limited to ▮▮▮▮▮

4.      Evidence relating to any work or potential work concerning ▮▮▮▮▮▮▮▮ or the recovery of assets stolen from Ukraine.

5.      Evidence relating to a trip by Rudolph Giuliani to Poland in February 2019.

6.      Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

## C.  Review of ESI

Following seizure of any cellphones, tablets, computers, and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein that was sent, received, posted, created, or otherwise accessed, established, modified, or deleted between the time period August 1, 2018 and December 31, 2019 for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

2019.11.19

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section III.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

3