19MAG11704

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All Content and Other Information Associated with the Email Account [redacted].com, Maintained at Premises Controlled by Google, LLC, USAO Reference No. 2018R01226

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant for Stored Electronic Communications**

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

[redacted], being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the federal campaign finance laws. I also have training and experience executing search warrants, including those involving electronic evidence.

### B. The Provider, the Subject Account and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email account [redacted].com (the "Subject Account"), maintained and controlled by Google, LLC (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California

94043. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3. As detailed below, there is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 951 (acting as an agent of a foreign government), 18 U.S.C. § 2 (willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (together, the "Subject Offenses").

4. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Provider**

5. I have learned the following about the Provider:

a. The Provider offers email services to the public. In particular, the Provider allows subscribers to maintain email accounts under the domain name gmail.com and under any domain name under the subscriber's control. For example, if a subscriber controls the domain name "xyzbusiness.com," the Provider enables the subscriber to host any email address under this domain name (*e.g.*, "john@xyzbusiness.com"), on servers operated by the Provider. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.

b. The Provider maintains the following records and information with respect to every subscriber account:

i. *Email contents.* In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii. *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv. *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

v. *Google Drive Content.* The Provider provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his subscriber account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

vi. *Google Docs.* The Provider provides users with the ability to write, edit, and collaborate on various documents with other users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

vii. *Google Calendar.* The Provider provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

viii. *Location History.* The Provider maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by the Provider. For example, the Provider collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. Apps and services also allow for location reporting, which allows the Provider to periodically store and use a device's most recent location data in connection with a subscriber account.

ix. *Device Information.* The Provider collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

x. *Android Services.* The Provider also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by the Provider, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. The Provider retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used. One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

xi. *Linked Accounts.* The Provider uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

xii. *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D. Jurisdiction and Authority to Issue Warrant**

6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

**II. Prior Applications Referenced Below**

9. On or about January 18, 2019, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18

Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, and others. On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the January 18 Warrant returns for evidence of additional offenses.

10. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for iCloud accounts belonging to Parnas, Fruman, and Van Rensburg. On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the May 16 Warrant returns for evidence of additional offenses.

11. On or about August 14, 2019, the USAO and FBI sought and obtained from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, a search warrant (the "August 14 Warrant") for email accounts belonging to Parnas, Fruman, and others.

## III. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

<u>Overview</u>

12. The FBI and USAO are investigating whether Victoria Toensing (the user of the Subject Account) and others – including Rudolph Giuliani, Lev Parnas, and Igor Fruman – undertook actions to cause the removal of the United States Ambassador to the Ukraine, Marie Yovanovitch, and other conduct detailed below at the request and/or under the direction of a foreign government, entity, or person, in violation of the Foreign Agents Registration Act ("FARA").

13. FARA criminalizes acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities. Activities covered by FARA include acting

as a "publicity agent" or engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-12. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* As relevant here, FARA requires any person acting "at the order, request, or under the direction or control" of (i) a foreign principal, or (ii) a person whose activities are "indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," to register with the Attorney General and to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. *Id.* Similarly, the federal foreign agent statute prohibits non-diplomats from acting within the United States as agents of a foreign government without prior notification to the Attorney General. 18 U.S.C. § 951.

14. There is probable cause to believe that Toensing, Giuliani, Parnas, and Fruman lobbied for the removal of then-Ambassador Yovanovitch, at the direction and request of at least one Ukrainian government official, and that they did so without registering under FARA or providing notice to the Attorney General. Indeed, as described below, it appears that Toensing was retained by, or was in discussions to be retained by, one or more Ukrainian nationals to lobby for the removal of Ambassador Yovanovitch, and aided Parnas, Fruman, and Giuliani in their efforts to remove the Ambassador, in violation of the Subject Offenses. Moreover, as set forth below, based on my review of materials obtained pursuant to the January 18 Warrant, May 16 Warrant, and August 14 Warrant, there is probable cause to believe that Toensing used the Subject Account in

furtherance of the Subject Offenses including by, among other things, communicating about the removal of then-Ambassador Yovanovitch.

Background

15. Parnas is a businessman and entrepreneur who lives in south Florida, and is a naturalized U.S. citizen originally from Ukraine.[1] Based on my review of emails obtained pursuant to the January 18 Warrant, May 16 Warrant, materials obtained pursuant to Grand Jury subpoenas, and my review of public reporting, I have learned that since at least 2016, Parnas has had close relationships with Ukrainian government officials, including Roman Nasirov (then-Head of the State Fiscal Service of Ukraine),[2] Victor Shokin (then-General Prosecutor of Ukraine), and Petro Poroshenko (then-President of Ukraine). Parnas also appears to have acted as an intermediary on their behalf in the United States. Specifically, I have learned the following with respect to Parnas's activities in 2016 and 2017 related to Ukrainian officials:

a. On or about December 16, 2016, according to records obtained pursuant to a grand jury subpoena to Ballard Partners, Parnas introduced Brian Ballard of the lobbying firm Ballard Partners to Nasirov, and it appears that the purpose of that meeting, at least in part, was to discuss Nasirov retaining Ballard Partners to lobby on his behalf.

[1] On October 9, 2019, a grand jury sitting in the Southern District of New York returned an indictment charging Parnas with conspiring to make unlawful straw donations, making and willfully causing false statements to be made to the FEC, fabricating documents to impede, obstruct, and influence the proper administration of a matter within the FEC's jurisdiction, and conspiring to make unlawful foreign contributions in 52 U.S.C. §§ 30121, 30122 and 18 U.S.C. §§ 371, 1001, 2, and 1519.

[2] Based on my review of public reporting and participation in the investigation, I have learned that the State Fiscal Service of Ukraine is a governmental agency that combines the powers of tax authorities, customs, and financial police, and is responsible for, among other things, implementing state tax and customs policy.

b. Based on my review of materials obtained from Ballard Partners and pursuant to the January 18 Warrant and May 16 Warrant, I have learned that throughout January 2017, Parnas served as an intermediary between Ballard and Nasirov, and received a referral fee from Ballard after Ballard was retained by Nasirov. It appears that Ballard and Parnas took efforts to hide the fact that Nasirov was the ultimate client. Although the earliest draft of the retainer agreement listed the client as the "Government of Ukraine," in a subsequent draft of a retainer agreement circulated in early January 2017, the client was listed as a British law firm "acting in the interests of Roman Nasirov, a citizen of Ukraine."

c. Based on my review of materials obtained from Ballard Partners and pursuant to the January 18 Warrant and May 16 Warrant, I have learned that the final agreement between Ballard and Nasirov omitted any reference to Nasirov, and described the client simply as the British law firm. Nonetheless, email correspondence between Parnas and Nasirov makes clear that Nasirov was the ultimate client. The contract memorialized an agreement for Ballard to "consult with the Client and advocate on its behalf" on any issues "before the Federal government of the United States" in exchange for $100,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant and from Ballard Partners, I have learned that in January 2017, Nasirov subsequently wired $100,000 to Ballard Partners, from a bank in Armenia, to the British law firm, and then onto Ballard Partners.

d. Nasirov subsequently began to solicit Parnas and Ballard's assistance in lobbying the U.S. government on his behalf. Based on my review of WhatsApp messages obtained pursuant to the May 16 Warrant, I have learned that Ballard appears to have assisted Parnas and Nasirov in getting tickets to then 58th Presidential Inauguration in January 2017. Then, on or about January 30, 2017, Nasirov texted Parnas that he was traveling to New York and Washington, and Parnas

reported that he had let Ballard know. On or about February 2, 2017, Nasirov forwarded Parnas a Russian-language article entitled "Nasirov predicts increased cooperation with the US under Trump's presidency," and a second article announcing that Trump and Poroshenko would hold a phone conversation in the coming days. Nasirov wrote, "I sent to Brian as well. I think u need to talk to him and he needs to try to talk to mr. T," in an apparent reference to President Trump. Nasirov added, ". . . I think Brian has to say in advance that he involved with Ukrainian situation and wants to participate more !!! ... We just need to stay on top of it! And can't loose [sic] control." Parnas confirmed "I agree I'm on [it] I will speak with him in the morning."

e. In February 2017, Parnas acted again as an intermediary between Ballard and the Ukrainian government. On February 10, 2017, Ballard emailed Parnas a copy of a contract for services between the "Government of Ukraine" and Ballard Partners, which appeared to be separate from Ballard's work for Nasirov (which was already subject to a paid retainer and signed contract); Parnas sent the contract to Nasirov by WhatsApp the next day. On February 14, 2017, Ballard sent Parnas a copy of a letter from Ballard to President Poroshenko, in which Ballard apologized for not being able to travel to meet Poroshenko, but looked forward to meeting him in New York to "discuss the issues of importance to Ukraine in its relations with the United States." Parnas then forwarded a copy of the letter to Nasirov by WhatsApp.

f. However, Ballard terminated his work on behalf of these Ukrainian clients shortly thereafter: on February 19, 2017, Parnas forwarded Ballard a copy of an article in the New York Times entitled "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates." Sylvester Lukis, the managing partner of Ballard's Washington office, wrote back "Not good." On March 14, 2017, Lukis emailed Parnas in reference to Ballard's "representation of the [British law firm]," and wrote that because they have not "received any direction" in the three months they

have been under contract, Ballard was terminating the agreement. Parnas replied, "Got it. I will let them know."

g. Based on my review of Department of Justice filings related to FARA, I have learned that neither Ballard nor Parnas registered under FARA in connection with any work performed in 2017 for Nasirov, the British law firm, or the government of Ukraine.[3]

Efforts to Cause the U.S. Ambassador to Ukraine to be Removed

16. Beginning in early 2018, it appears that Parnas and others undertook efforts to cause Ambassador Yovanovitch to be removed from her posting. As described below, it appears that Parnas lobbied for Yovanovitch's removal at the direction and request of Shokin and Yuriy Lutsenko, who was at that point the Ukrainian Prosecutor-General and an ally of then-President Poroshenko.[4]

17. It appears from public reporting that Lutsenko and others allied with then-President Poroshenko were motivated to seek the removal of Ambassador Yovanovitch for multiple reasons, which were subsequently referenced by Lutsenko in his communications with Parnas regarding Yovanovitch's removal in the spring of 2019. Specifically, based on my review of materials obtained pursuant to the May 16 Warrant and public reporting, I have learned the following:

a. According to public reporting, on April 4, 2018, Ukraine's National Anti-Corruption Bureau ("NABU") released an audio recording of Nazar Kholodnytsky, the head of the

[3] Based on public reporting, I have learned that on March 3, 2017, Nasirov was relieved of his duties after he was accused of embezzling in excess of $80 million, and was subsequently indicted in November 2017, however his conviction was subsequently overturned in December 2018 and he was formally reinstate as the head of the State Fiscal Service, however he did not assume that position.

[4] Based on my review of public reporting, I have learned that in 2016, former Prosecutor-General, Victor Shokin, was removed from his office by Ukraine's parliament. After Shokin's removal, on or about May 12, 2016, President Poroshenko appointed Lutsenko as Prosecutor-General.

Special Anti-Corruption Office ("SAPO") implicating Kholodnytsky in corruption. According to public reporting, NABU receives funding from the U.S. and European Union aid programs, and has worked with U.S. law enforcement to share information in the past. In the recordings, Kholodnytsky tipped off corruption targets that they were going to be searched, and pressured anti-corruption prosecutors and judges. As discussed below, Yovanovitch referenced this episode the following year, when she called for Kholodnytsky's removal. Based on subsequent messages between Lutsenko and Parnas which are discussed below, in which Lutsenko arranged for Kholodnytsky to be interviewed by a journalist as part of their efforts to remove Yovanovitch, it appears that Lutsenko and Kholodnytsky were aligned, or at the very least, were aligned in their opposition to NABU and Yovanovitch.

b. According to public reporting, in early 2018 Lutsenko led an investigation into corruption within the State Migration Service ("SMS"), which led to the arrests of NABU agents. Lutsenko used this episode to attack the head of NABU (Artem Sytnyk) as incompetent, and introduced an anti-NABU piece of legislation. However, Sytnyk announced that Lutsenko's arrests had thwarted a joint FBI-NABU investigation into the SMS allowing Iranians to obtain Ukrainian passports. According to public reporting, Yovanovitch and officials from the European Union used this incident (the thwarted investigation) to stop lawmakers from passing the anti-NABU legislation introduced by Lutsenko. Lutsenko subsequently sent documents related to this incident to Parnas in the spring of 2019, as their efforts to remove Yovanovitch intensified, and his messages evinced a belief that Sytnyk and Yovanovitch were aligned against Lutsenko.

c. According to an interview with Lutsenko published in the *New York Times* on October 5, 2019, Lutsenko frequently clashed with Ambassador Yovanovitch beginning in as early as 2016. For instance, Lutsenko stated that in his first meeting with Yovanovitch in 2016,



12.06.2018

Lutsenko told Yovanovitch that "no one is going to dictate to me who is going to be investigated," with respect to Lutsenko's investigations into anti-corruption activists, and that Yovanovitch left the meeting.

18. Based on my participation in the investigation to date, it appears that the push to remove Yovanovitch began in the spring of 2018. In March and April 2018, Parnas and Fruman began attending a number of political fundraising events and making large contributions to congressional candidates and political action committees with the apparent purpose of enhancing their influence in Republican circles. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound political access to seek Yovanovitch's removal. Specifically, I have learned the following:

a. During an April 20, 2018 roundtable at Mar-a-Lago sponsored by the House Majority Trust PAC (to which Fruman contributed $100,000), Parnas met then-Congressman Pete Sessions (R-TX), and subsequently scheduled a meeting with Sessions for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with Sessions.

b. It appears that in that first meeting, Parnas discussed Yovanovitch with Sessions, and advocated for her removal from that position. In a letter dated that same day—May 9, 2018—Sessions wrote to Secretary of State Michael Pompeo:

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine. As you likely know, Marie Yovanovitch is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador Yovanovitch has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. Yovanovitch as U.S. Ambassador to Ukraine immediately. I kindly ask you to consider

terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of Sessions's staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and Sessions' staff noted, "Please don't distribute, this is only for your records."

d. Parnas had multiple other meetings with Sessions in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for Sessions's reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to Sessions, who was running for reelection in November 2018, which were funded by Fruman.

e. Parnas's efforts to remove Yovanovitch continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President Poroshenko of Ukraine. Later that month, Sessions's staff arranged a call with the State Department regarding Ambassador Yovanovitch. Prior to that call, Sessions's chief of staff asked Parnas if there was anything else he wanted to discuss before she spoke to the State Department. Despite Sessions's letter and subsequent efforts, Ambassador Yovanovitch was not removed from her posting at that time.

<u>Parnas Enlisted Rudolph Giuliani and Others to Lobby for Yovanovitch's Removal</u>

19. After efforts to lobby Sessions to cause the State Department to remove or recall Yovanovitch did not, themselves, result in her removal, it appears that Parnas soon enlisted Giuliani in his efforts to remove Yovanovitch. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

a. Parnas appeared to have met Giuliani at a Republican fundraising event, and they subsequently had a meeting in or around July 2018 to discuss a number of matters, including Parnas's fledgling insurance business, Fraud Guarantee.

b. In September 2018, Parnas retained Giuliani, through his consulting firm Giuliani Partners LLC, ostensibly to act as a consultant and spokesman for Fraud Guarantee.[5] As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid, according to my review of the text messages between Giuliani and Parnas. Parnas and Giuliani exchanged a number of messages regarding the payment of Giuliani's retainer, but it did not appear from the messages that Parnas himself directly paid Giuliani. Instead, it appears that Parnas and Correia solicited third parties to invest in Fraud Guarantee, and directed at least one third party to wire $500,000 to a bank account in the name of Giuliani Partners with the notation "Credit towards Fraud Guarantee Holdings, LLC agreement."

c. It appears that Giuliani Partners performed minimal, if any, work for Fraud Guarantee in October and November 2018, and did not provide the work or reports that were specified in the agreement between Fraud Guarantee and Giuliani Partners. Additionally, it does not appear that Giuliani Partners performed any work for Fraud Guarantee after November 2018.

[5] FARA contains a narrow exemption from the registration requirement for attorneys engaged in the practice of law on behalf of a foreign client. However, based on my review of the January 18 Warrant, I have learned that while Giuliani is an attorney, it does not appear that he was performing legal work and therefore it does not appear the attorney exemption applies. Indeed, Giuliani's contract with Parnas included a detailed description of the scope of work to be performed by Giuliani Partners, none of which was legal in nature. To the contrary, the terms of the contract expressly state that Giuliani Partners was being retained "as a consultant" and described a series of non-legal tasks to be completed in that capacity. Thus, based on my participation in the investigation, it does not appear that Giuliani was representing Fruman or Parnas as an attorney, and it does not appear that Giuliani was performing legal work.

20. Instead, it appears that Giuliani's assistance on the efforts to remove the Ambassador began in December 2018. Specifically, it appears that on or around December 7, 2018, Parnas forwarded Giuliani a copy of the May 9, 2018, Sessions letter, and then Parnas began attempting to facilitate meetings between Giuliani and Lutsenko and/or Shokin. Specifically, based on my review of public reporting and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

a. In or about December 2018, Parnas, Fruman, and Correia traveled to Ukraine and met with Nasirov. Following the trip, based on my review of WhatsApp messages between Nasirov and Parnas, it appears that Parnas and Nasirov discussed getting a U.S. visa for Shokin so that Shokin could travel to the United States.

b. On or about January 7, 2019, Correia sent Parnas a document entitled "Discussion List," which had a section labeled "Ukraine," which referenced their efforts to remove Yovanovitch. On the document Correia noted that the "former Inspector General," which appears to be a reference to Shokin, was waiting on a visa, and that they would "need help if denied." The existing inspector general, which appears to be a reference to Lutsenko, was "coming January 10-15th." With respect to "Ambassador to Ukraine," Correia noted that they "[s]hould be receiving very important info by both [Shokin and Lutsenko]" including information regarding "payoffs and bribes," an "Anti-Trump" room in the embassy, and "Telling current President (and others) that Trump will be impeached."

c. Shokin did not obtain the visa. Rather, it appears that on or around January 9, 2019, the U.S. Embassy in Ukraine denied the visa. As a result, according to a memorandum dated January 23, 2019, which appears to have been provided to the State Department by Giuliani, Parnas and Giuliani interviewed Shokin by telephone in January. On the call, according to the

memorandum, Shokin provided information about his Burisma investigation and claimed that President Poroshenko had put an end to the investigation at the request of then-Vice-President Joe Biden.

d. Additionally, it also appears that in January 2019, Giuliani and Parnas met with Lutsenko at the offices of Giuliani Partners in New York. According to a memorandum regarding the meeting, dated January 25-26, 2019, which appears to have been subsequently provided to the State Department by Giuliani, they discussed Ambassador Yovanovitch, who Lutsenko asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine – an apparent reference to NABU and Artem Sytnyk – and who Lutsenko claimed asked him to close three cases, including a case against the member of Ukraine's Parliament who was involved in the disclosure of Paul Manafort-related information. According to the memorandum, Lutsenko also reported that he had re-initiated an investigation his predecessor, Shokin, had opened into Burisma, in which Hunter Biden, a board member, was implicated.

21. In or about February 2019, it appears that Giuliani formalized his representation of a Ukrainian principal by entering into consulting agreement between Giuliani, Victoria Toensing (the user of the Subject Account), and her partner and spouse, former Washington D.C. United States Attorney Joe diGenova, on the one side, and the Government of Ukraine, on the other. As described below, the arrangement was facilitated by Parnas. Specifically, based on my review of materials obtained pursuant to the January 18 Warrant, the May 16 Warrant, and the August 14 Warrant, as well as public sources and travel records, I have learned, among other things, the following:

a. On or about February 11, 2019, Giuliani and Parnas met with Lutsenko in Warsaw, Poland. In the days that followed the meeting, Parnas communicated with Giuliani and Toensing

via text about a retainer agreement. For instance, on or about February 14, 2019, Toensing texted Parnas: "Welcome back. . . . How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA."[6] Parnas responded on February 15, 2019, that Giuliani was working on the retainer. Parnas reiterated to Toensing on or about February 16, 2019, that he would follow up with Giuliani about the retainer.

b. On or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between "Yuriy Lutsenko, as the General Prosecutor of Ukraine," and Giuliani Partners, Toensing, and diGenova. The retainer amount was $200,000 and, according to the draft retainer, was ostensibly for Giuliani, Toensing, and diGenova's assistance in recovering "sums of money in various financial institutions outside Ukraine." It is not clear what this phrase refers to, and may simply have been an effort to legitimize, or give the appearance of legitimacy to, what were in truth their efforts to cause the U.S. Government to remove the U.S. ambassador to Ukraine. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement."

c. On or about February 18, 2019, Parnas texted Giuliani: "This is who the retainer should be me out to: ministry of justice of Ukraine, Att: minster Pavlo Petrenko." Based on my review of public sources, it appears that Pavlo Petrenko was the Minister of Justice of Ukraine

[6] "FARA" appears to be a reference to the Foreign Agents Registration Act, *i.e.*, one of the Subject Offenses. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that, in addition to Toensing, who referenced FARA, Parnas is familiar with FARA from this and prior conversations. For instance, on March 5, 2019, Parnas texted with [redacted], and [redacted] sent Parnas a FARA registration for a different individual, and Parnas confirmed "Got it." Notably, that FARA registration was completed on behalf of two embassies (the Embassy of Japan and Liberia) and on behalf of a foreign individual. Similarly, in April 2019, Parnas texted with [redacted], a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding Solomon and Lutsenko. On April 24, 2019, Parnas asked [redacted] to send him the "fara registration," and [redacted] responded with a FARA registration completed by a public relations firm on behalf of Ukrainian President Volodymyr Zelensky.

(from in or about 2014 to in or about July 2019), and was a political ally of Poroshenko and Lutsenko.

d. On or about February 19, 2019, Parnas texted Giuliani, "Hi my brother let me know when to expect the retainer agreement." Giuliani responded, "It will be there in ten minutes." Parnas responded that he got it and would "deliver it tomorrow." Parnas also asked Giuliani for wiring instructions and to "please send me a signed copy by you Victoria and joe so they can execute and wire funds." Giuliani texted back, in substance, that he would do so the next day.[7]

e. On or about February 20, 2019, the office manager at Giuliani Partners emailed Parnas (copying Giuliani) a copy of a retainer agreement signed by Giuliani. Pursuant to the terms of the agreement, "Pavlo Petrenko for the Ministry of Justice of the Republic of Ukraine . . . retains Giuliani Partners LLC and Victoria Toensing and Joseph DiGenova to advise on Ukrainian claims for the recovery of sums of money in various financial institutions outside Ukraine." The agreement also stated that the Ministry of Justice agreed to pay $300,000 to Giuliani Partners as a retainer, and that the agreement would be superseded by a later agreement. Parnas subsequently confirmed to Giuliani by text message that he had received the retainer.

f. On or about February 21, 2019, Giuliani texted Parnas, "How's it going???" Parnas responded, "Meeting with yuri now everything good," which appears to be a reference to the fact that, based on public reports, Parnas was meeting with Lutsenko, who was originally identified as the client in the draft retainer agreement described above. Three days later, Giuliani again asked

---

[7] Based on my review of materials obtained pursuant to the May 16 Warrant, it is not clear whether Parnas or Giuliani forwarded a copy of the February 2019 draft retainer agreement to Toensing. Around that time, Toensing repeatedly asked Parnas what the status of the retainer agreement was, and asked him to forward her a copy. Parnas responded that he was trying but it was not going through, although it is not clear whether Parnas ultimately succeeded in forwarding the draft retainer to Toensing.

how things were going, and Parnas explained that he was "meeting with [Y]uri [Lutsenko] in 2 hours he has some paperwork to give us I'll call you after the meeting."[8]

22. At or around the same time that Parnas, Giuliani, and Toensing were formalizing an agreement with Ukrainian government officials, it appears that Giuliani privately lobbied high-level officials—including, apparently, Secretary of State Pompeo and President Trump—for the removal of Ambassador Yovanovitch. Specifically, based on my review of materials obtained from the May 16 Warrant, I have learned, among other things, the following:

a. On or about February 11, 2019, the same day that Giuliani and Parnas met with Lutsenko, Toensing asked Parnas and Giuliani in a text message "Is there absolute commitment for HER to be gone this week?" Giuliani replied, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. Pompe[o] is now aware of it. Talked to him on Friday."

b. On or about February 14, 2019, the same day that Toensing asked Parnas if he had heard from Giuliani about a retainer, Parnas encouraged Toensing to "nudge [Giuliani] about the Mrs. A.," which appears to be a reference to Ambassador Yovanovitch.

c. On or about February 16, 2019, Parnas texted Toensing that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." It appears Parnas was in Ukraine at the time. Toensing responded, "That's for Rudy to get tonight."

d. On or about February 17, 2019, Toensing asked Parnas if Giuliani "me[]t with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4

[8] It is currently unclear whether these meetings between Parnas and Lutsenko regarded Lutsenko's desire to have the Ambassador removed; Giuliani's desire for information about Hunter Biden and Burisma; both; or another topic. Nonetheless, as reflected in text messages below, it does appear that Parnas's efforts to have Ambassador Yovanovitch removed were done at the request of Lutsenko.

hours," an apparent reference to President Trump. Later that day, Toensing asked "Was he successful re Amb?" to which Parnas replied "this week."

The Public Press Campaign to Remove Yovanovitch

23. Following Parnas's meeting with Lutsenko in February 2019, and since Giuliani's private lobbying efforts appeared to have failed, Parnas, Toensing, Giuliani, and Lutsenko worked with a journalist, John Solomon at *The Hill*, to mount an aggressive public media campaign to remove Yovanovitch. Their media campaign began within days of Lutsenko complaining to Parnas about actions that Yovanovitch had taken in Ukraine against an ally of Lutsenko's. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

a. On or around March 5, 2019, Yovanovitch gave a speech in which she called for Kholodnytsky's removal from SAPO. As discussed above, NABU had previously called for the removal of Kholodnytsky (who, according to public reporting, was an ally of Lutsenko and Poroshenko), and claimed that Kholodnytsky had leaked information about corruption cases to corruption targets; yet a year later, Kholodnytsky was still in his position. Yovanovitch also criticized the Ukrainian court system, which she described as riddled with compromised judges.

b. Lutsenko immediately complained about Yovanovitch's statements to Parnas. Specifically, on March 5, 2019, Lutsenko texted Parnas "Ambassador openly called to fire head of the SAPO," which was a reference to Kholodnytsky. Parnas asked Lutsenko to call him, and it appears Lutsenko reported that the Ambassador had also criticized Ukrainian Supreme Court judges.

c. On or about March 8, 2019, Parnas sent Toensing a photograph of Sessions's letter, and she replied by sending the contact information for John Solomon, a reporter at *The Hill*. That

same day, according to text messages, it appears that Parnas, Toensing, diGenova, and possibly Giuliani met with Solomon about Ambassador Yovanovitch, and the next day Parnas sent Solomon information about the Ambassador.

d. On or about March 8, 2019, Lutsenko wrote Parnas again, and referred to a statement Yovanovitch made in which she called for Kholodnytsky's removal; Parnas replied "we are all in the loop," and wrote to confirm that they were setting up an interview with Lutsenko and a journalist (Solomon, as discussed below). Lutsenko then sent Parnas the contact info for Kholodnytsky, and Lutsenko wrote: "Nazar [Kholodnytsky] is waiting I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and Lutsenko discussed setting up an interview between Solomon and Poroshenko, but Lutsenko told Parnas that Poroshenko could not answer questions about "the Ambassador, Biden" in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, Poroshenko was running for re-election, which he would ultimately lose.

24. Lutsenko appeared to grow impatient with Parnas's failure to secure Yovanovitch's removal. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that on March 11, 2019, Lutsenko asked Parnas when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On March 13, 2019, Lutsenko wrote Parnas "I am fucking sick of everything. I did not get the visit. My First did not get shit. I am ready to screw your opponents. But you want even more. We – everything. You – later. This is not fair." Based on my participation in the investigation, this appears to be a reference to Lutsenko and others' willingness to share information about Burisma and Hunter Biden and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador Yovanovitch and meeting with the Attorney

General. On March 14, 2019, Parnas responded "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or Toensing.

25. Parnas, Solomon, and Toensing continued to work together to publicize Lutsenko's allegations through Solomon. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

a. On or about March 12, 2019, Parnas received from Shokin a written narrative and answers to questions posed by Solomon about Yovanovitch, Vice-President Biden, and Hunter Biden. Parnas forwarded Shokin's answers to Solomon. Around that time, Parnas also spoke to Lutsenko and conveyed additional information back to Solomon. Solomon indicated that he needed President Poroshenko and Lutsenko "on the record about the ambassador and Biden," and so Parnas set up an interview between Solomon and Lutsenko.

b. Based on my review of public reporting, I have learned that on March 20, 2019, a portion of Solomon's video interview with Lutsenko and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in *The Hill*. In his interview, Lutsenko claimed he would open an investigation into whether the director of NABU, Sytnyk, attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee Hillary Clinton." In a second video interview published on March 20, 2019, by Solomon in *The Hill*, Lutsenko told Solomon that Ambassador Yovanovitch had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017. *The Hill* reported that Lutsenko was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman Sessions wrote a "private letter asking Secretary of State Mike Pompeo to recall the current U.S. ambassador, alleging that she made disparaging statements about

President Trump." *The Hill* also posted a copy of the letter. The article quoted Sytnyk as describing Lutsenko's allegations as untrue and an "absurd attempt" to discredit NABU.

26. Parnas continued working to publicize Lutsenko's allegations against Yovanovitch and texted links to Solomon's articles to many of his contacts. Specifically, based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned the following:

a. On March 20, 2019, Parnas sent [redacted], the development director of [redacted] (to which Parnas and Fruman had previously contributed) links to both of Solomon's articles in *The Hill*, along with links to tweets by Laura Ingraham and Sean Hannity. Parnas instructed [redacted], "have jr retweet it," an apparent reference to Donald Trump Jr. [redacted] confirmed "sent." As discussed below, Trump Jr. did, in fact, retweet a related article several days later. Moreover, President Trump retweeted one of the links that Parnas sent to [redacted] that same day, on March 20, 2019: an article entitled "As Russia Collusion fades, Ukrainian plot to help Clinton emerges." [redacted] then sent a copy of President Trump's tweet to Parnas.

b. Parnas frequently updated Lutsenko on the success of their March 20, 2019 press blitz. Parnas promptly sent a screenshot of President Trump's tweet to Lutsenko. In an apparent effort to garner more information for Solomon, Parnas asked Lutsenko to send him "the names of the people that she said," which appears to be a reference to Lutsenko's claimed "do not prosecute list." Lutsenko sent Parnas three names ("Leshenko, MP, Navem, MP, Shabunin, ngo") and described them all as "loud NABU activist[s]." As discussed above, based on public reporting, it appears that Lutsenko may have clashed with Yovanovitch regarding NABU in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for Lutsenko to claim that Yovanovitch had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated Lutsenko and told him that "Today you become a world-class

political figure. Glory to the Ukraine !!!" Lutsenko then asked Parnas if it was "true, that the Ambassador chick and Sytnik [sic] were called to Washington," which appears to be a reference to Yovanovitch and Sytnyk, the head of NABU, to which Parnas replied, "I will call later. We'll talk."

c. Parnas then reported to Lutsenko that President Trump had re-tweeted a story about Yovanovitch. Lutsenko responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that Lutsenko's reference to fighting off "our or your [people]" referred to their perceived enemics in Ukraine and the U.S., respectively.

d. The day after *The Hill* published the Lutsenko interview, on March 21, 2019, Parnas complained to Solomon and Toensing that the top news story in Ukraine was the reporting regarding Ambassador Yovanovitch, which prompted the Ambassador to put out a statement saying that Lutsenko was a "prime example of corruption." Lutsenko was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," Lutsenko continued, "they are saying in the State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call Lutsenko and had "good news." Then, in an apparent effort to quell the negative press Lutsenko was receiving and further publicize their allegations against Yovanovitch, Parnas offered via text to Solomon and Toensing, "You want me to go on Fox news and talk about it? I would not mention any names if I did that. I would just say a client approached me six months back with allegations that FBI and US Ambassador in Ukraine were playing favorites. And reference Burisma getting free pass and alleged ties to 'high level Obama administration officials'. Maybe mention

allegations about setting up Manafort. The media could connect the dots from there." Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant, Parnas's reference to his "client" appears to refer to Lutsenko.

e. Based on my review of public reporting, I have learned that Solomon's article soon received substantially increased press attention. On March 23, 2019, on the Laura Ingraham Show on *Fox News*, Ingraham aired a segment highlighting that former-Congressman Sessions sent Secretary of State Pompeo "an urgent letter" in May 2018, asking that Ambassador Yovanovitch be removed from her position, and published a copy of that letter. DiGenova was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman Sessions. She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that Trump had decided, at least at that point, to fire Yovanovitch appears to be the "good news" that Parnas reported back to Lutsenko two days prior.

f. In an apparent reference to diGenova's *Fox News* interview, Parnas happily wrote via text message to Toensing, "I love you and your husband you are the best," and "Tell joe he was awesome my hero." Toensing responded, "We can be really great if we have a retainer signed." Parnas agreed, and Toensing asked if the "Wicket Witch" was gone, which appears to be a reference to Yovanovitch.

g. Around this time, Toensing and Giuliani began frequently posting messages related to Ukraine, Yovanovitch, Biden, and the 2016 election on Twitter, apparently in an effort to further magnify the press attention their claims against Yovanovitch would receive.

h. On March 24, 2019, Donald Trump Jr. retweeted an article summarizing Solomon's reporting in the *Daily Wire*, entitled "Calls Grow to Remove Obama's U.S. Ambassador to Ukraine."

i. Although Parnas, Giuliani, and Toensing appeared to be pleased with the press response in the U.S., the press response in Ukraine appeared to be unfavorable to Lutsenko. On March 26, 2019, Lutsenko sent Parnas pictures of documents that allegedly contained information about Burisma, and noted, "I hope this is enough." He then complained to Parnas that despite the information he was gathering about Biden, the Ambassador had not been fired. In particular, he wrote the "Washington Post is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the conversation. My case on [a Ukrainian public figure who allegedly helped Biden] is proceeding along in force. Testimony about B [likely Burisma] monetary transfer is available. And only you are unable to bring down a single, stupid woman ☹." Parnas wrote back, "She is not a simple, stupid woman. Believe me. But she is not going anywhere."

j. On March 29, 2019, Parnas wrote to Lutsenko, "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." Lutsenko then told Parnas that he had additional documents related to Burisma, and when Parnas asked Lutsenko to send them to him, Lutsenko replied that he would "pass it along with the new Ambassador ☺."

k. Over the next several days, Parnas continued to feed information to Solomon, who asked Parnas to "eyeball" articles for "accuracy," and continued to publish articles in The Hill. On March 27, 2019, Parnas told Giuliani that "Hannity just canceled on [Solomon]," which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on March 30, 2019, Giuliani confirmed that he would be appearing on Fox that morning, to which Parnas responded, "Great." Parnas sent some of Solomon's articles to Giuliani.

l. However, when Yovanovitch still had not been removed, Lutsenko continued his complaints about Yovanovitch to Parnas. On March 29, 2019, Lutsenko told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding Poroshenko. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On April 2, 2019, Lutsenko bragged, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week." On April 9, 2019, Lutsenko provided the names of "Advisors and public speakers of the presidential candidate" Zelensky, who was running against Poroshenko, and their alleged connections to Yovanovitch (to whom Lutsenko referred by her nickname, "Masha"), and wrote that the candidate for Prosecutor-General—who would replace Lutsenko in the event Zelensky was elected—was a "Favorite activist of Masha."

27. Based on my participation in the investigation, I have learned that according to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Secretary of State Michael Pompeo received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani, among others, with Shokin and Lutsenko, dated January 23, 2019, regarding Burisma, Biden, and Yovanovitch. The documents

were separated into folders that bore the insignia of the Trump Hotel. The notes from the meeting with Lutsenko include his allegation about the "do not prosecute list" and his explanation that the heads of SAPO and NABU "do not like each other" and that the head of NABU favored Clinton over Trump, and that Yovanovitch spent money on "good public relations" for NABU. The package then contained Solomon's March 20, 2019 articles featuring his interview with Lutsenko, along with documents that appeared to be Solomon's notes and emails regarding the articles. On October 2, 2019, Giuliani confirmed to *CNN* that the package originated with him, and that he had "routed" an "outline" of allegations against Biden and Yovanovitch to Pompeo's office. Giuliani claimed that Pompeo told him that Pompeo would refer the documents for an investigation.

28. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas, Toensing, and Giuliani entered, or attempted to enter, into a second, more formal agreement with Lutsenko in April 2019. On April 13, 2019, Giuliani sent Parnas three separate versions of a retainer agreement between Toensing and diGenova, on the one hand, and Lutsenko and his deputy, on the other hand.[9] The agreement indicated that Lutsenko was retaining diGenova & Toensing, LLP to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections."[10] The

[9] Lutsenko's deputy was Kostiantyn Kulyk. According to an article published on October 5, 2019 in the *New York Times*, Yovanovitch asked Lutsenko to remove Kulyk at a meeting in 2016 due to Kulyk's corruption.

[10] Based on my participation in the investigation, I believe that "embezzlement of funds" may be a reference to an allegation that Hunter Biden misappropriated money from Ukraine or Burisma. "Interference in the 2016 U.S. election" may be a reference to the allegation that there was a plot to turn up information about then-candidate Trump and individuals working with him, including Paul Manafort.

agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain activities on behalf of foreign political parties or entities." Per the agreement, Lutsenko would pay a $125,000 retainer and $25,000 per month, plus costs.[11] Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that Toensing subsequently signed a copy of each of the three retainer agreements.[12]

29. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that between April 11 and 23, 2019, Parnas worked with Solomon to arrange additional interviews with Ukrainian government officials, and provided the questions that Solomon would ask one official. Specifically, I have learned, among other things, the following:

a. Solomon ran multiple articles during that period. However, during this time period, Lutsenko walked back some of his prior claims and, in particular, told *The Babel* on April 17, 2019, that Ambassador Yovanovitch had never requested a "do not prosecute" list, and it was instead he who had requested that list. In addition, on April 21, 2019, Zelensky won the Ukrainian presidential runoff against Poroshenko. Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and public reporting, I believe that Lutsenko may have walked back his comments due to the negative press attention his unfounded

---

[11] Based on the investigation to date, it is unclear whether Lutsenko, Kulyk, or any member of the Ukrainian government countersigned the proposed retainer agreements with Toensing and Giuliani, or paid Toensing or Giuliani in connection with their purported representation. (And according to press reports, Toensing and Giuliani have denied ever working as lobbyists on their behalf.) However, FARA does not require there to be a retainer agreement in place, or a foreign principal to have paid an unregistered agent, for the law to apply.

[12] Despite the fact that Toensing signed the agreements, based on my review of Department of Justice records related to FARA filings, I have learned that none of Parnas, Fruman, Giuliani, Toensing or diGenova registered under FARA or provided notice to the Attorney General at any point in 2018 or 2019.

allegations had garnered, or in an effort to maintain credibility with the incoming Zelensky administration, so that he would not be removed by any incoming administration.

b. On April 23, 2019, Parnas asked Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on May 4, 2019, Giuliani joked, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day, Lutsenko told Parnas that "People here are talking that there will be a very high level coming from you to the inauguration," to which Parnas replied "You do understand Who is dealing with this." Two days later, on May 6, 2019, according to public reporting, the State Department confirmed that Ambassador Yovanovitch would leave her post on May 20, 2019.

c. Based on my review of public reporting, I have learned that on May 9, 2019, Giuliani publicly confirmed that he had met with Lutsenko on multiple occasions, and stated his intention to travel to Ukraine to meet with newly-elected President Zelensky to push him to press ahead with two investigations he hoped would benefit President Trump in his reelection campaign: (i) the origin of the Special Counsel's investigation into Russian interference in the 2016 election; and (ii) Hunter Biden's involvement in Burisma. According to the *New York Times*, Giuliani was to be accompanied by Parnas and Toensing.

30. Based on my review of materials obtained pursuant to the August 14 Warrant, I have learned that on May 10, 2019, Giuliani wrote to President-Elect Zelensky to request a meeting with Zelensky, Giuliani, and Toensing to discuss a "matter." Specifically, I have learned the following:

a. On May 10, 2019, Giuliani's secretary forwarded a copy of a letter from Giuliani to President-Elect Zelensky to a Ukrainian government email address. Giuliani's secretary then forwarded that email, including the attached letter, to Giuliani and Parnas. In his letter to Zelensky, which was dated May 10, 2019, Giuliani wrote:

> I am a private counsel to President Donald J. Trump. Just to be precise, I represent him as a private citizen, not as President of the United States. This is quite common under American law because the duties and privileges of a President and a private citizen are not the same. Separate representation is usual process. Congratulations on a truly impressive victory in the recent election. . . . Anything I can do to help you or your country would be a great honor. However, I have a more specific request. In my capacity as personal counsel to President Trump and with his knowledge and consent, I request a meeting with you on this upcoming Monday, May 13th or Tuesday, May 14th. I will need no more than a half hour of your time and I will be accompanied by my colleague Victoria Toensing, a distinguished American attorney who is very familiar with this matter. Please have your office let me know what time or times are convenient for you, Victoria and I will be there.

b. Based on my participation in the investigation and my review of materials obtained pursuant to the May 16 Warrant and August 14 Warrant, as well as Giuliani's May 9, 2019 interview with the *New York Times* described above, it appears that Giuliani and Toensing sought to solicit President Zelensky's assistance in moving ahead with the Burisma and 2016 election interference investigations, which they believed would benefit President Trump's reelection campaign. However, based on my review of public reporting, I have learned that on May 15, 2019, Giuliani announced that his trip to Ukraine was cancelled.

31. On July 22, 2019, articles were published by *BuzzFeed News* and the *Organized Crime and Corruption Reporting Project* regarding Parnas and Fruman's campaign for the removal of Yovanovitch. Parnas and Sessions were interviewed for the articles. Parnas said that he and Fruman were not "acting at the behest of anyone." Parnas also said that he and Fruman were not

paid by anyone for their work in Ukraine, and that "[a]ll we were doing was passing along information. Information coming to us—either I bury it or I pass it along. I felt it was my duty to pass it along." Sessions claimed that "he raised the issue of Yovanovitch in the meeting—not Parnas or Fruman," and that he "sought their input." This claim is not credible for several reasons, not the least of which is because Sessions's own letter to Secretary Pompeo noted that others had brought the issue of Yovanovitch to his attention; Sessions wrote the letter after his first meeting with Parnas; and Sessions's staff later forwarded the letter to Parnas and solicited his input on what to discuss with the State Department regarding the letter.

32. Based on my review of public reporting, I have learned that on July 25, 2019, President Trump spoke to Ukrainian President Zelensky. According to a memorandum of the call, which the White House released publicly, President Trump noted that "[t]he former ambassador from the United States, the woman, was bad news and the people she was dealing with in the Ukraine were bad news." He also praised a "very good prosecutor," which appears to be a reference to Lutsenko, who was still in place at that time following Zelensky's election but subsequently removed from office, or possibly Shokin, the former prosecutor.

33. It appears that efforts to remove Ambassador Yovanovitch were encouraged by Dmytro Firtash, a Ukrainian oligarch who is involved in the natural gas business in Ukraine, and who was previously criticized for his involvement in corruption by Ambassador Yovanovitch. First, based on my review of bank records, it appears that Firtash has paid Parnas over $1 million through third parties. Specifically, according to public reports, Firtash is currently litigating extradition to the United States on bribery charges and in or about June 2019, he hired Toensing and diGenova, at the suggestion of Parnas and Fruman, to assist in his defense. Firtash, according to public reports, agreed to pay Toensing and diGenova $300,000 a month, which included a referral fee to Parnas

totaling $200,000. From my review of bank records, I have learned that in or about August 2019, Parnas received $200,000 in payments from diGenova & Toensing LLP, which is Toensing's law firm, as a "monthly retainer payment." Second, in addition to the referral fee that it appears Firtash paid Parnas through diGenova & Toensing LLP, it also appears that between September 3 and September 23, 2019, Parnas was paid $1,000,000 in five $200,000 installments from a bank account in Russia in the name of Ralph Oswald Isenegger. Isenegger is a Geneva-based attorney who represents Firtash, and the memo line on the transfers indicate they were made pursuant to a "loan agreement." While, based on the investigation to date, it is unclear why Firtash paid Parnas an additional $1,000,000, it appears from my review of bank records and emails obtained pursuant to the August 14 Warrant that at least some of that money was used to fund travel to Ukraine and other locations in Europe for meetings relating to, among other things, Ambassador Yovanovitch. Accordingly, it appears that Firtash may have been involved in funding or facilitating unlawful lobbying efforts, including those relating to the removal of Ambassador Yovanovitch.

34. As noted above, Parnas, Fruman, Giuliani, and Giuliani Partners have never registered with the FARA unit of the Department of Justice or provided the required notice to the Attorney General. The firm of diGenova & Toensing LLP previously registered on behalf of the Kurdistan Democratic Party, but diGenova & Toensing LLP, or diGenova or Toensing individually, never made a filing related to Ukraine or provided notice to the Attorney General. Based on my review of public reporting, it appears that Giuliani has been aware of the FARA registration requirements for some time but has publicly stated that he believes that he is not required to register because he contends he has never lobbied the U.S. government on behalf of his clients. According to a July 10, 2018 article in the *Washington Post*, Giuliani reported that he was working with clients in, among other places, Ukraine, Brazil, and Columbia, and had given a paid speech to an Iranian

dissident group, but that he has never registered with the Justice Department on behalf of his foreign clients because he does not directly lobby the U.S. government on behalf of his clients and was not charging President Trump for his legal services. In particular, Giuliani explained that he has never lobbied President Trump on "anything." According to a September 6, 2018 article in the *Wall Street Journal*, seven Senators wrote the Department of Justice to ask that Giuliani's lobbying on behalf of foreign clients be investigated, after Giuliani wrote a letter on behalf of a Romanian client, in which Giuliani took a position contrary to that of the State Department's. In an interview, Giuliani stated that he "did nothing to invoke FARA either now or ever" because he had never represented his foreign client's interests before the U.S. government. As discussed above, however, Giuliani repeatedly lobbied the U.S. government, including President Trump and Secretary of State Pompeo, as part of a scheme to seek Yovanovitch's removal at the request of a Ukrainian government official.

35. Based on the above, there is probable cause to believe that the efforts by Parnas, Fruman, Giuliani, and Toensing to lobby for the removal of Ambassador Yovanovitch were done at the direction and/or request of Lutsenko and likely other Ukrainian officials, in violation of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent); 18 U.S.C. § 951 (acting as an agent of a foreign government), and 18 U.S.C. § 371 (conspiracy to commit the same). Specifically, there is probable cause to believe that Toensing committed the Subject Offenses in at least two ways. First, according to the retainer agreements in February and April, Lutsenko contemplated retaining Giuliani Partners and diGenova & Toensing to represent him. Toensing took numerous steps in furtherance of Lutsenko's desire to remove Yovanovitch after the retainer agreements were circulated, including engaging in a public media campaign to remove Yovanovitch and privately encouraging Giuliani to lobby President Trump and Secretary Pompeo

to remove Yovanovitch. Notably, the draft long-form retainer agreements between diGenova & Toensing and Lutsenko specifically referenced FARA, and that language would be unnecessary if Toensing did not appreciate that they were acting at the request of one or more foreign nationals. Second, Toensing worked with Parnas and Fruman—who were themselves working at Lutsenko's request—to remove Yovanovitch. There is probable cause to believe that Toensing knew that Parnas was working closely with Lutsenko, and that Lutsenko's primary objective was to remove Yovanovitch. Toensing undertook activities, including assisting Giuliani and Parnas in lobbying government officials, and participating in a media campaign, in coordination with Parnas, who was acting at the request of Lutsenko. Accordingly, I respectfully submit that there is probable cause to believe that Toensing has acted in violation of the Subject Offenses.

**B. Probable Cause Regarding the Subject Account**

36. Based on the foregoing, the facts set forth below, and my training and experience, there is probable cause to believe that the Subject Account will contain evidence and instrumentalities of the Subject Offenses, including communications related to Toensing's efforts to cause the removal of the U.S. Ambassador to the Ukraine, which appear to have been done at the request or direction of a foreign government or individual.

37. First, as described above, Toensing communicated via electronic message with Parnas and Giuliani about the removal of Ambassador Yovanovitch. Some of those communications took the form of text and/or WhatsApp messaging, and as detailed in the next paragraph, others occurred via e-mail. With respect to text and WhatsApp, Toensing, (i) communicated with Parnas about Giuliani's drafting of retainer agreements between diGenova & Toensing and Lutsenko, including the fact that the retainer agreement was "need[ed] for FARA," *see* ¶ 21; (ii) communicated with Giuliani and Parnas about Giuliani's efforts to lobby Secretary of State Pompeo and President Trump regarding the removal of Yovanovitch, *see* ¶ 27; (iii) received a copy of the May 2018

Sessions letter from Parnas, and passed along John Solomon's contact information to Parnas, *see* ¶ 23; (iv) arranged meetings with Parnas, Giuliani, Solomon, and diGenova in furtherance of their efforts to remove Yovanovitch, and communicated about Giuliani's efforts to lobby Secretary of State Pompeo and President Trump regarding the removal of Yovanovitch, *see* ¶¶ 27; and (v) communicated with Parnas regarding their efforts to publicize Lutsenko's allegations, *see* ¶¶ 23-28. While those communications were sent by text and WhatsApp message, based on my training and experience, I have learned that individuals use text in a similar manner as they use email, and regularly communicate with the same contacts on both methods of communication relating to the same subjects. Accordingly, there is reason to believe that Toensing also used email to communicate about the removal of Ambassador Yovanovitch.

38. Second, with respect to e-mails, based on my review of e-mails obtained pursuant to the August 14 Warrant, I have learned that Toensing used the Subject Account in furtherance of the Subject Offenses. For instance, I have learned the following:

a. On or about March 8, 2019, Parnas emailed Toensing at the Subject Account a copy of the May 9, 2018 letter from Congressman Sessions to Secretary Pompeo. As noted above, on the same day, Parnas communicated with Toensing via text message about meeting with Solomon about Ambassador Yovanovitch.

b. On or about March 12, 2019, Solomon emailed Parnas, diGenova, and Toensing at the Subject Account a number of interview questions for Lutsenko, including questions about Ambassador Yovanovitch.

c. On or about March 24, 2019, Parnas emailed Toensing at the Subject Account a link to an article published in the *Daily Wire* entitled "Calls Grow to Remove Obama's U.S.

Ambassador to Ukraine." The article summarized Solomon's reporting about Ambassador Yovanovitch. As noted above, on the same day Donald Trump Jr. retweeted the article.

39. Additionally, based on my training and experience, email accounts like the Subject Account, which have been used to communicate with others in furtherance of the Subject Offenses, often contain records of that activity, including email correspondence, address books with contact information for co-conspirators, and documents saved as email attachments or to Google Docs or Google Drive folders. Indeed, as described above, Parnas and Toensing exchanged emails and documents in furtherance of the Subject Offenses. Additionally, based on my training and experience, and my participation in the investigation, it appears that Toensing had communications and meetings with Giuliani, Parnas, and Solomon about the removal of the Ambassador, and therefore I believe the Subject Account will contain evidence of such communications.

40. Based on my training and experience, and my participation in this investigation, it also appears that Toensing had meetings with Parnas and Giuliani, among others, and that evidence in the Subject Account will corroborate the existence of such meetings. Specifically, location data, IP transaction records, and calendar entries may contain evidence to establish Toensing's location at relevant dates set forth above. Furthermore, device and Android information, and cookie data for linked accounts, may contain evidence of other email accounts or electronic devices that could contain evidence of the Subject Offenses, including correspondence with co-conspirators or location information to corroborate the existence of meetings. Indeed, from my participation in this investigation, I have learned that the individuals involved in the commission of the Subject Offenses have used multiple email or iCloud accounts, and/or multiple cellphones, to communicate with co-conspirators.

41. Temporal Limitation. This application is limited to content created, sent, or received after December 1, 2018, which is shortly prior to Toensing's initial correspondence with Parnas and Giuliani, to the present.

**C. Evidence, Fruits and Instrumentalities**

42. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section III of Attachment A to the proposed warrant. In particular, I believe the Subject Account is likely to contain the following information:

a. Communications with Lev Parnas, Igor Fruman, David Correia, Rudolph Giuliani, Roman Nasirov, Victor Shokin, Nazar Kholodnytsky, Kostiantyn Kulyk, Yuriy Lutsenko, or any other Ukrainian national.

b. Communications with or about John Solomon that relate to Ukraine, Burisma, and/or Marie Yovanovitch.

c. Evidence relating to Marie Yovanovitch, including but not limited to the May 9, 2018 letter from Congressman Pete Sessions to Secretary of State Mike Pompeo regarding Yovanovitch, attempts to remove Yovanovitch from her position as U.S. Ambassador to Ukraine, or communications with U.S. government officials regarding Yovanovitch or Ukraine.

d. Evidence relating to any funds received directly or indirectly from Parnas, Fruman, Correia or any entity or individual associated with them, into any account controlled by or associated with Toensing or Giuliani.

e. Evidence of the motives of Giuliani, Toensing, Parnas, and Fruman in seeking the removal of Yovanovitch.

f. Evidence of money, actions, or information requested by, or offered or provided to Giuliani, Toensing, Parnas, or Fruman, by any Ukrainian, including but not limited to the efforts to remove Yovanovitch and/or any Ukrainian investigation of Burisma Holdings Ltd., Hunter Biden, or potential interference in the 2016 U.S. presidential election.

g. Evidence of requests for action or payment of money by Dmytro Firtash for any matter besides the legal defense of Firtash in extradition or U.S. criminal proceedings.

h. Evidence that Giuliani and/or Toensing were acting at the direction, control, or request of any Ukrainian national, government official, corporation or political party, including but not limited to agreements with such an individual or entity, records of meetings, written instructions, payment records, and documents provided by such individuals or entities.

i. Evidence that Toensing had meetings with Parnas, Fruman, Correia, Victor Shokin, Roman Nasirov, Nazar Kholodnytsy, Kostiantyn Kulyk, Yuriy Lutsenko, or any other Ukrainian government official, corporation, or political party, including but not limited to travel records, and location and IP records that establish or aid in establishing Toensing's presence in the vicinity of those individuals.

j. Evidence of any contemplated, planned, or actual lobbying efforts relevant to Ukraine, including any press interviews or media strategies, or meetings with U.S. government officials.

k. Evidence of knowledge of the foreign agent registration laws and requirements, or lobbying laws, including but not limited to knowledge of the requirement to register as an agent of a foreign principal, or of the prohibition of acting on behalf of, lobbying for, or making contributions on behalf of a foreign principal.

l. Evidence of efforts or attempts to conceal meetings or communications with individuals acting on behalf of or associated with any Ukrainian national or government official.

m. Passwords or other information needed to access user's online accounts.

## IV. Review of the Information Obtained Pursuant to the Warrant

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

44. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture

all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

45. Additionally, because Toensing is an attorney, the review of evidence from the Subject Account will be conducted pursuant to the USAO's screening procedures to ensure that the law enforcement personnel involved in the investigation, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. The USAO will use a designated "filter team," separate and apart from the investigative team, in order to review potentially privileged communications and determine which communications to release to the investigation and prosecution team.

**V. Request for Non-Disclosure and Sealing Order**

46. While Parnas, Fruman, and others have been publicly indicted with respect to separate charges, and there has been some public reporting about the existence of a criminal investigation into the removal of Ambassador Yovanovitch, the scope and focus of this criminal investigation, including any focus on Toensing, are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation and/or to the scope and focus of the investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, from my experience investigating public corruption offenses, I know that individuals who participate in offenses such as the Subject Offenses may communicate about known government investigations and tailor their stories to be consistent, and tamper with or hide potential evidence. Accordingly, premature disclosure of the scope of this investigation would undermine efforts to obtain truthful statements from relevant witnesses, and could lead to witness tampering and/or obstruction of

justice. In addition, the investigation relates to financial transactions involving foreign bank accounts, and premature disclosure of the focus of this investigation could lead to efforts to hide or conceal foreign funds or transactions. Lastly, if certain subjects of this investigation named herein were alerted to the scope of the criminal investigation, it may prompt them to delete electronic records, including in e-mail accounts or other electronic media not presently known to the government.

47. Additionally, notice is not appropriate to the law firm of diGenova & Toensing, LLP, which is the entity that appears to control the email enterprise account [redacted]. Toensing and diGenova, whose involvement is described above, are two of the three apparent employees of the law firm, and it appears that they direct the firm's operations. Therefore, there does not appear to be any person who works for the firm that could be notified without jeopardizing the investigation. Accordingly, there is reason to believe that, were the Provider to notify the subscriber, the enterprise subscriber, or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

48. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## VI. Conclusion

49. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

[redacted]
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of December, 2019

HONORABLE J. PAUL OETKEN
United States Magistrate Judge
Southern District of New York