UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 21 MAG 4001

In re: Warrant and Order for Prospective and Historical Location Information and Pen Register Information for the Cellphones Assigned Call Numbers [redacted], [redacted], and [redacted], USAO Reference No. 2018R01228

**APPLICATION**

**21 Mag. _________**

## Application for Warrant and Order for Cellphone Location and Pen Register Information

The United States of America, by its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, Rebekah Donaleski, Assistant United States Attorney, of counsel, respectfully requests that the Court issue the accompanying proposed Warrant and Order for prospective location information, pen register information, and historical location information for three cellphones. As grounds for this Application the Government relies on the following facts and authorities.

## I. Introduction

1. I am an Assistant United States Attorney in the U.S. Attorney's Office for the Southern District of New York. This Application is submitted in conjunction with the accompanying affidavit of a law enforcement agent ("Agent Affidavit"), to be sworn before this Court, and incorporated by reference herein. I make this Application based on information and belief, including the Agent Affidavit, my review of other documents in the case, and information received from investigative personnel.

2. The Investigating Agencies, Target Cellphones, Subscribers, Target Subjects, Service Provider, Subject Offenses, Successor Service Providers, and Successor Cellphones referenced in this Application are as specified in the Agent Affidavit.

## II. Legal Authority

### A. Prospective Location Information

3. The Government seeks to obtain both precision location information and cell site data for the Target Cellphones on a prospective basis (the "Prospective Location Information") for a period of 45 days from the date of this order—the same period of time for which a warrant for a tracking device may be granted under Rule 41(e)(2)(C). It bears noting, however, that while the Prospective Location Information may permit "tracking" the user of the phone in the colloquial sense, this is not an application for a warrant for a "tracking device" as defined in Fed. R. Crim. P. 41(a)(2)(E) and 18 U.S.C. § 3117(b). Those provisions only apply where an agent is seeking to physically install a tracking device on a given object. Instead, the Prospective Location Information will be obtained by requiring the Service Provider to provide the information.

4. The authority for this application is found in 18 U.S.C. § 2703(c)(1), which authorizes a court of competent jurisdiction to require any electronic communication service provider (which includes a cellular telephone service provider[1]) to disclose any "record or other information pertaining to a subscriber" other than the "contents of communications," when the government obtains, *inter alia*, a warrant under the applicable procedures of Rule 41. *See* 18 U.S.C. § 2703(c)(1)(A). Because data concerning a subscriber's location, such as precision location information and cell site data, constitutes "information pertaining to a subscriber" that does not include the "contents of communications," that data is among the types of information available

---

[1] *See* 18 U.S.C. § 2711(1) (incorporating by cross-reference statutory definitions set forth in 18 U.S.C. § 2510); 18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications").

under § 2703(c)(1)(A).[2] Further, as specified in 18 U.S.C. § 2711(3), this Court is a court of competent jurisdiction under the Stored Communications Act because it has jurisdiction over the Subject Offenses.

5. The Government's request for cell site data also implicates the pen register statute, because such data constitutes signaling information used by the Service Provider to route communications to and from the Target Cellphones. In order to collect such data, a valid pen register order is required.[3] Accordingly, I hereby certify pursuant to 18 U.S.C. § 3122 that such signaling information is relevant to an ongoing investigation being conducted by the Investigating Agencies into suspected violations of the Subject Offenses by the Target Subjects.

**B. Historical Location Information**

6. The Government also seeks historical cell site data for the Target Cellphones for the periods set forth in the Agent Affidavit and proposed Warrant and Order (the "Historical Location Information"). Because such data—like "Prospective Location Information"—constitutes information concerning a subscriber, the Court is authorized to order the Service Provider to

---

[2] *See In re Application*, 460 F. Supp. 2d 448, 459–60 & n. 55 (S.D.N.Y. 2006) (Kaplan, J.) (cellphone location information falls within § 2703(c)(1)); *accord, e.g.*, *United States v. Caraballo*, 963 F. Supp. 2d 341, 361 (D.Vt. 2013); *In re Order*, 632 F. Supp. 2d 202, 207 (E.D.N.Y. 2008); *In re Application*, 405 F. Supp. 2d 435, 444-45 (S.D.N.Y. 2005). *But see In re Application*, 849 F. Supp. 2d 526, 574 (D.Md. 2011) (rejecting view that cellular location data falls within the scope of the SCA and finding that phone must be treated as "tracking device" for purposes of Rule 41 where used to collect location data); *In re Application*, 2009 WL 159187, at *5-*6 (S.D.N.Y. Jan. 13, 2009) (McMahon, J.) (same).

[3] *See* 18 U.S.C. § 3121 (prohibiting use of pen register or trap and trace device without an order under the pen register statute); 3127(3) & (4) (defining pen register and trap and trace device to include devices or processes that record, *inter alia*, signaling information). Although cell site data constitutes "signaling" information within the meaning of the pen register statute, a separate statute precludes the Government from relying "solely" on the authority provided by the pen register statute to ascertain a subscriber's location. 47 U.S.C. § 1002(a). Here, the Government seeks to obtain such data pursuant to 18 U.S.C. § 2703(c) as well as the pen register statute, rather than "solely" under the latter statute. *See In re Application*, 460 F. Supp. 2d at 456-59.

provide this data pursuant to a warrant application under 18 U.S.C. § 2703(c), under the applicable procedures of Rule 41. *See* 18 U.S.C. § 2703(c)(1)(A). I respectfully submit that the same Agent Affidavit establishing probable cause supporting the Government's request for a warrant to obtain the Prospective Location Information requested above also supports the issuance of a warrant under § 2703(c) for the requested Historical Location Information. In addition, the Government seeks toll records for the same period as the Historical Location Information. Pursuant to 18 U.S.C. § 2703(d), I respectfully submit that the Agent Affidavit offers specific and articulable facts showing that there are reasonable grounds to believe that the toll record information sought is relevant and material to an ongoing criminal investigation.

### C. Pen Register Information

7. Finally, the Government seeks an order pursuant to 18 U.S.C. §§ 3121-26 authorizing the use of a pen register on the Target Cellphones for a period of 45 days from the date of this order. Specifically, the Government seeks an order directing the Service Provider to furnish any information, facilities, and technical assistance necessary to operate, unobtrusively and with minimum disruption of service, a pen register and trap and trace device to capture all dialing, routing, addressing, or signaling information associated with each call transmitted to or from the Target Cellphones, as specified further in the proposed Warrant and Order (the "Pen Register Information").[4]

[4] The Government is also not seeking authorization to obtain post-cut-through dialed digits ("PCTDD"), or digits that are dialed after a telephone call from the Target Cellphones has been connected. Pursuant to the attached Order, if possible, the Service Provider will forward only pre-cut-through-dialed digits to the Investigating Agencies. However, if the Service Provider's technical capabilities require it to forward all dialed digits, including PCTDD, to the Investigating Agencies, the Investigating Agencies will only decode and forward to the agents assigned to the investigation the numbers that are dialed before the call is cut through.

8. I hereby certify pursuant to 18 U.S.C. § 3122 that the Pen Register Information is relevant to an ongoing investigation being conducted by the Investigating Agencies into suspected violations of the Subject Offenses by the Target Subjects.

**D. Sealing and Non-Disclosure Order to Service Provider**

9. When the Government obtains records or information under § 2703(c), it is not required to notify the subscriber or customer. 18 U.S.C. § 2703(c)(3). Additionally, the Government may obtain an order precluding the Service Provider from notifying the subscriber or any other third-party of the warrant or order obtained, for such period as the Court deems appropriate, where there is reason to believe that such notification will result in endangering the life or physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, or intimidation of potential witnesses, or will otherwise seriously jeopardize the investigation. 18 U.S.C. § 2705(b).

10. Further, 18 U.S.C. § 3123(d) provides that an order directing installation of a pen register or trap and trace device shall direct the pertinent service provider "not to disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person unless or until otherwise ordered by the Court."

11. Accordingly, as explained further in the Agent Affidavit, in light of the confidential nature of the continuing criminal investigation and the adverse consequences expected in the event of premature notification, the Government respectfully requests that the Court direct the Service Provider not to notify the Subscribers or any other person of the Warrant and Order sought herein for a period of one year, subject to extension upon application to the Court, if necessary.

12. For similar reasons, I respectfully request that the proposed Warrant and Order, this Application, and the accompanying Agent Affidavit, be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to

serve the Warrant and Order on the Service Providers; provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## III. Prior Requests

13. Except as may be set forth above, no prior request for the relief requested herein has been made.

Dated: New York, New York
April 13, 2021

Rebekah Donaleski
Rebekah Donaleski
Assistant United States Attorney
Tel.: 212-637-2423



2019.07.24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 21 MAG 4001

In re: Warrant and Order for Prospective and Historical Location Information and Pen Register Information for the Cellphones Assigned Call Numbers [redacted], [redacted], and [redacted], USAO Reference No. 2018R01228

**AGENT AFFIDAVIT**

**21 Mag. _________**

## Agent Affidavit in Support of Warrant and Order for Cellphone Location and Pen Register Information

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

[redacted], being duly sworn, deposes and states:

## I. Introduction

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the foreign agent registration laws. I have received training applicable to the investigation of such offenses, and have gained expertise in these areas through additional training and daily work related to these types of investigations.

2. **Requested Information.** I respectfully submit this Affidavit pursuant to 18 U.S.C. §§ 2703(c) and (c)(1)(A) and the applicable procedures of Federal Rule of Criminal Procedure 41; 18 U.S.C. §§ 2703(d) & 2705; and 18 U.S.C. §§ 3121-3126, in support of a warrant and order for prospective location information and pen register information for the Target Cellphones identified below (collectively, the "Requested Information").

3. **Basis for Knowledge.** This Affidavit is based upon my participation in the investigation, which is being conducted by the United States Attorney's Office for the Southern

District of New York ("USAO") and the Federal Bureau of Investigation ("FBI") (together, the "Investigating Agencies"), my examination of reports and records, and my conversations with other law enforcement agents and other individuals, as well as my training and experience. Because this Affidavit is being submitted for the limited purpose of obtaining the Requested Information, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In addition, unless otherwise indicated, statements by others referenced in this Affidavit were not necessarily made to me, but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who in turn may have had either direct or indirect knowledge of the statement). Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose report I have read.

4. **Target Cellphones, Subscribers, Target Subjects, and Service Provider.** The Service Provider referenced in this Affidavit is AT&T. The Target Cellphones, Subscribers, and Target Subjects referenced in this Affidavit are as follows:

a. Target Cellphone-1 is the cellphone assigned call number [redacted]. Based on records provided by AT&T, AT&T is the service provider for Target Cellphone-1, which is subscribed to in the name of Rudolph Giuliani. Rudolph Giuliani is believed to use Target Cellphone-1 and is a Target Subject of this investigation.

b. Target Cellphone-2 is the cellphone assigned call number [redacted]. Based on records provided by AT&T, AT&T is the service provider for Target Cellphone-2, which

is subscribed to in the name of Giuliani Partners LLC, with the user name listed as "William Lewis iPhone X." Rudolph Giuliani (whose full name is Rudolph William Louis Giuliani) is believed to use Target Cellphone-2 and is a Target Subject of this investigation.

c. Target Cellphone-3 is the cellphone assigned call number [redacted]. Based on records provided by AT&T, AT&T is the service provider for Target Cellphone-3, which is subscribed to in the name of Victoria Toensing. Victoria Toensing is believed to use Target Cellphone-3 and is a Target Subject of this investigation.

5. **Precision Location Capability.** Cellphone service providers have technical capabilities that allow them to collect at least two kinds of information about the locations of the cellphones to which they provide service: (a) precision location information, also known as E-911 Phase II data, GPS data, or latitude-longitude data, and (b) cell site data, also known as "tower/face" or "tower/sector" information. Precision location information provides relatively precise location information about a cellphone, which a provider can typically collect either via GPS tracking technology built into the phone or by triangulating the device's signal as received by the provider's nearby cell towers. Cell site data, by contrast, reflects only the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication (sometimes referred to as "per-call measurement" ("PCM") or "round-trip time" ("RTT") data). Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data is typically less precise than precision location information. Based on my training and experience, I know that the Service Provider has the technical ability to collect precision location information from any cellphone on its network, including by initiating a signal on the Service Provider's networks to determine the phone's location. I further know that cell site

data is routinely collected by the Service Provider in the course of routing calls placed to or from any cellphone on its network.[1]

6. **Successor Service Provider.** Because it is possible that the Target Subjects may change cellphone service provider during the course of this investigation, it is requested that the warrant and investigative order requested apply without need for further order to any Successor Service Providers who may provide service to the Target Cellphones during the time frames at issue herein.

## II. Facts Establishing Probable Cause

7. Although I understand that probable cause is not necessary to obtain all of the Requested Information, I respectfully submit that probable cause exists to believe that the Requested Information will lead to evidence of the crimes of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 2 (attempting and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (together, the "Subject Offenses"), as well as the locations of the Target Subjects at the times they were engaged in the Subject Offenses.

### A. Prior Search Warrant Applications Referenced Below

8. In the course of the investigation discussed below, the USAO and FBI sought and obtained search warrants that have yielded evidence that is described below. As is relevant for the instant application, the following search warrants were previously obtained:

a. On or about January 18, 2019, the USAO and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search

[1] Toll records are sometimes necessary or helpful in order to obtain or interpret historical cell site data and are therefore also requested herein.

warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, and others. On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the January 18 Warrant returns for evidence of additional offenses.

b. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for records in iCloud accounts belonging to Parnas and Fruman, among others. On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the May 16 Warrant returns for evidence of additional offenses.

c. On or about August 14, 2019, the USAO and FBI sought and obtained from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, a search warrant (the "August 14 Warrant") for email accounts belonging to Parnas, Fruman, and others.

d. On or about November 4, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "November 4 Warrant") for records in iCloud accounts belonging to Giuliani and Victoria Toensing.

e. On or about December 13, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "December 13 Warrant") for records in an email account belonging to Toensing.

f. Together, the records obtained pursuant to the January 18 Warrant, May 16 Warrant, August 14 Warrant, November 4 Warrant, and December 13 Warrant are referred to as the "Prior Search Warrant Returns."

### B. Probable Cause Regarding Subjects' Commission of the Subject Offenses

Overview

9. The FBI and USAO are investigating whether Rudolph Giuliani, Victoria Toensing, Lev Parnas and others undertook actions to cause the removal of the United States Ambassador to the Ukraine, Marie Yovanovitch, including actions detailed below at the request and/or under the direction of a foreign government, entity, or person, in violation of the Foreign Agents Registration Act ("FARA").[2] Specifically, as discussed below, there is probable cause to believe that starting in at least January 2019, Giuliani, Toensing, and Parnas engaged in a multi-pronged lobbying effort aimed at causing Ambassador Yovanovitch's removal, all while hiding the fact that they were doing so at the request and direction of Yuriy Lutsenko, a Ukrainian official from whom Giuliani, Toensing, and Parnas sought personal compensation and gain. As discussed below, after meeting with Lutsenko on two occasions in January and February 2019, Giuliani lobbied then-President Donald J. Trump on at least three occasions and lobbied then-Secretary of State Michael Pompeo on at least two occasions for the Ambassador's removal. When those efforts appeared to have failed, Giuliani, Toensing, and Parnas appear to have devised and participated in a coordinated media campaign aimed at using and publicizing disinformation from Lutsenko. It appears that

[2] FARA criminalizes acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities. Activities covered by FARA include acting as a "publicity agent" or engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-12. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* As relevant here, FARA requires any person acting "at the order, request, or under the direction or control" of (i) a foreign principal, or (ii) a person whose activities are "indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," to register with the Attorney General and to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. *Id.*

Giuliani, together with Toensing and Parnas, were incentivized to undertake these efforts on behalf of Lutsenko in at least two different ways. First, in the same discussions in which Lutsenko raised the firing of Ambassador Yovanovitch, he mentioned the possibility of retaining Giuliani to aid in a legal matter or lawsuit in the United States to recover purportedly stolen Ukrainian assets. As discussed below, Giuliani was interested in being engaged to do that work, and proposed a retainer with a $200,000 upfront payment. Thus, it appears that Giuliani and Toensing took steps to cause the firing of the Ambassador to prove to Lutsenko what they could achieve in order to, among other things, secure the legal representation. Second, as discussed below, it appears that Giuliani and Toensing were also motivated to act at Lutsenko's direction and on Lutsenko's request so that Lutsenko would provide derogatory information about, among other things, now-President Joseph Biden and his son Hunter Biden, which would potentially be politically valuable to Giuliani and Toensing. The efforts were successful: the Ambassador was removed from her post in late April 2019. Moreover, despite all these efforts to lobby for the removal of the Ambassador on behalf of Lutsenko, Giuliani, Parnas, and Toensing never filed a FARA registration.

10. As set forth below, based on my review of the Prior Search Warrant Returns, as well as subpoena returns and public sources, there is probable cause to believe that the Requested Information will lead to evidence of the Subject Offenses, and will enable agents to seize cellphones and electronic devices used by Giuliani and Toensing in furtherance of the Subject Offenses.

<u>Giuliani's Involvement with Parnas in 2018</u>

11. Parnas is a Florida-based Ukrainian-American businessman.[3] Giuliani first met Parnas in or around July 2018, and based on my review of materials obtained pursuant to the May 16 Warrant, it appears that over the next several months they started communicating and spending time together on a regular basis. Among other things, based on my review of records obtained pursuant to the January 18 Warrant, it appears that in or around August 2018, Parnas raised with Giuliani the prospect of being hired by Parnas's nascent insurance business, Fraud Guarantee. On or about August 16, 2018, Giuliani emailed Parnas's business partner, David Correia,[4] a one-page draft agreement between Fraud Guarantee and Giuliani's consulting and management firm, Giuliani Partners, which contemplated that Fraud Guarantee would pay Giuliani Partners $500,000 upon signing the agreement, and $100,000 per month thereafter. Based on my review of the materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I know that Giuliani repeatedly requested that Parnas complete the engagement and pay Giuliani Partners the $500,000, and in or about September and October 2018, Parnas induced a third party to make two payments

[3] Parnas has been charged alongside co-defendants Igor Fruman, David Correia, and Andrey Kukushkin in a seven-count indictment which charges Parnas with (i) conspiring to make straw donations, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30122, 30109(d)(1)(A) & (D); (ii) making false statements to the Federal Election Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2; (iii) falsification of records, in violation of 18 U.S.C. § 1519 and 2; (iv) conspiring to violate the foreign donor ban, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30121, 30122, and 30109(d)(1)(A) & (D); (v) soliciting a contribution from a foreign national, in violation of 52 U.S.C. § 30121, 30109(d)(1)(A), and 18 U.S.C. § 2; (vi) aiding and abetting the making of a contribution from a foreign national, in violation of 52 U.S.C. § 30121, 30109(d)(1)(A), and 18 U.S.C. § 2; and (vii) conspiring to commit wire fraud in connection with his business "Fraud Guarantee," in violation of 18 U.S.C. § 1349. Parnas has pleaded not guilty and is scheduled to proceed to trial in October 2021. *See United States v. Parnas, Fruman, Correia, and Kukushkin*, S1 19 Cr. 725 (JPO).

[4] Correia was charged alongside Parnas in indictment S1 19 Cr. 725 (JPO), and has since pleaded guilty and been convicted of (i) making false statements to the Federal Election Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2; and (ii) conspiring to commit wire fraud in connection with "Fraud Guarantee," in violation of 18 U.S.C. § 1349. In February 2021, Correia was sentenced to a term of one year and one day's imprisonment, and is currently serving his sentence.

totaling $500,000. While Giuliani stayed in regular contact with Parnas after receiving the payments, it appears that he did little to no work for Fraud Guarantee.

12. It appears based on my review of the Prior Search Warrant Returns that in or around November or December 2018, Parnas started providing Giuliani with information about Ukraine. For instance, based on my review of those materials, on or about December 7, 2018, Parnas forwarded Giuliani a copy of a letter dated May 9, 2018, which Parnas had caused Congressman Pete Sessions to write and send to Secretary Pompeo, and which called for the firing of Ambassador Yovanovitch. On or about December 14, 2018, Parnas told Giuliani that he was traveling to Ukraine the following day, and texted Giuliani a link to a Ukrainian news article alleging that two Ukrainian government officials broke Ukrainian law in revealing Paul Manafort "black ledgers," which were relevant to the Special Counsel's Office ("SCO") investigation.[5]

13. Based on my review of the Prior Search Warrant Returns, I have learned that while in Ukraine, Parnas met with multiple current and former Ukrainian government officials, including Viktor Shokin, the former Prosecutor General, which is the position equivalent in Ukraine of the United States Attorney General. Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that Correia created notes during or shortly after the Ukraine trip that reflected that Ambassador Yovanovitch was a topic of conversation, and that Shokin and Lutsenko (the then-Prosecutor General) would each provide information regarding alleged corruption by now-President Joseph Biden and Ambassador Yovanovitch. Based on my review of those same materials, it appears that Correia went to Giuliani's residence in New York shortly after returning to the United States to discuss, among other things, the topics contained in those

[5] Based on my involvement in this investigation to date, it is not clear whether Giuliani requested the materials from Parnas because he was interested in Ukraine as a result of the SCO investigation or for other reasons, or if Parnas provided them to Giuliani unprompted.

notes. Additionally, based on my review of the Prior Search Warrant Returns, I have learned that upon returning to the United States, Parnas solicited Giuliani's assistance in arranging a visa for Shokin to come to the United States and, among other things, meet with Giuliani. Based on my review of the Prior Search Warrant Returns, as well as records provided by the State Department and my participation in interviews with officials at the State Department, Giuliani did, in fact, make requests to officials at the State Department that they grant a visa to Shokin, but Giuliani was ultimately unsuccessful in securing a visa.

14. Notwithstanding the negative information that was provided by Parnas to Giuliani in 2018 about Ambassador Yovanovitch, and Giuliani's inability to obtain a visa for Shokin—which from my review of the Prior Search Warrant Returns and participation in the investigation it appears that Parnas and Shokin, if not Giuliani, blamed at least in part on Ambassador Yovanovitch—Giuliani did not seek the Ambassador's removal until after meeting with Lutsenko in late January and early February 2019, as discussed below.

<u>Giuliani's January 2019 Meetings with Lutsenko and Shokin</u>

15. On or about January 25 and 26, 2019, Giuliani, George Boyle (who works for Giuliani Partners), Parnas, and Fruman met with Lutsenko, Gyunduz Mamedov, and Glib Zagorii (both of whom worked with Lutsenko) at the offices of Giuliani Partners in Manhattan. I have reviewed a three and a half page memorandum prepared by Boyle regarding the two-day, multi-hour meeting. The memorandum was obtained from the State Department, and was provided to the State Department by Giuliani, as discussed below. From my review of that memorandum, as well as public statements subsequently made by Parnas and Lutsenko, I have learned, among other things, the following:

a. According to the memorandum, during the January 25 and 26 meetings, Lutsenko stated, in sum and substance, that his predecessor, Shokin, had opened an investigation into

Burisma, in which Hunter Biden, a board member, was implicated. According to the memorandum, Lutsenko also provided information regarding the Manafort "black book." The memorandum also indicated that Lutsenko raised two issues of potential importance to himself. First, it appears from the memorandum that Lutsenko and Giuliani discussed Ambassador Yovanovitch, whom Lutsenko asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine, who Lutsenko claimed asked him to close three cases. According to the memorandum, Lutsenko stated that, in his then-capacity as Prosecutor General of Ukraine, he had re-initiated an investigation into Hunter Biden. Second, it appears from the memorandum that Lutsenko raised allegations that the global investment firm Franklin Templeton held approximately $7 billion dollars in money that had been embezzled from Ukraine since 2010 to benefit pro-Russian Ukrainians. A separate memorandum that appears to also have been prepared by Boyle indicates that Giuliani also spoke by phone with Shokin, who was in Ukraine at that time, on January 23, 2019 regarding some of the same allegations regarding Burisma.

b. Based on my review of statements subsequently made by Lutsenko that were quoted in an article published by the *New Yorker*, Lutsenko claimed that in 2018, his office sent a letter to the legal attaché at Embassy Kiev, requesting the Americans' assistance in recovering assets from Franklin Templeton, but that his office did not receive the requested assistance in pursuing these funds. Accordingly, it appears that Lutsenko was seeking assistance in recovering assets from or bringing legal action against Franklin Templeton, and after he was unsuccessful through formal channels, he raised the issue with Giuliani.

c. Based on my review of the transcript of a televised January 16, 2020 interview of Parnas by Rachel Maddow, I have learned that Parnas stated, among other things, that Lutsenko wanted Yovanovitch removed for "his own career reasons" and that "both Lutsenko and Shokin

had an interest in getting rid of" Yovanovitch. While it is not clear from Parnas's statements the timing of when these messages were conveyed by Lutsenko, Parnas was also asked whether "Lutsenko [was] saying in effect, listen, if you want me to make these Biden allegations, you're going to have to get rid of this ambassador," to which Parnas replied, "absolutely."[6]

16. Based on my review of materials obtained via the Prior Search Warrant Returns, including text messages between Parnas and Giuliani, who was using Target Cellphone-2, I have learned that Giuliani and Parnas exchanged several messages about Lutsenko following those meetings in New York. Specifically, on or about February 4, 2019, Giuliani texted Parnas from Target Cellphone-2 to have a safe flight to D.C., and said "need to lock up law suit for AG [o]f Ukraine," which appears to be a reference to Lutsenko retaining Giuliani to file a lawsuit to recover the Franklin Templeton assets. On or about February 10, 2019, Giuliani texted Parnas from Target Cellphone-2, "Any word on guy [Lutsenko] coming here" and in connection with their upcoming trip to Poland and Ukraine, "Any progress on plane tomorrow[.]" Parnas responded by text to Target Cellphone-2 that "[t]hey," in sum and substance, were calling him shortly and Parnas would find out the details. Shortly thereafter, Parnas texted Target Cellphone-2, in sum and substance, that Lutsenko would meet Giuliani and Parnas on or about February 12, 2019 in Warsaw, Poland.

---

[6] Based on my conversations with the prosecutors assigned to this investigation, I have learned that on or about October 28, 2019, Parnas's counsel proffered to the USAO that all of Parnas's efforts to remove Yovanovitch were done at the direction of President Trump and/or Giuliani, who was himself acting at the direction of President Trump. For the reasons discussed herein, the USAO and FBI do not regard this claim as credible, and believe the evidence provides probable cause to believe that Giuliani and Parnas were acting at the request and/or under the direction of one or more foreign principals, including Lutsenko.

I am also aware that on or about March 4, 2020 Parnas himself provided information to the USAO and FBI, in a proffer session. That information is not being set forth herein as a basis for probable cause. Nonetheless, I am aware that Parnas described ulterior motives for his efforts to seek Ambassador Yovanovitch's removal, in addition to the fact that Lutsenko had requested her removal, including among other things his desire to ingratiate himself with Giuliani and President Trump.

Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that Giuliani and Parnas did then travel to Poland.

Anticipated Retention of Giuliani, Toensing, and diGenova by Lutsenko and Continued Lobbying for Ambassador Yovanovitch's Removal

17. Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that in or around February 2019, Parnas, Giuliani, and Toensing exchanged messages and a draft retainer agreement reflecting Giuliani Partners and Toensing's anticipated representation of Lutsenko in connection with what appears to be the Franklin Templeton allegations. Based on my review of the Prior Search Warrant Returns, as discussed below, it appears that Giuliani, Parnas, and Toensing undertook efforts to cause the removal of Ambassador Yovanovitch from her post at or around the same time they were drafting a retainer agreement to represent Lutsenko. Additionally, as discussed below, it appears from the same materials that those efforts to cause the Ambassador's removal were undertaken at Lutsenko's request or direction, at least in part, in order to secure the retainer agreement to represent Lutsenko in the Franklin Templeton matter. Moreover, as discussed below, based on my review of the Prior Search Warrant Returns, it appears that Lutsenko also incentivized Giuliani, Toensing, and Parnas to cause the Ambassador to be fired by agreeing to provide negative information about now-President Joseph Biden and Hunter Biden, in addition to information Giuliani could use to attack the SCO investigation, all of which appears, from text messages and emails, to have been of significant interest and value to them. Specifically, with respect to the foregoing, I have learned the following, based on my review of materials obtained via the Prior Search Warrant Returns:

a. Toensing became involved in Giuliani and Parnas's efforts to remove Ambassador Yovanovitch on or around February 9, 2019. Based on my review of materials obtained from the Prior Search Warrant Returns (including text messages between Toensing at

Target Cellphone-3 and Giuliani at Target Cellphone-2), I have learned that Giuliani invited Toensing to participate in the matter, with what appears to be the expectation that in exchange for Toensing, Giuliani, and Parnas's efforts to remove Ambassador Yovanovitch from her post, Lutsenko would reward Toensing and Giuliani with a several-hundred thousand dollar retainer agreement which expressly contemplated future paid work by Toensing and Giuliani.[7] Based on my review of materials obtained via the Prior Search Warrant Returns, including text messages between Toensing and Giuliani, who was using Target Cellphone-1 and Target Cellphone-2, I have learned that Toensing and Giuliani had a preexisting relationship and discussed matters related to press appearances and the SCO investigation (they both represented individuals in connection with that inquiry), and that Giuliani introduced Toensing to Parnas in or around February 2019.

b. On or about February 9, 2019, Toensing texted Parnas from Target Cellphone-3, "Anything happening? My emails to you have come back." As discussed above, based on my review of travel records, I have learned that Parnas and Giuliani traveled to Warsaw, Poland and met with Lutsenko, on February 11, 2019.[8] On or about February 11, 2019, Toensing texted

---

[7] Based on my review of a financial analysis prepared based on bank records and public reporting, it appears that around this time, Giuliani had a financial interest in receiving a retainer agreement from Lutsenko. Specifically, in May 2018, Giuliani left his former law firm and its substantial compensation package. Based on my review of a financial analysis of bank records that have been collected to date (which may not include all of Giuliani's checking and credit card accounts), on or around January 25, 2018, Giuliani had approximately $1.2 million cash on hand, and approximately $40,000 in credit card debt. By contrast, on or around January 25, 2019, right before he met with Lutsenko, Giuliani had approximately $400,000 cash on hand in those same accounts and approximately $110,000 in credit card debt. By on or around February 16, 2019, his account balances had dropped to approximately $288,000 and his credit card debt remained over $110,000.

[8] Based on my review of public reporting, I have learned that according to an article published on September 29, 2019 in *Reuters*, Giuliani admitted that he met Lutsenko in Warsaw in February 2019 after first meeting him in New York in January, but that the meeting with Lutsenko in Warsaw was "really social . . . I think it was either dinner or cigars after dinner. Not opportune for substantive discussion." However, this does not appear to be accurate, since as described

Giuliani at Target Cellphone-1 and Target Cellphone-2 and Parnas, from an iCloud account linked to Target Cellphone-3[9]: "Is there absolute commitment for HER to be gone this week?" On or about the same day, Giuliani texted back from Target Cellphone-1 and Target Cellphone-2, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. Pompe[o] is now aware of it. Talked to him on Friday [February 8, 2019]."

c. Toensing, Giuliani, and Parnas exchanged numerous messages following the meeting with Lutsenko regarding Giuliani's drafting of a retainer agreement for Lutsenko, and Parnas's need for information on the status of Ambassador Yovanovitch while he was in Ukraine and meeting with Lutsenko. Specifically, on or about February 14, 2019, Toensing texted Giuliani at Target Cellphone-2 from the Toensing iCloud, which is linked to Target Cellphone-3: "How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA." Toensing then texted Parnas a copy of what she described in a text as her "nudge to Rudy." Parnas then texted Toensing to "nudge [Giuliani] about the Mrs. A.," which appears to be a reference to Ambassador Yovanovitch. Toensing (using Target Cellphone-3) and

herein, Giuliani circulated a draft retainer agreement between Lutsenko, Giuliani Partners, and diGenova & Toensing (a law firm owned by Toensing and her husband, Joseph diGenova) only five days after meeting with Lutsenko, and communicated with Parnas and Toensing about lobbying Pompeo and Trump to remove Yovanovitch on the same day, and in the days following, his meeting with Lutsenko.

[9] Based on my review of materials obtained from Apple and AT&T, I understand that as of the time of the events described above, specifically January through March 2019, Toensing's iCloud account was registered to [redacted] and Target Cellphone-3 (the "Toensing iCloud"). The Toensing iCloud was also registered to an iPad belonging to Toensing that was purchased in 2016, along with several other devices that were purchased prior to 2016. The iCloud messages described above appear to all have been sent from the iPad purchased in 2016 that was linked to Toensing's iCloud account, however, because users can import messages sent from different devices linked to the same iCloud account to those devices, I understand that text messages, emails, and other materials found on Toensing's iCloud account could be located on Target Cellphone-3, her iPad, or both.

Parnas exchanged several messages stating, in sum and substance, that they had followed up with Giuliani about the retainer agreement and complaining about the delay.

d. It appears that Parnas continued to press Toensing and Giuliani for movement on the retainer agreement and the Ambassador's removal while he was in Ukraine meeting with Lutsenko. On or about February 15, 2019, Toensing texted Parnas from Target Cellphone-3 that she had "[t]alked to Rudy" but "[d]id not bring up Retainer as I figured you are on ground in need of it." On or about February 16, 2019, Parnas texted back that he was waiting to hear from Giuliani, and stated to Toensing by text that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." Based on my review of travel records for Parnas, it appears that "here" was a reference to Ukraine. Toensing responded, "That's for Rudy to get tonight." Later that day, Giuliani texted Toensing from Target Cellphone-2: "I'm heading for Florida. Lev meeting with our friend and going over retainer will get it to him today." Based on my involvement in this investigation and review of text messages, I believe that "our friend" was a reference to Lutsenko. Toensing sent Giuliani's message to Parnas and asked if "Rudy c[a]me through," and Parnas confirmed to Toensing that he had received a draft.

e. On or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between "Yuriy Lutsenko, as the General Prosecutor of Ukraine," and Giuliani Partners, Toensing, and diGenova. The retainer amount was $200,000 for services by Giuliani, Toensing, and diGenova in recovering "sums of money in various financial institutions outside Ukraine." Based on my involvement in this investigation, I believe that the description in the agreement of recovering "sums of money in various financial institutions outside Ukraine" was a reference to recovering allegedly stolen assets from Franklin Templeton, which Lutsenko had raised with Giuliani at their first meeting. The agreement also stated that it was a temporary agreement to be

superseded "by a long term agreement." Parnas told Giuliani that same day that he had just met with "the other gentleman," in an apparent reference to Shokin, and that it "went great call me when you can I'll update you."

f. On or about February 17, 2019, Parnas texted Toensing at the Toensing iCloud, which is linked to Target Cellphone-3, to confirm that Giuliani had sent the retainer agreement. Toensing asked Parnas by text if Giuliani "me[]t with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to Giuliani meeting with President Trump to lobby for Ambassador Yovanovitch's removal. Toensing also texted Giuliani at Target Cellphone-2, "What happened with the big Guy re Amb." Giuliani replied, "It is in process." Later that day, Toensing (from Target Cellphone-3) asked Parnas "Was he successful re Amb?" to which Parnas replied "this week," which appears to be a reference to their expectation that as a result of Giuliani's lobbying, President Trump would remove Ambassador Yovanovitch that week. The next day, on February 18, 2019, Parnas told Giuliani to make out the retainer agreement to the Ministry of Justice of Ukraine, attention to Minister Pavlo Petrenko. Giuliani asked "How much?" and Parnas promised to call him shortly, and then followed up regarding the retainer agreement again.

g. Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that Parnas met with Lutsenko regarding the retainer agreement on or around February 21, 2019, and then appears to have met again with Lutsenko several days later to obtain paperwork. On or about February 20, 2019, Parnas texted Giuliani at Target Cellphone-2 to send wire instructions and a "signed copy by you Victoria and joe so they can execute and wire funds." Based on my involvement in this investigation, I believe that "joe" is a reference to Joseph diGenova, Toensing's husband and law partner who, as

discussed herein, later made media appearances promoting the removal of the Ambassador. Later that day, Parnas confirmed that he had "received [the] signed retainer." On the day of the meeting between Parnas and Lutsenko, on or about February 21, 2019, Giuliani texted Parnas from Target Cellphone-2, "How is it going????" to which Parnas replied, "Meeting with [Y]uri [Lutsenko] now everything good." Three days later, Giuliani again asked how things were going, and Parnas responded that he was "meeting with [Y]uri [Lutsenko] in 2 hours he has some paperwork to give us I'll call you after the meeting." On or about the same day, Toensing (from the Toensing iCloud, which is linked to Target Cellphone-3) texted Giuliani at Target Cellphone-2, "What happened with discussion," to which Giuliani replied from Target Cellphone-2, "Told today getting done Saturday I said no need a confirmation and will get it tomorrow." Based on my involvement in this investigation and my review of text messages, it appears that Giuliani was referring to the execution of Lutsenko's retainer agreement and the wiring of funds. However, based on my review of bank records, it does not appear that Lutsenko wired funds to Giuliani at that time, or any subsequent time.

h. On or about February 24, 2019, Toensing (using the Toensing iCloud, which is linked to Target Cellphone-3) texted Giuliani at Target Cellphone-2, "Was the deed done?" On or about February 25, 2019, Toensing texted Parnas to ask, "Is she still there?" Parnas texted back, "Yes." On or about February 25, 2019, Toensing (using the Toensing iCloud, which is linked to Target Cellphone-3) also texted Giuliani at Target Cellphone-2, "Is she still there?" Based on my involvement in this investigation and my review of text messages from the Prior Search Warrant Returns, it appears that Toensing was asking whether Ambassador Yovanovitch had been removed from her post.

Public Media Campaign to Remove Ambassador Yovanovitch

18. Based on my review of the Prior Search Warrant Returns and public sources, I have learned that following Parnas's meeting with Lutsenko in February 2019, and in light of the fact that Giuliani's lobbying efforts up until that point appeared to have been unsuccessful, Parnas, Toensing, Giuliani, and Lutsenko worked with a journalist, John Solomon at *The Hill*, to mount an aggressive and coordinated public media campaign aimed at discrediting and causing the removal of Ambassador Yovanovitch.[10] It appears from my review of the materials that their media campaign began within days of Lutsenko complaining, in early March 2019, to Parnas about actions that Yovanovitch had taken in Ukraine. Specifically, based on my participation in the investigation, my participation in an interview with Ambassador Yovanovitch, my review of public statements made by Lutsenko, Giuliani, and diGenova, and my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. Based on my review of articles published on or around March 6, 2019, I have learned that on or about March 5, 2019, Ambassador Yovanovitch gave a speech in which she called for the removal of an ally of Lutsenko's, Nazar Kholodnytsky, from his government position in Ukraine because he had been accused by NABU of leaking information about corruption investigations to the targets of those investigations. Yovanovitch also criticized the Ukrainian court system, which she described as riddled with compromised judges.

b. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Lutsenko immediately complained about Yovanovitch's statements to Parnas.

[10] Informational materials that an agent disseminates or causes to be disseminated in interstate commerce on behalf of a foreign principal must contain labeling as required by Section 614(b) of FARA. *See* 22 U.S.C. § 614; 28 C.F.R. § 5.400 and 5.402. The articles published in *The Hill* and the subsequent tweets disseminating that information did not contain such labeling.

Specifically, on or about March 5, 2016, the day of Yovanovitch's speech, Lutsenko texted Parnas "Ambassador openly called to fire [Kholodnytsky]."[11] Parnas asked Lutsenko to call him, and Lutsenko texted back, in sum and substance, that the Ambassador had also criticized Ukrainian Supreme Court judges.

c. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that in response to Lutsenko's complaint, on March 8, 2019, Parnas sent Toensing at Target Cellphone-3 a text message containing a photograph of the May 2018 letter written by Congressman Sessions, and she replied by sending the contact information for Solomon. Toensing also texted Giuliani at Target Cellphone-2 to "Contact John Solomon re interview this am."

d. On or about March 8, 2019, Lutsenko texted Parnas and referred to a statement Yovanovitch made in which she called for Kholodnytsky's removal. Parnas texted back, "we are all in the loop," and wrote, in sum and substance, that they were setting up an interview between Lutsenko and a journalist—a reference to Solomon. Lutsenko then sent Parnas the contact info for Kholodnytsky, and Lutsenko wrote: "Nazar [Kholodnytsky] is waiting[,] I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and Lutsenko also discussed setting up an interview between Solomon and then-President Petro Poroshenko of Ukraine, but Lutsenko told Parnas that Poroshenko could not answer questions about "the Ambassador, Biden" in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, Poroshenko was running for re-election, which he would ultimately lose.

e. On or about March 9, Parnas texted Giuliani at Target Cellphone-2 information about the press campaign, and stated, in sum and substance, that he had just spoken with Solomon

[11] Parnas's text messages with Lutsenko were in Russian, and my description of those messages herein are based on preliminary translations of those messages by FBI Russian-language linguists.

and Lutsenko. Parnas also asked Giuliani, by text sent to Target Cellphone-2, to call Parnas so he could "update you very good stuff."

f. However, it appears that Lutsenko grew impatient with Parnas's failure to secure Ambassador Yovanovitch's removal. On or about March 11, 2019, Lutsenko texted Parnas about when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On or about March 13, 2019, Lutsenko texted Parnas, "I am fucking sick of everything. I did not get the visit. My Number One did not get shit. I am ready to shaft your competitor. But you want even more. We do everything. You do later. This is dishonest." Based on my participation in the investigation, this appears to be a reference to Lutsenko and others' willingness to share information about Burisma and the Bidens and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador Yovanovitch or a meeting with Attorney General Barr. On or about March 14, 2019, Parnas texted back, "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or Toensing.

g. At the same time, based on my review of the Prior Search Warrant Returns, it appears that Parnas, Solomon, and Toensing worked together to publicize Lutsenko's allegations through Solomon. On or about March 12, 2019, Parnas received from Shokin a written narrative and answers to questions posed by Solomon about Yovanovitch and the Bidens. Parnas forwarded Shokin's answers to Solomon. Parnas also texted with Lutsenko and conveyed additional information back to Solomon.

h. On or about March 19, 2019, Toensing texted Solomon that she had spoken with "Rudy and Lev" and stated "I have the plan. So call when you can." Based on my review of

the Prior Search Warrant Returns and public reporting, it appears that Parnas set up an interview between Solomon and Lutsenko. On or about March 20, 2019, a portion of Solomon's video interview with Lutsenko and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in *The Hill*. In his interview, Lutsenko claimed he would open an investigation into whether the director of NABU, Sytnyk, attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee Hillary Clinton." In a second video interview published on March 20, 2019, by Solomon in *The Hill*, Lutsenko told Solomon that Ambassador Yovanovitch had given him "a list of people whom we should not prosecute" during their first in-person meeting. *The Hill* reported that Lutsenko was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman Sessions wrote a "private letter asking Secretary of State Mike Pompeo to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." *The Hill* also posted a copy of the letter. The article quoted Sytnyk as describing Lutsenko's allegations as untrue and an "absurd attempt" to discredit NABU.[12]

i. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas continued working to publicize Lutsenko's allegations against Yovanovitch and texted links to Solomon's articles to many of his contacts. On or about March 20, 2019, Parnas sent [redacted], the development director of [redacted] (to whom Parnas had previously donated in the name of a corporation), links to both of Solomon's articles

[12] Based on my participation in an interview with Ambassador Yovanovitch, I have learned that each of Lutsenko's claims were either false or fabrications. Ambassador Yovanovitch did not give Lutsenko a "do not prosecute" list or direct him to prosecute, or not prosecute, anyone. Similarly, Ambassador Yovanovitch and the U.S. embassy did not show political bias, but were focused on implementing U.S. policy in Ukraine. Indeed, Lutsenko himself retracted or otherwise walked back many of these claims in subsequent interviews and statements.

in *The Hill*, along with links to tweets by Laura Ingraham and Sean Hannity. Parnas instructed [redacted], "have jr retweet it," in reference to Donald Trump Jr. [redacted] did so, and confirmed to Parnas, "sent." Trump, Jr. subsequently retweeted an article summarizing Solomon's reporting in the Daily Wire, entitled "Calls Grow to Remove Obama's U.S. Ambassador to Ukraine." Moreover, while it is not known how he came across the article, on March 20, 2019, then-President Trump also retweeted one of the links that Parnas had sent to [redacted]: an article entitled "As Russia Collusion fades, Ukrainian plot to help Clinton emerges." [redacted] sent a copy of President Trump's tweet to Parnas.

j. Parnas frequently updated Lutsenko on the success of their press blitz in Russian-language text messages. In particular, Parnas promptly sent a screenshot of then-President Trump's tweet to Lutsenko. In an apparent effort to garner more information for Solomon, Parnas asked Lutsenko to send him "the names of the people that she said," which appears to be a reference to Yovanovitch and the "do not prosecute list" Lutsenko claimed she had given him. Lutsenko sent Parnas three names and described them all as "loud NABU activist[s]." Based on public reporting and my participation in this investigation, including my interview with Ambassador Yovanovitch, it appears that Lutsenko may have clashed with Yovanovitch regarding what he perceived to be a rival prosecutor's office in Ukraine, the National Anti-corruption Bureau of Ukraine ("NABU") in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for Lutsenko to falsely claim that Yovanovitch had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated Lutsenko and told him that "Today you become a world-class political figure. Glory to the Ukraine !!!" Lutsenko then texted Parnas if it was "true, that the Ambassador chick and [the head of NABU] were called to Washington," to which Parnas replied, "I will call later. We'll talk." Parnas then reported to

Lutsenko by text message, in sum and substance, that then-President Trump had re-tweeted a story about Yovanovitch. Lutsenko responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that Lutsenko's reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

k. The day after *The Hill* published the Lutsenko interview, on or about March 21, 2019, Parnas wrote Solomon and Toensing that the top news story in Ukraine was the reporting regarding Ambassador Yovanovitch, which according to Parnas prompted the Ambassador to put out a statement saying that Lutsenko was a "prime example of corruption." Based on my review of text messages, Lutsenko was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," Lutsenko continued, "they are saying in the State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call Lutsenko and had "good news."

l. Lutsenko continued to complain to Parnas about the lack of results with respect to Yovanovitch's removal. On or about March 22, 2019, Lutsenko wrote that "It is simply that if you do not make a decision regarding the madam, you cast doubt on all of my statements, including regarding B." Based on my review of a televised January 16, 2020 interview with Rachel Maddow, Parnas confirmed that the "madam" was Yovanovitch and "B" was "Biden," and that Parnas understood Lutsenko to be saying, in sum and substance, that if Parnas wanted Lutsenko to make Biden allegations (and for those allegations to be taken seriously), he needed to have Yovanovitch removed. Meanwhile, Giuliani continued to lobby then-President Trump for Ambassador Yovanovitch's removal, and on or about March 22, 2019, Giuliani texted Toensing (at the



2019.07.24

Toensing iCloud, which is linked to Target Cellphone-3) from Target Cellphone-2, apparently in reference to then-President Trump and the letter from Congressman Sessions calling for Yovanovitch's removal, that "he has letter says she's gone no more screwing around[.]"

m. Based on my review of public reporting, Solomon's articles soon received substantially increased press attention. On or about March 22, 2019, on *The Ingraham Angle* on Fox News, Ingraham aired a segment highlighting that former-Congressman Sessions sent Secretary of State Pompeo "an urgent letter" in May 2018, asking that Ambassador Yovanovitch be removed from her position, and published a copy of that letter. DiGenova was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman Sessions. She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . . and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that then-President Trump had decided, at least at that point, to fire Yovanovitch appears to be the "good news" that Parnas reported back to Lutsenko two days prior.

n. Later that day, in an apparent reference to diGenova's Fox News interview, Parnas texted Toensing at Target Cellphone-3, "I love you and your husband you are the best," and "Tell joe he was awesome my hero." Toensing responded from Target Cellphone-3, "We can be really great if we have a retainer signed." Based on my participation in the investigation as well as my review of the Search Warrant Returns, I believe that Toensing was telling Parnas, in sum and substance, that her and her husband's efforts to seek the Ambassador's removal were an indicator of how "great" they could be for Lutsenko, and how much more they could do for him,

if he signed the retainer agreement and paid them. Parnas agreed, and Toensing (from Target Cellphone-3) asked if the "Wicket [sic] Witch" was gone, which appears to be a reference to Yovanovitch. Giuliani separately texted Toensing (at the Toensing iCloud, which is linked to Target Cellphone-3) from Target Cellphone-2 to say that "Joe is my hero and you too." Based on my review of public statements made by Giuliani and Toensing, I have learned that around this time, Toensing and Giuliani frequently posted messages related to Ukraine, Yovanovitch, Biden, and the 2016 election on Twitter, apparently in an effort to further magnify the press attention Lutsenko's allegations against Yovanovitch would receive.

o. Based on my participation in an interview with [redacted], a public relations strategist with whom Parnas had previously worked (and to whom he owed money), I have learned that on or about March 22, 2019, Parnas met or spoke with [redacted] and asked him to help Parnas in his efforts to disseminate negative information about the Ambassador. Based on my review of the Prior Search Warrant Returns, it appears that after the meeting, at Parnas's instruction, Correia sent [redacted] a copy of Congressman Sessions's letter, links to *The Hill* articles, and a number of tweets about the Ambassador. Parnas then texted [redacted], "Please send it to me when it goes out." [redacted] sent the materials forwarded by Correia to Ryan Saavedra, a reporter for *The Daily Wire*, as well as a number of conservative social media influencers such as Seb Gorka and Arthur Schwartz, among others. Saavedra published an article in *The Daily Wire* and those influencers tweeted about the Ambassador. On or about March 24, 2019, as discussed above, Donald Trump Jr. retweeted *The Daily Wire* article.

p. Although Parnas, Giuliani, and Toensing appeared to have been pleased with the press response in the U.S., as noted above, the press response in Ukraine was unfavorable to Lutsenko. On or about March 26, 2019, Lutsenko texted Parnas pictures of documents that

allegedly contained information about Burisma, and noted, "I hope this is enough." He then complained to Parnas, in sum and substance, that despite the information he was gathering about Biden, the Ambassador had not been fired. In particular, he stated: the "Washington Post is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the conversation. My case on Zlochevskyy [the head of Burisma] is moving along nicely. There is evidence about transfers to B [Biden]. And only you cannot get rid of that fool of a woman ☹." Parnas wrote back, "She is not a simple fool of a woman. Believe me. Well, she will have nowhere to go."

q. On or about March 29, 2019, Parnas wrote to Lutsenko, "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." Lutsenko then told Parnas that he had additional documents related to Burisma's payments to Hunter Biden, and when Parnas asked Lutsenko to send them to him, Lutsenko replied that he would "forward through the new Ambassador ☺."

r. Over the next several days, Parnas continued to feed information to Solomon, who asked Parnas by text to "eyeball" articles for "accuracy," and continued to publish articles in *The Hill*. On or about March 27, 2019, Parnas told Giuliani that "Hannity just canceled [on Solomon]," which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on or about March 30, 2019, Giuliani confirmed that he would be appearing on Fox News that morning, to which Parnas responded, "Great." Parnas sent some of Solomon's articles to Giuliani, among many other contacts. Solomon also texted with Toensing (at the Toensing iCloud, which is linked to Target Cellphone-3) about Sean Hannity's show canceling on him.

Solomon texted Toensing, "I think everything will be fine once we get Biden reported next [w]eek" and said that "Pompeo told [Giuliani] that ambassador under criminal investigation." Toensing texted back, "Geez. So what could possibly be the rationale to keep her? Makes no sense."

s. When Yovanovitch still had not been removed, Lutsenko continued his complaints about Yovanovitch to Parnas. On or about March 29, 2019, Lutsenko told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding Poroshenko. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On or about April 2, 2019, Lutsenko texted Parnas, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week." On or about April 9, 2019, Lutsenko provided the names of "Advisors and public speakers of the presidential candidate" Volodymyr Zelensky, who was running against Poroshenko, and their alleged connections to Yovanovitch (to whom Lutsenko referred by her nickname, "Masha"), and wrote that the candidate for Prosecutor-General—who would replace Lutsenko in the event Zelensky was elected—was a "Favorite activist of Masha."

Giuliani's Continued Lobbying of the State Department for Ambassador Yovanovitch's Removal

19. Around this time, based on my review of materials obtained from the State Department as well as public statements made by Giuliani, I have learned that Giuliani facilitated the delivery of a package of materials to Secretary Pompeo in furtherance of his efforts to seek Ambassador Yovanovitch's removal. According to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Pompeo received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani with Shokin and Lutsenko from January 2019 regarding Burisma, Biden, and Yovanovitch. The

documents were separated into folders that bore the insignia of the Trump Hotel. The package also contained Solomon's March 20, 2019 articles (discussed above) featuring his interview with Lutsenko, along with documents that appeared to be Solomon's notes and emails regarding the articles.

20. On or about October 2, 2019, Giuliani confirmed to CNN that the package originated with him, and that he gave the documents to the White House, which then passed them to Secretary Pompeo. Giuliani claimed that Pompeo told him that Pompeo would refer the matters detailed in the documents for further investigation.

Continued Efforts to Formalize Relationship with Lutsenko and Seek Ambassador Yovanovitch's Removal

21. Parnas, Toensing, and Giuliani made continued efforts to formalize the relationship with Lutsenko in April 2019. Specifically, based on my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. On or about April 13, 2019, Giuliani sent Parnas a message from [redacted]@icloud.com, which contained a new retainer agreement, this one between Toensing and diGenova and Lutsenko and his deputy, Kulyk.[13] The agreement indicated that Lutsenko was retaining diGenova & Toensing, LLP to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections." The agreement also noted that the firm's services "may entail activities subject to

[13] Based on my review of publicly available material, I have learned that Kulyk worked under Lutsenko at that time as the deputy head of International Legal Cooperation. According to an article published on October 5, 2019 in the *New York Times*, Yovanovitch asked Lutsenko to remove Kulyk at a meeting in 2016 due to Kulyk's corruption.

mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain of its activities on behalf of foreign political parties or entities." Per the agreement, Lutsenko would pay a $125,000 retainer and $25,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that Toensing subsequently signed a copy of each of the three retainer agreements. Lutsenko did not ultimately pay Giuliani or Toensing any money. Shortly after receiving the retainer, Toensing wrote to Solomon to nudge him on questions for additional Ukrainian interviews because "Lev wanted me to work with you," and reported, presumably about the retainer, that "Lev says Yuri should be client."

b. Between in or around April 11 and 23, 2019, Parnas worked with Solomon to arrange additional interviews with Ukrainian government officials, and provided the questions that Solomon would ask one official. Solomon ran multiple articles during that period. However, Lutsenko walked back some of his claims and told *The Babel* on or about April 17, 2019 that Ambassador Yovanovitch had never provided him with a "do not prosecute" list, and it was instead he who had requested that list. In addition, on or about April 21, 2019, Zelensky won the Ukrainian presidential runoff against Poroshenko.

c. On or about April 23, 2019, Parnas texted Giuliani at Target Cellphone-2 to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on or about May 4, 2019, Giuliani texted Parnas from Target Cellphone-2, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day, Lutsenko told Parnas that "People here are talking that there

will be a very high level coming from you to the [Ukrainian] inauguration,"[14] to which Parnas replied "You do understand Who is dealing with this." Two days later, on or about May 6, 2019, the State Department confirmed that Ambassador Yovanovitch would leave her post on May 20, 2019. That same day, Parnas reported to Giuliani and Solomon that "Lutsenko [] said Ukraine media is saying that the ambassador is being recalled by us."

d. On or about May 9, 2019, Parnas forwarded to Lutsenko three articles entitled "Giuliani previews potential 2020 attack dog role with Biden-Ukraine story," "How Rudy Giuliani's unfounded claims of an anti-Trump conspiracy in Ukraine may have ousted an ambassador," and "Giuliani plans Ukraine Trip to Push for Inquiries That Could Help Trump." However, Toensing appears to have not been pleased with the press coverage regarding her relationship with Lutsenko. On or about May 9, 2019, Toensing texted Giuliani at Target Cellphone-2 if he told the *New York Times* that she had been representing Lutsenko, because "I do not have a client." Giuliani responded "Sorry I thought that's why you were coming?" Toensing wrote, "Pls call. NYT now after me for not registering under FARA. I told you earlier today I had no Retainer with anyone. Now I am being accused of violating FARA. This needs to be corrected ASAP."[15] Giuliani replied by text from Target Cellphone-2, "Really." Toensing wrote Parnas

---

[14] Based on my review of public reporting, I have learned that the 2019 Ukrainian election was held on March 31 and April 21 in a two-round system. Volodymyr Zelensky won the election in the second round with 73% of the vote, defeating the incumbent President Poroshenko. Zelensky's inauguration was May 20, 2019.

[15] Based on my review of public statements made by a spokesman for Toensing to the *Washington Post* on or about November 27, 2019, I have learned that Toensing and diGenova had "agreed to represent people they described as 'Ukrainian whistleblowers'" and that those discussions included a possible representation of Lutsenko. However, "all of the retainer letters under consideration included 'the necessary notice of FARA registration,'" which according to the article, "suggest[ed] the couple had planned to register as foreign lobbyists if the agreements had been executed. (*See* https://www.washingtonpost.com/politics/giuliani-was-in-talks-to-be-paid-by-ukraines-top-prosecutor-as-they-together-sought-damaging-information-on-

"Pls tell me name of client. What happened? I do not represent Lutsenko. Or anyone else at this moment . . . Who is the person I am supposed to represent? Rudy told NYT I had been representing Lutsenko. I need to get retainer done so this is cleared up." Parnas texted back, "I'm not aware of that but don't worry we will clear everything up [once] you['re] here and will get retainer signed." Toensing asked again for the "complete name so I can have office draft retainer."[16]

e. On or about May 13, 2019, Giuliani texted Parnas from Target Cellphone-2 a public statement Giuliani intended to make calling for the Bidens to be investigated. Parnas responded "Awesome." Around that time, Parnas sent Lutsenko a copy of a statement issued by

democrats/2019/11/27/636c3e86-112d-11ea-b0fc-62cc38411ebb_story.html). While this statement and the above-referenced text messages reflect a self-professed intention to register for FARA based on Toensing's representation of Lutsenko in the Franklin Templeton matter once there was a signed contract, even assuming those statements are credited, FARA explicitly does not require a written contract. *See* 22 U.S.C. § 612(a)(4). Moreover, the evidence described above indicates that Toensing, Giuliani, and Parnas never had any intention of registering for FARA based on their representation of Lutsenko in connection with their efforts to seek Ambassador Yovanovitch's removal at Lutsenko's direction and request; only that they may have intended to register in connection with the more innocuous-sounding "recovery of stolen assets."

[16] Based on my review of public statements made by Giuliani, I have learned, among other things, that Giuliani (i) told the *New York Times* in an interview on November 27, 2019, that, with respect to the proposed contract with Lutsenko, "I thought that would be too complicated. I never received a penny." (*See* https://www.nytimes.com/2019/11/27/nyregion/giuliani-ukraine-business-trump.html); and (ii) stated on Twitter on November 27, 2019, that "I did NOT pursue a business opportunity in Ukraine, as [the *New York Times*] misrepresented. I could have helped them recover $7B in stolen money, but I didn't. Was paid ZERO." (*See* https://twitter.com/RudyGiuliani/status/1199823401663258624). As noted above, Toensing made similar statements, distancing herself from representation of Lutsenko, after the relationship became public in May 2019 reporting in the *New York Times*. However, based on my review of the information described herein, Giuliani's and Toensing's statements, made after intense media focus on their relationship with Lutsenko and role in Ambassador Yovanovitch's removal, appear to be inconsistent with the materials described herein and indeed intended to distance them from the conduct under investigation. For instance, as described herein, Giuliani appeared close to going forward with the representation of Lutsenko in late February 2019, having sent a retainer agreement and Parnas having requested wiring instructions from Giuliani to send to Lutsenko, and it appears the only reason it did not go forward is because Lutsenko did not wire the money.

Giuliani. On or about June 21, 2019, Lutsenko wrote Parnas, "I think it is time for us to talk with the Mayor. I have 2-2.5 months and I have a plan. I am serious. We have to talk."

Knowledge of FARA and Absence of FARA Registration

22. Based on my review of a publicly-available FARA registration database maintained by the Department of Justice, I have learned that Parnas, Giuliani, and Giuliani Partners have never filed a FARA registration. Additionally, based on my review of those same records, I know that Toensing previously registered under FARA and therefore it appears was aware of the requirement. Specifically, the firm of diGenova & Toensing LLP previously registered on behalf of the Kurdistan Democratic Party, but never made a filing related to Ukraine or Lutsenko. Based on my review of the Prior Search Warrant Returns, I have learned from Toensing's statements in text messages, discussed above, as well as the language of her draft retainer, that she is aware of FARA's registration requirements.

23. As detailed below, notwithstanding the fact that Giuliani and Parnas had not previously registered, it appears that both Parnas and Giuliani were aware of the FARA registration requirement. Specifically, based on my review of publicly available FARA filings, press reports, and materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. On or about July 11, 2018, *The Washington Post* ran an article on Giuliani's work on behalf of foreign clients while he was working for President Trump, and in response to a request for comment, Giuliani stated: "I've never lobbied [President Trump] on anything . . . I don't represent foreign governments in front of the U.S. government. I've never registered to lobby." In September 2018, seven United States Senators wrote to the Justice Department to request a review into whether Giuliani had complied with FARA. In response to the letter, Giuliani

told *The Wall Street Journal* that he was working for a U.S. firm and was not trying to influence U.S. policy. He added that he "did nothing to invoke FARA either now or ever" and "never represented foreign interests with [the] U.S. government."

b. Parnas explicitly discussed FARA or was privy to materials about it on multiple occasions. First, in or around January 2017 Parnas sent a contact an article that specifically referenced a FARA registration on behalf of the Ukrainian government. Second, on or about March 5, 2019, one of Parnas's contacts sent him a FARA registration filed by a third party, and Parnas confirmed "Got it." Notably, that FARA registration was completed regarding lobbying work done on behalf of two embassies (the Embassy of Japan and Liberia) and on behalf of a foreign individual in order to arrange meetings with Congressional representatives and staffers, and set up a Liberian congressional caucus. Third, in or around April 2019, Parnas texted with [redacted], a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding Solomon and Lutsenko. On or about April 24, 2019, as part of a conversation unrelated to the lobbying activities detailed above, Parnas asked [redacted] to send him the "fara registration," and [redacted] responded with a FARA registration completed by a public relations firm on behalf of Zelensky.

* * *

24. Based on the above, there is probable cause to believe that the efforts by Giuliani, Toensing, and Parnas to seek the removal of Ambassador Yovanovitch were done at the direction and/or request of Lutsenko, as a part and in furtherance of the Subject Offenses.[17] Based on my

[17] Based on my review of public statements made by Giuliani, I have learned that Giuliani has made statements intended to suggest that he sought Ambassador Yovanovitch's removal for reasons independent of his desire to gain business from Lutsenko. Giuliani told the *New York Times* in a December 16, 2019, interview that he "gave them [President Trump and Secretary

training, experience, and involvement in this investigation, I believe there is probable cause to believe that the Requested Information will lead to evidence of violations of the Subject Offenses. In particular, I believe that prospective precision location from the Target Cellphones may lead to the location of the Target Cellphones and thus the discovery of evidence of violations of the Subject Offenses. As detailed above, each of the Target Cellphones appears to have been used by a Target Subject of the investigation to communicate with other Target Subjects, and similarly appears to have been used to communicate regarding and/or in furtherance of the Subject Offenses. As such, the Target Cellphones are each likely to contain evidence of the Subject Offenses.

25. Additionally, based on materials from AT&T as well as a commercial database frequently relied upon by law enforcement, the Target Cellphones all appear to remain active. Accordingly, prospective precision location information will assist law enforcement in conducting

---

Pompeo] the facts. I mean, did I think [Ambassador Yovanovitch] should be recalled? I thought she should have been fired. If I was attorney general, I would have kicked her out. I mean – Secretary of State," and that he had "pointed out to the president a couple of times … what I had learned about the visa denials. I may or may not have passed along the general gossip that the embassy was considered to be a kind of out-of-control politically partisan embassy, but that was like, general gossip, I didn't report that as fact." (https://www.nytimes.com/2019/12/16/us/politics/giuliani-yovanovitch-ukraine.html). In an interview with the *New Yorker* published on December 16, 2019, Giuliani stated, "I believed that I needed Yovanovitch out of the way. She was going to make the investigations difficult for everybody." (https://www.newyorker.com/magazine/2019/12/23/the-ukrainian-prosecutor-behind-trumps-impeachment?verso=true). In a December 16, 2019, television interview he stated, "I didn't need [Ambassador Yovanovitch] out of the way. I forced her out because she's corrupt." (https://www.youtube.com/watch?v=qFCeznGIXKs). Giuliani stated on Twitter on December 17, 2019 that "Yovanovitch needed to be removed for many reasons most critical was denying visas to Ukrainians who wanted to come to US and explain Dem corruption in Ukraine. She was OBSTRUCTING JUSTICE and that's not the only thing she was doing. She at minimum enabled Ukrainian collusion." As detailed herein, these statements appear to be inconsistent with the evidence, including the fact that Giuliani did not take actions to seek the Ambassador's firing until *after* Lutsenko had offered a retainer in connection with a potential legal matter, which strongly suggest that acting at Lutsenko's request and direction appears to have been a strong motivating factor for Giuliani. Moreover, and tellingly, none of these statements makes reference to that retainer or the offer of negative information about the Bidens that Lutsenko offered Giuliani shortly before Giuliani's lobbying efforts began.

physical surveillance on the Target Subjects with the purpose of enabling law enforcement to identify and/or confirm the current places of residence of the Target Subjects in advance of potential additional investigative steps such as seeking to seize the Target Cellphones themselves and/or other electronic or physical evidence that may be found in the Target Subjects' possession.

26. Moreover, with respect to the additional historical cell site information for the Target Cellphones requested by this application, based on my training and experience, individuals who use cellphones for personal business and/or criminal activity typically carry those cellphones with them, and so historical cell site data can provide information about where the user of the cellphone was located on a historical basis. Historical cell site information is requested for the time period of December 1, 2018 (when Parnas provided information to Giuliani about Yovanovitch) through April 30, 2019 (at which time Yovanovitch was removed). As detailed extensively above, during this time period, Giuliani and Toensing were engaged in a continuous course of activity related to their efforts to cause the removal of the Ambassador, including frequent meetings and communications, including meetings and communications with Government officials who were the subject of their lobbying efforts, meetings with Lutsenko and other Ukrainians in New York and Poland; and meetings with each other in furtherance of the Subject Offenses throughout December 2018 to April 2019. This information will provide information about Giuliani's and Toensing's whereabouts during this key period under investigation, and may establish, among other things, the fact of meetings with each other, Parnas, Solomon, Lutsenko, and/or U.S. Government officials. Therefore, I submit that there is probable cause to believe that the historical cell site location information associated with the Target Cellphones for the time period specified below will confirm, among other things, whether Toensing and Giuliani were in the vicinity of

other potential witnesses and/or co-conspirators at particular points in time when the Target Subjects were believed to have been together at meetings in furtherance of the Subject Offenses.

27. The requested historical cell site information will also lead to evidence of where Giuliani and Toensing were located when they sent and received certain electronic messages in furtherance of the Subject Offenses.

## III. Request for Warrant and Order

28. Based on the foregoing I respectfully request that the Court require the Service Provider to provide the Requested Information as specified further in the Warrant and Order proposed herewith, including prospective precision location and cell site data for a period of 45 days from the date of this Order; historical cell site data and toll records for the period from December 1, 2018 to April 30, 2019; and pen register information for a period of 45 days for the Target Cellphones from the date of this Order.

29. **Nondisclosure.** The existence and full scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets to the scope of the Government's investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, given that targets of the investigation are known to use computers and electronic communications in furtherance of their activity, the targets could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3).

30. Accordingly, there is reason to believe that, were the Service Provider to notify the subscribers or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Service Provider be directed not to notify the subscriber or others of the existence of the Warrant and Order

for a period of one year, and that the Warrant and Order and all supporting papers be maintained under seal until the Court orders otherwise, as specified in the Application submitted in conjunction with this Affidavit.

[redacted]
Special Agent
FBI

Sworn to before me by reliable electronic means this
13th day of April, 2021

J. PAUL OETKEN
United States District Judge